**TO: Clerk's Office**
**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

_____

**APPLICATION FOR LEAVE**
**TO FILE DOCUMENT UNDER SEAL**

*********************************

United States

      -v.-                     **20-935 M**

FAWAZ OULD AHMED OULD AHEMEID,       Docket Number

*********************************

SUBMITTED BY: Plaintiff____ Defendant____ DOJ ✔____
Name: _AUSA Michael Keilty_____
Firm Name:USAO-EDNY_____
Address:___271 Cadman Plaza E._____
_____Brooklyn, NY 11201_____
Phone Number: _718-254-7528_____
E-Mail Address:michael.keilty@usdoj.gov_____

INDICATE UPON THE PUBLIC DOCKET SHEET: YES____ NO ✔
**If yes, state description of document to be entered on docket sheet:**

_____

_____

_____

**A) If pursuant to a prior Court Order**:
Docket Number of Case in Which Entered:_____
Judge/Magistrate Judge:_____
Date Entered:_____

_____

**B) If a _new_ application,** the statute, regulation, or other legal basis that authorizes filing under seal

ongoing criminal investigation_____

**ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE, AND MAY _NOT_ BE UNSEALED UNLESS ORDERED BY THE COURT.**

DATED: Brooklyn_____, NEW YORK
       10/09/20
_____*Vera M. Scanlon*_____

**U.S. MAGISTRATE JUDGE**

RECEIVED IN CLERK'S OFFICE_10/09/20_____
                                DATE

**MANDATORY CERTIFICATION OF SERVICE**:
**A.)** ___ A copy of this application either has been or will be promptly served upon all parties to this action, **B.)** ___ Service is excused by 31 U.S.C. 3730(b), or by the following other statute or regulation:_____; or **C.)** _✔_This is a criminal document submitted, and flight public safety, or security are significant concerns. (Check one)

____10/09/2020_____       _*Michael T. Keilty*_____
      DATE                         SIGNATURE

DMP:MEL/MTK
F. #2019R00929

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

    - against -

FAWAZ OULD AHMED OULD AHEMEID,
    also known as "Ibrahim Idress" and "Ibrahim
    Dix,"

                  Defendant.

– – – – – – – – – – – – – X

20-935 M

**TO BE FILED UNDER SEAL**

C O M P L A I N T   A N D
A F F I D A V I T   I N   S U P P O R T
O F   A R R E S T   W A R R A N T

(18 U.S.C. §§ 844(h)(1), 844(h)(2),
924(c)(1)(A)(i), 924(c)(1)(A)(ii),
924(c)(1)(A)(iii), 924(c)(1)(B)(ii),
924(j)(1), 2332(a)(1), 2339B(a)(1), 2
and 3551 et seq.)

EASTERN DISTRICT OF NEW YORK, SS:

         CRAIG MATTEO, being duly sworn, deposes and states that he is a Special

Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as

such.

COUNT ONE
(Murder of Anita Ashok Datar)

         On or about November 20, 2015, within the extraterritorial jurisdiction of the

United States, the defendant FAWAZ OULD AHMED OULD AHEMEID, also known as

"Ibrahim Idress" and "Ibrahim Dix," together with others, did knowingly and intentionally

kill Anita Ashok Datar, a national of the United States, while such national was outside the

United States, which killing was a murder as defined in Title 18, United States Code, Section

1111(a).

         (Title 18, United States Code, Sections 2332(a)(1), 2 and 3551 et seq.)

## COUNT TWO
(Brandishing and Discharging a Firearm During a Crime of Violence)

On or about November 20, 2015, within the extraterritorial jurisdiction of the United States, the defendant FAWAZ OULD AHMED OULD AHEMEID, also known as "Ibrahim Idress" and "Ibrahim Dix," together with others, did knowingly and intentionally use and carry one or more firearms during and in relation to a crime of violence, to wit: the crime charged in Count One, and did knowingly and intentionally possess such firearms in furtherance of said crime of violence, which firearms were brandished and discharged, one or more of which firearms was a machinegun.

(Title 18, United States Code, Sections 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(B)(ii), 2 and 3551 et seq.)

## COUNT THREE
(Causing the Death of Anita Ashok Datar Through the Use of a Firearm)

On or about November 20, 2015, within the extraterritorial jurisdiction of the United States, the defendant FAWAZ OULD AHMED OULD AHEMEID, also known as "Ibrahim Idress" and "Ibrahim Dix," together with others, in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the crime charged in Count Two, did knowingly and intentionally cause the death of a person through the use of a firearm, which killing was a murder as defined in Title 18, United States Code, Section 1111(a), in that the defendant, together with others, with malice aforethought, did unlawfully kill, and cause the killing of, Anita Ashok Datar willfully, deliberately, maliciously and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

## COUNT FOUR
### (Conspiracy to Provide Material Support to Foreign Terrorist Organizations)

In or about and between February 2008 and April 2016, both dates being approximate and inclusive, within the extraterritorial jurisdiction of the United States, the defendant FAWAZ OULD AHMED OULD AHEMEID, also known as "Ibrahim Idress" and "Ibrahim Dix," together with others, did knowingly and intentionally conspire to provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b), including property, services and personnel, including himself and others, to foreign terrorist organizations, to wit: (1) al-Qaeda in the Islamic Maghreb ("AQIM"), which at all relevant times was designated by the Secretary of State as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act, and (2) al-Murabitoun, which at all relevant times was designated by the Secretary of State as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act, knowing that AQIM and al-Murabitoun were designated foreign terrorist organizations and that AQIM and al-Murabitoun had engaged in and were engaging in terrorist activity and terrorism, and the offense occurred in and affected interstate and foreign commerce, and the offense resulted in the death of one or more persons.

(Title 18, United States Code, Sections 2339B(a)(1) and 3551 et seq.)

## COUNT FIVE
### (Provision and Attempted Provision of Material Support to a Foreign Terrorist Organization)

In or about and between February 2008 and April 2016, both dates being approximate and inclusive, within the extraterritorial jurisdiction of the United States, the defendant FAWAZ OULD AHMED OULD AHEMEID, also known a "Ibrahim Idress," and "Ibrahim Dix," together with others, did knowingly and intentionally provide and attempt to

provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b), including property, services and personnel, including himself and others, to foreign terrorist organizations, to wit: (1) AQIM, which at all relevant times was designated by the Secretary of State as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act, and (2) al-Murabitoun, which at all relevant times was designated by the Secretary of State as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act, knowing that AQIM and al-Murabitoun were designated foreign terrorist organizations and that AQIM and al-Murabitoun had engaged in and were engaging in terrorist activity and terrorism, and the offense occurred in and affected interstate and foreign commerce, and the offense resulted in the death of one or more persons.

(Title 18, United States Code, Sections 2339B(a)(1), 2 and 3551 et seq.)

## COUNT SIX
(Use of Explosives)

In or about and between August 2015 and November 2015, within the extraterritorial jurisdiction of the United States, the defendant FAWAZ OULD AHMED OULD HEMEID, also known as "Ibrahim Idress," and "Ibrahim Dix," together with others, did knowingly and intentionally use one or more explosives, to wit: grenades, to commit one or more felonies, to wit: the crimes charged in Counts One, Four and Five, which felonies may be prosecuted in a court of the United States, and did knowingly and intentionally carry such explosives during the commission of said felonies.

(Title 18, United States Code, Sections 844(h)(1), 844(h)(2), 2 and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been assigned to the New York Joint Terrorism Task Force ("JTTF") for approximately two years.   During my tenure with the FBI, I have participated in numerous investigations involving terrorists and foreign terrorist organizations, during the course of which I have, among other things, conducted physical surveillance, interviewed witnesses, executed court-authorized search warrants and used other investigative techniques to secure relevant information.   I am familiar with the facts and circumstances set forth below from my participation in the investigation and from reports of other law enforcement officers involved in the investigation.

A.  AQIM and al-Murabitoun

2.      From in or about 1989, up to and including the date of the filing of this application, al-Qaeda has been an international terrorist group that is dedicated to opposing non-Islamic governments with force and violence.   Usama Bin Laden ("Bin Laden") was the leader or "emir" of al-Qaeda until his death on May 2, 2011.   Following Bin Laden's death, Ayman al-Zawahiri ("al-Zawahiri") – who had previously served as a senior associate of Bin Laden and later as the deputy leader of al-Qaeda – assumed the role of al-Qaeda's emir.   Al-

---

[1]  Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.   In addition, some of the communications referenced in this Complaint reflect draft translations of statements originally made in Arabic and are subject to revision.   Unless otherwise indicated all statements attributed to the defendant or any other individual are in sum, substance and part.   Social media posts, messages and other electronic communications quoted herein have not been edited to correct grammatical and/or spelling errors.

Zawahiri remains al-Qaeda's emir to this date.   Members of al-Qaeda typically have pledged an oath of allegiance (called a "bayat") to Bin Laden and al-Qaeda.

3.      The core purpose of al-Qaeda, as stated by Bin Laden and other al-Qaeda leaders, is to leverage violent attacks against property and nationals, both military and civilian, of the United States and other Western countries to drive U.S. forces from Islamic countries, including Saudi Arabia and Somalia, and to eliminate American support for the governments of other Islamic countries.   Between 1989 and 2001, al-Qaeda established training camps, guest houses and business operations in Afghanistan, Pakistan, and other countries for the purpose of training and supporting its agenda of violence and murder. Members and associates of al-Qaeda, both known and unknown, have executed a number of terrorist attacks all in furtherance of the organization's stated goal to kill Americans, including the September 11, 2001 attacks in New York, Virginia and Pennsylvania, which killed approximately 2,976 people.

4.      Al-Qaeda functions both on its own and through various terrorist organizations that operate under al-Qaeda's umbrella.   One of those organizations is AQIM. AQIM is a terrorist organization operating in North and West Africa.   AQIM formerly called itself the Salafist Group for Preaching and Combat ("GSPC").   GSPC was founded in the late 1990s with the assistance of Bin Laden, and it declared war on Algeria's secular authorities and on Western targets.   On or about September 11, 2006, Ayman al-Zawahiri issued a videotaped statement.   Among other things, Zawahiri said:   "Usama Bin Laden has told me to announce to Muslims that the GSPC has joined al-Qaeda."   Soon thereafter, the GSPC issued a statement indicating that it had changed its name on Bin Laden's "orders."   The

GSPC's new name was AQIM.   Subsequently, the leader of AQIM publicly said:   "We [AQIM] and al Qaeda are one body."

5.       AQIM has conducted numerous terrorist operations, including guerrilla-style ambushes, mortar, rocket, IED attacks, kidnapping for ransom operations and small arms attacks against locations that are frequented by Westerners.   For example, in December 2008, in Niger, AQIM kidnapped two Western diplomats who were working as part of a United Nations mission; AQIM held the two victims for approximately four months in the desert before releasing them in Mali.   In June of 2009, AQIM publicly claimed responsibility for killing a U.S. citizen in Mauritania for his missionary activities.   In 2011, AQIM killed two French hostages during an attempted rescue operation in Niger.

6.       Mokhtar Belmokhtar was a leader of an AQIM subgroup operating in the Sahel.   In or about December 2012, Belmokhtar announced the formation of a new battalion, al-Murabitoun, which is also known as "Al-Muwaqqi'un bil-Dima" or "Those Who Sign in Blood."   In the announcement, Belmokhtar stated that the emir of the new battalion was Zawahiri, establishing that the group was loyal to and a branch of al-Qaeda.   In 2015, al-Murabitoun and AQIM jointly conducted several high profile attacks.

7.       On or about December 5, 2001, the Secretary of State designated AQIM, then known as the Salafist Group for Call and Combat, as a Terrorist Exclusion List organization under section 212 of the Immigration and Nationality Act, as amended by the USA PATRIOT Act.   On or about February 4, 2008, the Secretary of State amended the designation of AQIM as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224 to include the name al-Qa'ida in the Islamic Maghreb.   The

Secretary also added the following aliases to the FTO listing:   AQIM and Tanzim al-Qa'ida fi Bilad al-Maghrib al-Islamiya.   To date, AQIM remains a designated FTO.

8.   On or about December 18, 2013, the Secretary of State designated the al-Mulathamun Battalion as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224.   The Secretary also added the following aliases to the FTO listing for al-Mulathamun Battalion:   the "Those Who Sign in Blood" battalion and "al-Murabitoun."   To date, al-Murabitoun remains a designated FTO.

B.   The August 7, 2015 Attack on the Hotel Byblos in Sevare, Mali

9.   On or about August 7, 2015, a lone gunman armed with a Kalashnikov ("AK-47") assault rifle and equipped with a suicide vest entered the Hotel Byblos in Sevare, Mali, and opened fire.   The attack resulted in the deaths of 13 individuals, including five United Nations workers.   The gunman was killed in the attack.   On or about August 10, 2015, al-Murabitoun issued a public statement claiming responsibility for the attack.

C.   The November 20, 2015 Attack on the Radisson Blu Hotel in Bamako, Mali

10.   On or about November 20, 2015, at approximately 7:00 a.m., two men armed with AK-47s and hand grenades attacked the Radisson Blu Hotel in Bamako, Mali, a popular hotel frequented by Western visitors.   The attackers moved from floor to floor of the hotel shooting individuals as they progressed.   The attackers also deployed hand grenades at various stages of the attack.   The attack lasted until approximately 9:30 a.m. and resulted in the deaths of 22 people, including U.S. citizen Anita Ashok Datar.   The attack also wounded at least seven other people.   Approximately 10 to 15 American citizens were present at the

hotel at the time of the attack.   On or about December 7, 2015, al-Murabitoun issued a statement on Twitter claiming responsibility for the Radisson Blu Hotel attack.

D.   AHEMEID's Role in the Attacks

11.   The defendant FAWAZ OULD AHMED OULD AHEMEID is an approximately 42-year-old citizen of Mauritania.

12.   In or about April 2016, AHEMEID was captured in Bamako, Mali and taken into Malian custody.   On or about June 3, 2016 and December 15, 2016, agents with the JTTF conducted interviews of AHEMEID in Mali with the assistance of an FBI linguist. AHEMEID stated that he reads and writes Arabic and French fluently.[2]   At the beginning of each interview, AHEMEID was advised of and waived his Miranda rights both orally and in writing.   AHEMEID was provided with a Miranda form in French, and he initialed each section, signed the form and stated that he understood each of his rights individually and as a whole and understood that the interviews were voluntary.   AHEMEID then provided the following information.

13.   In or about 2007, AHEMEID joined AQIM.   In approximately July 2015, AHEMEID met with the Malian-based head of operations for al-Murabitoun ("CC-1"), to discuss carrying out terrorist attacks on Western targets in the region.

14.   At the meeting, CC-1 instructed AHEMEID that AHEMEID – who had previously personally committed other attacks – was to plan, but not participate in, future attacks.   During this meeting, CC-1 provided AHEMEID with an assistant ("CC-2") to aid in the planning of the attacks.   CC-1 explained that CC-2 was to be used to surveil potential

---

[2] The interview was conducted by agents in English and translated for AHEMEID into French by the FBI linguist.

attack locations.   During the FBI interview, AHEMEID identified a photograph of CC-2, an individual also in custody in Mali, as his "number two man" in Bamako.

15.    AHEMEID ultimately recieved permission from CC-1 to conduct an attack on the Hotel Byblos in Sevare, Mali.   AHEMEID and CC-2 jointly planned the Hotel Byblos attack.   During this planning phase, CC-2 conducted surveillance for approximately one month.   CC-2 sent surveillance reports back to AHEMEID, and AHEMEID briefed CC-1 on the reports.   AHEMEID also personally conducted surveillance of the Hotel Byblos approximately two to three days prior to the attack.

16.    Shortly before the Hotel Byblos attack, CC-1 provided AHEMEID with an individual who would carry out the attack.    AHEMEID subsequently informed CC-1 that the individual was not suitable for the attack.   CC-1 then provided AHEMEID with different individual to conduct the attack.   This individual wished to become a suicide attacker to avenge the death of his son who had previously been killed by French military forces.

17.    On or about August 7, 2015, the attacker, armed with an AK-47 and equipped with a suicide vest, entered the Hotel Byblos and opened fire.   As discussed above, the attack killed 13 individuals, including five United Nations workers.

18.    Following the attack on the Hotel Byblos, AHEMEID met with CC-1 to discuss carrying out additional terrorist attacks on Western targets in the region.   AHEMEID and CC-1 discussed Dakar, Senegal as a potential location for an attack.   AHEMEID traveled to Dakar and determined that the security posture in the city was not conducive to an attack. Prior to leaving Dakar, AHEMEID noticed a Radisson Blu Hotel in the city.   A taxi driver informed AHEMEID that the hotel was popular with Westerners.    Thereafter, AHEMEID conducted internet research on the Radisson Blu Hotel chain in Africa.   AHEMEID

subsequently learned from French radio that the Radisson Blu Hotel in Bamako, Mali was also frequented by Western patrons.

19.     AHEMEID instructed CC-2 to conduct surveillance on the Radisson Blu Hotel in Bamako.   AHEMEID also directed CC-2 to secure a staging house in Bamako and retrieve two AK-47s and ammunition that had been stored in Sevare, Mali.   CC-2 surveiled the Radisson Blu Hotel for approximately 20 days.   In addition to the sureveillance of the Radisson Blu Hotel in Bamako, AHEMEID instructed CC-2 to conduct surveillance on a French school in Bamako.   AHEMEID abandoned the plan to attack the French school after learning from CC-2 that the school contained mostly children.

20.     In or about November 2015, AHEMEID traveled to northern Mali to meet with CC-1 and other al-Murabitoun leaders.   AHEMEID advised CC-1 on his plan to attack the Radisson Blu Hotel in Bamako.   CC-1 approved the attack and offered to provide AHEMEID with four attackers.   However, AHEMEID informed CC-1 that his plan required only two attackers.   CC-1 subsequently told AHEMEID that one attacker would be provided by al-Murabitoun and the other attacker would be provided by AQIM.   During the FBI interview, AHEMEID identified photographs of both of the attackers, who were from Mali, and explained that AQIM and al-Murabitoun decided to conduct the attack jointly against a "common enemy."

21.     Approximately ten days prior to the Radisson Blu attack, AHEMEID and CC-1 met with the attackers.   During this meeting, CC-1 stated that the purpose of the attack was to "avenge the prophet Mohammed, peace be upon him."   CC-1 and AHEMEID instructed the attackers to kill as many Westerners as possible, with French citizens being the priority.   CC-1 cautioned the attackers not to kill women, children or elderly people.

22.     The following day, AHEMEID traveled to Bamako.   The attackers arrived at the staging house in Bamako the next day and CC-2 showed them the Radisson Blu Hotel.   AHEMEID provided money to buy the attackers three cellular telephones and two SIM cards in order to communicate before and after the attack.   CC-2 purchased two blue cellular telephones and one black cellular telephone.   Thereafter, AHEMEID, CC-2 and the attackers held a party to honor the attackers and celebrate the anticipated success of the attack.

23.     On or about November 18, 2015, AHEMEID informed CC-2 and the attackers that he had been directed by CC-1 to travel to Gao, Mali.   Prior to leaving, AHEMEID drafted a handwritten note on a piece of paper and provided it to the attackers. The note stated "vengeance for the Prophet PBUH [peace be upon him]" and contained the names "Al Kadim Ould Saman" and "Abou Assim al Mouadjir."   AHEMEID informed the attackers that the names were of two prisoners that al-Murabitoun sought to be released.

24.     On or about November 20, 2015. at approximately 7:00 a.m., CC-2 texted AHEMEID and informed him that the attackers had entered the Radisson Blu Hotel. The attackers used a previously arranged code word to indicate to CC-2 that they had commenced the attack.   The attackers entered the hotel with two backpacks containing two AK-47s, ammunition, grenades and the flag of al-Murabitoun.   The attackers wore Western clothing and carried green ammunition harnesses on their body.   During the FBI interview, AHEMEID was shown a series of crime scene photographs taken by investigators following the Radisson Blu Hotel attack.   As discussed more fully below, AHEMEID identified many of the items recovered following the attack.

E.  Additional Evidence

25.     As detailed above, AHEMEID drafted a note for the attackers of the
Radisson Blu hotel that contained the names of two al-Murabitoun prisoners.   That note was
subsequently recovered by Malian authorities from the bodies of the attackers and the original
was provided to the FBI.   AHEMEID was shown a photograph of the note and identified it as
a photograph of the note that he had provided to the attackers.   AHEMEID stated that the
note was written in his handwriting.   Agents subsequently took a handwriting sample from
AHEMEID.   A handwriting expert reviewed the original note found on the attackers and the
handwriting sample from AHEMEID, and determined that the same individual wrote both
documents.

26.     Two Nokia model 105 cell phones, each bearing a blue case, were
recovered by Malian authorities on or around the bodies of the deceased attackers.   As
discussed above, AHEMEID stated that he provided money for CC-2 to purchase cell phones
and that CC-2 provided two blue cell phones to the attackers.   AHEMEID was shown a
photograph depicting the recovered cell phones and identified them as the ones provided to
the attackers by CC-2.

27.     Surveillance video from the Radisson Blu Hotel shows the attackers
enter the lobby and move from floor to floor searching for victims.   Surveillance video also
shows the attackers carrying and wearing the backpacks and green ammunition harnesses
described by AHEMEID.   AHEMEID was shown photographs of these backpacks and
ammunition harnesses and positively identified them as being the harnesses and backpacks
that he had provided to the attackers.   AHEMEID was also shown photographs of two AK-
47s, ammunition magazines and grenades that were recovered from the deceased attackers.

AHEMEID stated that the AK-47s, ammunition magazines and grenades were consistent with those that he had provided to the attackers.   AHEMEID was also shown a picture of an al-Murabitoun flag that was recovered from the attackers.   AHEMEID stated that he provided the flag to the attackers.

28.   Video recovered in a military operation, which appears to have been footage taken by al-Murabitoun, depicts AHEMEID and the two Radisson Blu attackers standing in front of a beige pickup truck parked under a tree that appears to match the location of the still photographs attached to the claim of responsibility issued on Twitter by al-Murabitoun for the Radisson Blu Hotel attack on or about December 7, 2015.   These videos also depict AHEMEID conducting military training with the two attackers, including discharging AK-47s and throwing hand grenades.

29.   Additional video obtained by the FBI depicts the two attackers inside of a building, posing with AK-47s in front of the al-Murabitoun flag.   The attackers are wearing the green ammunition harnesses described by AHEMEID and later recovered from their bodies following the attack.   The al-Murabitoun flag depicted in the video matches the al-Murabitoun flag recovered from attackers at the Radisson Blu Hotel.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant FAWAZ OULD AHMED OULD AHEMEID, also known as "Ibrahim Idress" and "Ibrahim Dix," and that he be dealt with according to law.   I further request that this affidavit and the arrest warrant be filed under seal as disclosure of this application would give other targets of the investigation an opportunity to destroy evidence,

and flee from or evade prosecution, with the exception that the affidavit and arrest warrant are unsealed for the limited purpose of disclosing the existence of or disseminating the affidavit and/or arrest warrant to relevant United States, foreign, or intergovernmental authorities, at the discretion of the United States and in connection with efforts to prosecute the defendant or to secure the defendant's arrest, extradition or expulsion, or as otherwise required for purposes of national security.

CRAIG MATTEO
Special Agent, Federal Bureau of Investigation

Sworn to before me this by telephone
9th day of October, 2020

*Vera M. Scanlon*

THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK