UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES,

     v.                                         20 Cr. 502 (BMC)

FAWAZ OULD AHMED OULD AHEMEID,

     Defendant

--------------------------------------------------------X

**DEFENDANT'S MOTION FOR PARTIAL STAY OF PROCEEDINGS DUE TO LAPSE IN CJA FUNDING AND RESULTING IMPACT ON DEFENSE INVESTIGATION**

MICHAEL K. BACHRACH, ESQ.
224 West 30th Street, Suite 302
New York, New York 10001
(212) 929-0592
michael@mbachlaw.com

ANTHONY CECUTTI, ESQ.
217 Broadway, Suite 707
New York, New York 10007
(917) 741-1837
anthonycecutti@gmail.com

KESTINE THIELE, ESQ.
305 Broadway, Suite 700
New York, New York 10007
(212) 542-3860
kestine@kthielelaw.com

*Attorneys for Defendant Fawaz Ould Ahmed Ould Ahemeid*

**Table of Contents**

Table of Authorities ...................................................................................................... ii

I.      Preliminary Statement ..........................................................................................1

II.     Background ...........................................................................................................2

        A.      Charges, pre-Indictment foreign detention, and torture ...........................2

        B.      CJA Funding Lapse ...................................................................................3

        C.      CJA payments in this case .......................................................................7

        D.      Present motion schedule ...........................................................................8

III.    Argument ............................................................................................................12

        A.      In all criminal cases, the Sixth Amendment guarantees a meaningful
                defense ..................................................................................................12

        B.      This Court should not ignore the possibility that the Attorney General will
                attempt to reverse the prior decision not to seek death in this case .......15

        C.      An international investigation is both costly and time-consuming .........23

IV.     Conclusion .........................................................................................................26

Judge Cathy Seibel, Chair, Judicial Conference Committee on Defenders Services, Memorandum, dated, May 5, 2025, re INTERRUPTION OF CJA VOUCHER PAYMENTS DURING JUDICIARY INTEGRATED FINANCIAL MANAGEMENT SYSTEM UPGRADE AND ANTICIPATED END-OF-FISCAL-YEAR PAYMENT DEFERRAL DUE TO FY 2025 FUNDING SHORTFALL (IMPORTANT INFORMATION) ................................................................. Exhibit A

Judge Cathy Seibel, Chair, Judicial Conference Committee on Defenders Services, Memorandum, dated, June 26, 2025, re UPDATE ON ANTICIPATED CJA PAYMENT DEFERRAL START DATE DUE TO FISCAL YEAR 2025 FUNDING SHORTFALL (IMPORTANT INFORMATION) ..................................................................................................... Exhibit B

Judge Robert J. Conrad, Jr., Director, Administrative Office of the United States Courts, Memorandum, dated, October 24, 2025, re UPDATE ON PHASE 2 OF THE LAPSE IN APPROPRIATIONS (IMPORTANT INFORMATION) ........................................................ Exhibit C

Susan Garvey, National Mitigation Coordinator for the Administrative Office of the U.S. Courts' Habeas Assistance and Training Project ("HAT"), Declaration, dated, October 25, 2025 ..................................................................................................................... Exhibit D

## Table of Authorities

FEDERAL CASES

Abdul-Kabir v. Quarterman,
550 U.S. 233 (2007)................................................................................................21

Ake v. Oklahoma,
470 U.S. 68 (1985)..................................................................................................13

Atkins v. Virginia,
536 U.S. 304 (2002)................................................................................................18

Ayers v. Belmontes,
549 U.S. 7 (2006)....................................................................................................21

Boyde v. California,
494 U.S. 370 (1990)................................................................................................20

Britt v. North Carolina,
404 U.S. 226 (1971)................................................................................................13

Buchanan v. Angelone,
522 U.S. 269 (1998)................................................................................................19

Caldwell v. Mississippi,
472 U.S. 320 (1985)................................................................................................18

Eddings v. Oklahoma,
455 U.S. 104 (1982)....................................................................................19, 20, 21

Ford v. Wainwright,
477 U.S. 399 (1986)...........................................................................................14, 18

Gardner v. Florida,
430 U.S. 339 (1977)................................................................................................17

Gideon v. Wainwright,
372 U.S. 335 (1963)................................................................................................12

Green v. Georgia,
442 U.S. 95 (1979)..................................................................................................19

Harmelin v. Michigan,
501 U.S. 957 (1991)................................................................................................17

Harris v. Alabama,
513 U.S. 504 (1995)..................................................................................................16

Kennedy v. Louisiana,
128 S.Ct. 2641 (2008)..............................................................................................18

Kyla Shipping Co. v. Shanghai Zhenhua Heavy Industry Co. Ltd.,
Docket No. 09-00765-CB-N,
2012 WL 1565634 (S.D. Ala. Apr. 30, 2012)........................................................25

Lockett v. Ohio,
438 U.S. 586 (1978)......................................................................................18, 19, 20

McCleskey v. Kemp,
481 U.S. 279 (1987)..................................................................................................19

McKoy v. North Carolina,
494 U.S. 433 (1990)..................................................................................................20

Monge v. California,
524 U.S. 721 (1998)..................................................................................................18

New Jersey v. T. L. O.,
469 U.S. 325 (1985)..................................................................................................20

Padilla v. Kentucky,
559 U.S. 356 (2010)............................................................................................16, 21

Payne v. Tennessee,
501 U.S. 808 (1991)..................................................................................................20

Penry v. Lynaugh,
492 U.S. 302 (1989)..................................................................................................20

Roper v. Simmons,
543 U.S. 551 (2005)..................................................................................................18

Ross v. Moffitt,
417 U.S. 600 (1974)..................................................................................................13

Sampson v. United States,
832 F.3d 37 (1st Cir. 2016)......................................................................................17

Skipper v. North Carolina,
476 U.S. 1 (1986)......................................................................................................19

iii

Smith v. Texas,
543 U.S. 37 (2004)................................................................................................21

Tennard v. Dretke,
542 U.S. 274 (2004).................................................................................19, 20, 21

United States v. Cole & Smith,
Docket No. 1:23-CR-0016,
--- F.Supp.3d ---, 2025 WL 2592515 (D.VI September 7, 2025) .....................15

United States v. Dangleben,
Docket No. 3:23-cr-0072,
2025 WL 2647195 (D.VI September 15, 2025) ................................................15

United States v. Constanza-Galdomez,
787 F.Supp.3d 131 (D.MD 2025) ....................................................................15

United States v. Karake,
443 F.Supp.2d 8 (D.DC 2006) .........................................................................14

United States v. Karake,
Docket No. CRIM.A. 02-00256 ESH,
2007 WL 8045732 (D.DC Feb. 7, 2007) ..........................................................15

United States v. Meador,
138 F.3d 986 (5th Cir 1988) ............................................................................26

United States v. Merrell,
Docket No. 3:20-CR-46-1,
2025 WL 2911170 (GROH) (N.D.W.V. October 7, 2025) ..............................15

United States v. Spurlock,
782 F.Supp.3d 987 (D.Nev. 2025)....................................................................15

United States v. Tsethlikai,
Docket No. CR 1:24-00539 DHU,
2025 WL 2962603 (D.NM October 18, 2025) .....................................7, 13, 14, 15, 21, 22

Williams v. Taylor,
529 U.S. 362 (2000)..........................................................................................19

Woodson v. North Carolina,
428 U.S. 280 (1976)..........................................................................................17

STATE CASES

State v. McKoy,
323 N.C. 1, 372 S.E.2d 12 (1988)................................................................................20

STATUTES AND OTHER AUTHORITIES

18 U.S.C. § 3006A....................................................................................................3

18 U.S.C. § 3292.....................................................................................................26

Fed.R.Crim.P. 12 ................................................................................................1, 26

U.S. Const., Amend. V ...........................................................................................26

U.S. Const., Amend. VI ..........................................................................................12

H.R.Rep. No. 98-907 (1984), reprinted in 1984 U.S.C.C.A.N. 3579................................26

Guide to Judiciary Policy, Volume 7A, Ch. 2, § 230.13 .......................................4

Guide to Judiciary Policy, Volume 7A, Ch. 2, § 230.63.50 ..................................4

Guide to Judiciary Policy, Volume 7A, Ch. 2, § 230.73 .......................................4

Guide to Judiciary Policy, Volume 7A, Ch. 2, § 230.73.20 ..................................6

Guide to Judiciary Policy, Volume 7A, Ch. 2, § 310.60 .......................................4

Guide to Judiciary Policy, Volume 7A, Ch. 2, § 630.40 ....................................4, 6

Guide to Judiciary Policy, Volume 7A, Ch. 2, § 660.40 .......................................4

Guide to Judiciary Policy, Volume 7A, Ch. 2, § 660.40.10 ..................................6

*2017 Report of the Ad Hoc Committee to Review the Criminal Justice Act* (chaired by the Honorable Kathleen Cardone, U.S. District Court for the Western District of Texas, and known as the "Cardone Report") (available at https://www.uscourts.gov/sites/default/files/2017_report_of_the_ad_hoc_committee_to_review_the_criminal_justice_act-revised_2811.9.17.29_0.pdf) ........................5, 23

Guideline 1.1, History of Guideline, *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913, 995 (2003) ...............................................................................16

Guideline 10.2, *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913, 995 (2003)..................................................................................................................16

Guideline 10.7, *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913, 995 (2003)..............................................................................................................21, 24

Guideline 10.11, *American Bar Association Supplementary Guidelines for the Mitigation Function of Defense Teams in Capital Cases*, 36 HOFSTRA L. R EV. 677 (2008)...............................................................................................................21, 22

Standard 4-4.1, *ABA Standards for Criminal Justice: Prosecution and Defense Function* (3d ed. 1993) (available at https://dids.nv.gov/uploadedFiles/didsnvgov/content/Resources/ABAStandardsfor theDefenseFunction(1).pdf) ...................................................................................24

Office of the Director of National Intelligence, "How the IC Works" (available at https://www.intelligence.gov/how-the-ic-works) .................................................3

*Federal Judiciary Budget Crisis and Government Shutdown Ends Funding for Indigent Defendants, Raising Serious Constitutional Concerns*, Death Penalty Information Center (October 2, 2025) (available at https://deathpenaltyinfo.org/federal-judiciary-budget-crisis-and-government-shutdown-ends-funding-for-indigent-defendants-raising-serious-constitutional-concerns) ...............................................................................................................13

*Funding Crisis Leaves Defense Lawyers Working Without Pay*, U.S. Courts, News (July 15, 2025) (available at https://www.uscourts.gov/data-news/judiciary-news/2025/07/15/funding-crisis-leaves-defense-lawyers-working-without-pay) ...........5, 6

*Here's How a Government Shutdown Works*, NY Times (published, Sept. 30, 2025; updated, Oct. 1, 2025) (available at https://www.nytimes.com/2025/09/30/us/politics/government-shutdown-congress.html)...........................................................................................................7

Russell Stetler, W. Bradley Wendel, *The Tenth Anniversary of the ABA Capital Defense Guidelines: The Road Traveled and the Road to be Traveled: Part One: The ABA Guidelines and the Norms of Capital Defense Representation*, 41 HOFSTRA L. REV. 635, 696 (2013) ..................................................................................16

## I.    Preliminary Statement

Defendant Fawaz Ould Ahmed Ould Ahemeid (hereinafter, "Defendant" or "Mr. Ahemeid"), by and through counsel, writes to respectfully request a partial stay of the proceedings. Specifically, Mr. Ahemeid seeks a stay of the scheduling of Rule 12(b)(3)(A)(ii),(iii) and 12(b)(3)(C) motions and trial until: (1) the Attorney General reaches a decision on whether to seek the death penalty in this case (and, if the prior decision not to seek the death penalty is reversed, litigation on a motion to strike the Notice of Intent is complete); (2) CJA funding has been restored; and (3) the defense has been given sufficient time to restart and complete our international investigation.

To be clear, this motion does not seek a stay of any motions that are already *sub judice*, nor does this motion seek to interfere with the timing of the Attorney General's decision whether to seek the death penalty. Similarly, this motion does not seek to limit our ability to continue to review discovery, meet with our client, and communicate with any potential defense witnesses in this case, or litigate the Attorney General's ability to reverse a prior "no-seek" determination if a reversal is indeed attempted. In short, what would be impacted by this stay are only matters requiring travel outside of the United States by defense counsel or those acting on counsels' behalf, as well as the use of experts or other service providers for whom expenses and/or associated service fees would need to be advanced.

A stay would, however, specifically include briefing on Defendant's anticipated suppression motion, since the corroboration of Mr. Ahemeid's claims requires significant work to be completed outside of the United States.

1

## II.       Background

### A.       Charges, pre-Indictment foreign detention, and torture

As this Court is aware, Mr. Ahemeid is charged in a six-count indictment with offenses arising from his alleged membership in al-Qaeda in the Islamic Maghreb ("AQIM") and al-Murabitoun.  Mr. Ahemeid is accused of planning and committing three terrorist attacks in Mali: an attack on the La Terrasse restaurant in Bamako, Mali, on March 7, 2015, in which five people were killed; an attack on the Hotel Byblos in Sevare, Mali, on August 7, 2015, in which 13 individuals – including five United Nations workers – were killed; and an attack on the Radisson Blu Hotel in Bamako, Mali, on November 20, 2015, in which 20 victims were killed, including U.S. citizen Anita Ashok Datar.

Upon his capture in April 2016, Mr. Ahemeid was incarcerated at a Malian intelligence facility in Bamako until December 2022 when he was extradited to the United States.  At this black site, known as Direction Générale de la Sécurité d'Etat ("DGSE"), Mr. Ahemeid endured years of torture and repeated interrogations by numerous law enforcement agencies, including the FBI. Based upon United States intelligence gathering in prior cases, it is reasonable to assume that other United States intelligence agencies were involved in Mr. Ahemeid's interrogations, but at a minimum the Government has confirmed the FBI's involvement.

During this time, Mr. Ahemeid made various incriminating statements.  We intend to argue by way of motion practice and at a hearing that such statements were involuntary and a product of years of torture while detained at DGSE.  We also intend to argue that the conditions of his confinement, the torture and/or "enhanced interrogation techniques" that he was subjected to, the involvement therein of the Government, which includes the United States Intelligence Community ("USIC"), as well as the USIC and Attorney General's involvement in the decision regarding when

2

to finally transfer Mr. Ahemeid to United States custody for the instant prosecution, are factors relevant to additional motions to dismiss the Indictment as well.[1]

As should be clear from the summary provided above, with the exception of defense interviews of the defendant himself, the entire investigation of this case, including all fact investigation related to Mr. Ahemeid's period of DGSE detention and torture, the mitigation investigation related to the same, and nearly all other aspects of Mr. Ahemeid's potential penalty phase case, requires international travel and investigation, all of which is costly and time consuming.

## B.    CJA Funding Lapse

On May 5, 2025, Judge Cathy Seibel, Chair, Judicial Conference Committee on Defender Services, issued a memorandum to all Judges of the United States Courts of Appeal, United States District Courts, Circuit Executives, Federal Public/Community Defenders, District Court Executives, Clerks of the United States Courts of Appeal and United States District Courts, and Senior Staff Attorneys, alerting all of an impending interruption of CJA payments during two separate events: an upgrade of the judiciary's Integrated Financial Management System and the then-anticipated end-of-fiscal-year payment deferral due to the judiciary's FY 2025 funding shortfall.  See Memorandum, dated, May 5, 2025 (annexed hereto as, "Exhibit A").

As Judge Seibel explained:

> [T]wo events … will, over the coming months, affect voucher payments to appointed counsel and their service providers under the Criminal Justice Act, 18 U.S.C. § 3006A ("CJA").  First, beginning Wednesday, June 11, 2025, the Administrative Office (AO) will upgrade the Judiciary Integrated Financial Management System

---

[1]    The United States Intelligence Community is comprised of 18 organized agencies that each focus on a different aspect of a common mission.  In turn, it is subject to oversight by several governmental groups and also partners with numerous other external groups which include domestic, international, military, law enforcement and private sector partners.  See Office of the Director of National Intelligence, "How the IC Works" (available at https://www.intelligence.gov/how-the-ic-works) (last accessed, October 25, 2025).

3

> (JIFMS), the judiciary's accounting and payment system. The system will remain offline through Thursday, June 26, 2025 (11 workdays) while software is updated and data is verified for quality. eVoucher payments must be certified by **Thursday, June 5, 2025, at 1:59 AM Eastern Time** to be included in the final pre-downtime disbursement on Friday, June 6…. eVoucher payments certified after the June 5 deadline will be held in a queue and uploaded to JIFMS after the upgrade is complete. Access to JIFMS will resume on June 27, 2025, and queued eVoucher payments will be processed sequentially by July 4, 2025….

> Second, to address the fiscal year (FY) 2025 funding shortfall resulting from the Full-Year Continuing Appropriations and Extensions Act, 2025 (Pub. L. No. 119-4), passed by Congress on March 15, 2025, the Executive Committee approved a FY 2025 financial plan that anticipates the need to defer payments to CJA Panel members and providers for an estimated 49 business days, beginning approximately July 23, 2025, just three weeks after the resumption of JIFMS activity.

Exhibit A at 1-2. Judge Seibel also reminded recipients of the memo of long-standing Judicial Conference policy that "Absent extraordinary circumstances, judges should act upon panel compensation claims within 30 days of submission," Exhibit A at 2, citing, Guide to Judiciary Policy, Volume 7A, Ch. 2 ("CJA Guidelines"), § 230.13(b), and "Courts and presiding judges or their delegates should allow interim payments to CJA counsel and service providers in representations exceeding 90 days in duration or $4,000 in accrued compensation and expense claims and in all capital cases," Exhibit A at 2, citing, Id. §§ 230.63.50, 230.73, 310.60, 630.40, 660.40.

Judge Seibel concluded by stating, "Providing fair compensation to appointed counsel is mandated by the CJA and is a critical component of the administration of justice in our federal courts." Exhibit A at 3. The memo was also cc'd to all CJA Circuit Case Budgeting Attorneys and all CJA Panel Attorney District Representatives, see id., who then forwarded the memo to their respective CJA Panels.

4

On June 26, 2025, Judge Seibel issued an additional memorandum, addressed to the same recipients including all Circuit Court and District Court judges, to update all concerned on the anticipated CJA Payment Deferral Start Date Due to Fiscal Year 2025 Funding Shortfall (annexed hereto as, "Exhibit B"). In this memo, Judge Seibel alerted the Court and all concerned that despite the initial estimate of needing a 49-day deferral of CJA payments, instead the deferral would be longer:

> Initially, panel attorney payments were projected to be deferred beginning on or about July 23, 2025. But because of an increase in the daily panel attorney payment rate leading up to the JIFMS upgrade shutdown, it is possible that panel attorney funds could be depleted as early as the week of July 7. It is difficult to predict the precise day when this unfortunate event will occur. We will continue to closely monitor and analyze the daily panel attorney payment rate, but making it to July 23 is unlikely.
>
> Securing necessary funds to provide fair and timely compensation to appointed counsel and CJA service providers is of the highest priority for the judiciary, as the work of these individuals is critical to the administration of justice and protecting the rights of the accused in our federal courts. The judiciary will continue to seek every opportunity to obtain additional funding to meet this need. I ask that you continue to process and approve CJA vouchers during the payment deferrals so that queued payments may be disbursed as soon as funding becomes available. Any vouchers that have not been paid when the FY 2025 funds are depleted will be paid when funding becomes available in fiscal year 2026.

Exhibit B at 2 (also thanking all concerned, "for your continued cooperation and compliance with these policies to help ensure the availability of highly qualified CJA counsel willing to accept future CJA appointments"); see *Funding Crisis Leaves Defense Lawyers Working Without Pay*, U.S. Courts, News (July 15, 2025) (available at https://www.uscourts.gov/data-news/judiciary-news/2025/07/15/funding-crisis-leaves-defense-lawyers-working-without-pay) (last accessed, October 25, 2025) (noting that CJA funding ended up running out on July 3, 2025); see also *2017 Report of the Ad Hoc Committee to Review the Criminal Justice Act* (chaired by the Honorable

Kathleen Cardone, U.S. District Court for the Western District of Texas, and known as the "Cardone Report"), § 5.4.2, at 113-14 ("When payment of the voucher is substantially delayed further hardship results … delayed payments affect the ability and willingness of quality attorneys to accept CJA appointments.    It is unfair to delay paying attorneys.…") (available at https://www.uscourts.gov/sites/default/files/2017_report_of_the_ad_hoc_committee_to_review_the_criminal_justice_act-revised_2811.9.17.29_0.pdf) (last accessed, October 25, 2025); CJA Guidelines §§ 230.73.20, 630.40, and 660.40.10 (all stating that interim payments should be provided for CJA counsel and service providers in capital cases because of "the anticipated hardship … in providing services for such a period without compensation").

As a result of the combined impact of the above, with very few exceptions, CJA funding for all CJA attorneys ceased on either June 11, 2025, or July 3, 2025, depending upon where attorneys' vouchers were in queue, and cannot resume until funding becomes available in fiscal year 2026 ("FY 2026").  See *Funding Crisis Leaves Defense Lawyers Working Without Pay*, U.S. Courts, News, supra ("Judge Amy St. Eve, chair of the Judicial Conference's Budget Committee, said, 'The right of a criminal defendant to effective counsel regardless of the defendant's economic status is guaranteed under our Constitution and the Criminal Justice Act. That fundamental right is at risk because we ran out of funding on July 3 to pay the private practice attorneys appointed to represent federal defendants….' 'These attorneys will not be paid until October 1 for the work they have done and for the work that we continue to ask them to do, unless the Judiciary receives supplemental funding from Congress before then.'"); see also Id. (noting, "There are more than 12,000 private panel attorneys throughout the country who accept CJA assignments annually. **About 85 percent of them work for small firms or are solo practitioners who can ill afford long delays in payments for their work.** Significant amounts of work affected by the funding

6

freeze have already been performed.") (emphasis added).

FY 2026 began on October 1, 2025, but without a budget approved by Congress and signed into law by the President. As a result, the government shut down on that date and the anticipated deferred CJA payments remain indefinitely delayed. See *Here's How a Government Shutdown Works*, NY Times (published, Sept. 30, 2025; updated, Oct. 1, 2025) (available at https://www.nytimes.com/2025/09/30/us/politics/government-shutdown-congress.html). As recently held by the Hon. David Herrera Urias, United States District Judge of the District of New Mexico, in granting an even broader – indeed, full and complete – stay application in an authorized capital case:

> The right to a defense is one of the bedrock principles of this country, and the shutdown has unquestionably impeded Defendant's right to counsel in this case. This deprivation of his constitutional right to counsel is not outweighed by any of the interests cited by the Government.

United States v. Tsethlikai, Docket No. CR 1:24-00539 DHU, 2025 WL 2962603, *4 (D.NM October 18, 2025).

### C.   CJA payments in this case

Defense counsel were last paid in this case as follows:

- Michael Bachrach: last payment May 13, 2025 (for work through March 10, 2025)

- Anthony Cecutti: last payment July 1, 2025 (for work conducted between February 17, 2025 and March 20, 2025, but no other compensation in this case for work completed since December 29, 2024)

- Kestine Thiele: last payment July 1, 2025 (for work conducted between February 17, 2025 and March 20, 2025, but no other compensation in this case for work completed since December 29, 2024)

Payments to defense service providers:

- Mitigation specialist: last payment June 5, 2025 (for work through April 29, 2025)

7

- Investigator: last payment June 2, 2025 (for work through May 31, 2025)[2]

- Interpreter: last payment June 30, 2025 (for work through April 29, 2025)

No other defense experts or service providers have been paid in 2025 in this case. See Supplemental Letter, dated, October 27, 2025 (filed ex parte and under seal) (further detailing, inter alia, work of defense experts and service providers).

Defense counsel collectively submit that we are unable to provide further advance funding to experts, service providers, or towards the international investigation necessary to the effective representation of the defendant in this case until such time as CJA payments to the undersigned have resumed *and been deposited in counsels' accounts*.[3] See Supplemental Letter, dated, October 27, 2025 (filed ex parte and under seal) (discussing, inter alia, counsels' financial obligations).

### D.    Present motion schedule

On April 7, 2025, well-prior to the lapse in CJA funding and government shutdown that later followed, the parties agreed to the following schedule, which was so-ordered by this Court:

Unclassified Rule 16([a])([1])(E) motions: May 29, 2025
Response: June 26, 2025
Reply, if any: July 10, 2025

Defense Mitigation Submission: June 2, 2025
(CRC Meeting scheduled for June 9, 2025)

---

[2]    The payments made to the defense investigator were paid directly by defense counsel as advance-payments to be reimbursed as expenses on defense counsel's CJA eVouchers, as instructed by Alan Nelson, 2d Cir. CJA Case Budgeting Attorney.

[3]    CJA payments are made through direct deposit. Once payments are issued there should be no delay between when counsels' payments are issued and when the funds are deposited in counsels' accounts. However, that does not mean that payments will be issued the moment the shutdown ends. Instead, payments will be made in the order they were approved by the courts (nationally, not simply locally within any specific District). See also Exhibit A at 3 ("Payments to CJA panel attorneys and their service providers are made from a national, centrally held Defender Services account, separate from amounts appropriate for circuit and district court operations.").

First set of Rule 12 motions, *i.e.*, Rule 12(b)(3)(A)(i),(iv),(v), 12(b)(3)(B)(i),(ii),(iii),(iv),(v): July 21, 2025
Response: September 2, 2025
Reply, if any: September 23, 2025

**Second set of Rule 12 motions, *i.e.*, Rule 12(b)(3)(A)(ii),(iii), 12(b)(3)(C): 45 days after decision to maintain prior no-seek (but no sooner than August 1, 2025) - date subject to change if prior no-seek is reversed**
**Response: 30 days after motion is filed**
**Reply, if any: 14 days after response if filed**

CIPA motions and motions related to authorization process to be scheduled upon request, if needed.

Order, dated, April 7, 2025 (Doc. No. 116), at 1-2 (emphasis added).

To be clear, the above schedule set a 45-day deadline for the filing of, <u>inter alia</u>, suppression motions *assuming the no-seek determination is reaffirmed*. <u>Id.</u> at 1. If, however, the Attorney General attempts to reverse the prior decision not to seek the death penalty, then the parties and the Court had agreed that the deadline would be "subject to change". <u>Id.</u> Furthermore, because the schedule was set months prior to the CJA funding lapse, and also prior to Judge Seibel's memoranda informing the Court and defense counsel of the potential that such lapse could even occur, *the 45-day schedule was entered into without knowledge or consideration of the CJA funding lapse that followed*.

On October 20, 2025, at the most recent status conference in this case, the Government informed the Court that it "expect[s] to have an answer" on how the Attorney General wishes the Government to proceed with respect to the death penalty in this case "by the end of next week." Transcript, dated, October 20, 2025 (hereinafter cited as, "Tr."), at 4 (annexed hereto as, "Exhibit C"). The Government then requested that the Court "set a [motion] schedule as soon as there is a decision" (Tr. 6), and stressed the need for a schedule "because we'll have to do full briefing on a suppression motion the defendants [sic] haven't filed yet because the defendants [sic] didn't want

9

to file the motion until the death penalty decision" (Tr. 7). Defense counsel sought to "come back for a conference in 60 days to set a schedule on the suppression issue" (Tr. 7-8) and stressed that "There's been a CJA deferment. The defense team has not been paid, nor have been able to rely upon our experts because they are not getting paid. This entire case is outside the United States. Our entire investigation is in West Africa, both fact and mitigation. And we are currently at a standstill and have had our investigation disrupted in light of things that are completely outside of our control" (Tr. 8). Counsel further stressed, "The issue is simply that we have not been able to move things along … in many months, since spring, summer 2025, in light of the CJA deferment, and now the government shutdown. And so we are requesting a conference in about 60 days" (Tr. 8).

After this Court initially directed the suppression motion to be filed within "45 days" of the Government's notice of whether it would seek the death penalty, co-counsel interjected, "If I may, Your Honor. To be very clear here, first of all, the deadlines were set prior to the deferral of CJA payments. We have been operating as best we can. But the suppression motion is not simply a statement of our client, but also what we hope to be able to corroborate. That's the part that we have not been able to do in a very long period of time. And we cannot control it" (Tr. 10-11).

This Court allowed the parties to brief the issue, emphasizing "that briefing needs to include a representation that you lawyers are either unable or it would constitute a severe hardship to front the necessary resources in order to carry on with this case. Because lawyers do that" (Tr. 11). The following colloquy then ensued:

> THE COURT: I mean, obviously, if you're going to tell me you have to come out of pocket by $5 million in the next 45 days in order to file a suppression motion, and you convince me of that, then we're going to have one situation. But, you know, if we're talking about a couple hundred or a few hundred thousand dollars and you've got a bank line anyway, and it's just a question of timing, then I don't

think it should slow you down that much.

You think about it, okay? But you don't tell me, oh well, your experts want to be paid, and, you know, the government won't immediately approve interim vouchers, which it doesn't have to – which I don't have to do anyway.

MR. BACHRACH: Your Honor, interim vouchers doesn't help when we're talking about individuals who don't even live in this country. And we have been fronting, as long as we could, we were fronting some of our investigator's fees, with the expectation that once the deferment was over, we would be reimbursed for those funds. But we are at the point collectively where we can no longer front the funds anymore, and they are in other countries and –

THE COURT: If you convince me of that, then I am not sure I am going to have any choice, right? If they can't front the money to put on a defense, and they need third parties who are saying I am not helping without the money, then we have a constitutional issue about going forward in that situation.

Tr. 11-12.

We note for the record that defense counsel have not been paid on this case in months: for Mr. Bachrach, not since May 13, 2025 (for work done through March 10, 2025); for Mr. Cecutti, not since July 1, 2025 (for work done between February 17, 2025 and March, 20, 2025, but no other payments to him on this case for work done since December 29, 2024); and for Ms. Thiele, not since July 1, 2025 (for work done between February 17, 2025 and March, 20, 2025, but no other payments to her on this case for work done since December 29, 2024). Defense counsel further note that with the exception of three relatively small checks received by Mr. Cecutti, defense counsel have not been paid on any CJA case since the CJA funding lapse began; this too weighs towards the overall hardships suffered by defense counsel. See Supplemental Letter, dated, October 27, 2025 (filed ex parte and under seal) (further detailing, inter alia, the deferred CJA payments outstanding to Mr. Bachrach, Mr. Cecutti, and Ms. Thiele).

While Mr. Bachrach and Mr. Cecutti have sources of income beyond CJA case work, due

11

to each counsel's personal financial obligations, all three defense counsel hereby represent that we are not in a position to self-fund or further advance the costs of the international investigation required to effectively represent Mr. Ahemeid. Each of us are solo practitioners, unconnected with law firms having extensive corporate funds and/or lines of credit.

We can – and will – continue to review discovery, meet with Mr. Ahemeid, litigate outstanding discovery and, if needed, litigate whether the Attorney Generally may lawfully reverse the prior Attorney General's decision not to seek the death penalty in this case, but we can no longer cover the costs of our experts, investigators, or our or anyone else's international travel – all of which are necessary to the effective representation of this case both with respect to the anticipated suppression motion and penalty phase.

### III.   Argument

#### A.   In all criminal cases, the Sixth Amendment guarantees a meaningful defense

The Sixth Amendment guarantees, "In all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defense." U.S. Const., Amend. VI. The Supreme Court has held this to mean "that … counsel must be provided for defendants unable to employ counsel unless the right is competently and intelligently waived." Gideon v. Wainwright, 372 U.S. 335, 339-40 (1963). In Gideon, the Court explained:

> The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours. From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him.

Gideon, 372 U.S. at 344.

12

Since then, the Supreme Court has held that criminal defendants are not only guaranteed the right to counsel but are entitled to effective representation and access to the tools necessary for a meaningful defense.  See Ake v. Oklahoma, 470 U.S. 68, 76 (1985) (listing cases).  As the Supreme Court unequivocally explained in Ake:

> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, see Ross v. Moffitt, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), it has often reaffirmed that fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system," id., at 612, 94 S.Ct., at 2444. To implement this principle, we have focused on identifying the "basic tools of an adequate defense or appeal," Britt v. North Carolina, 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971), and we have required that such tools be provided to those defendants who cannot afford to pay for them.

Ake, 470 U.S. at 77; see also United States v. Tsethlikai, supra, 2025 WL 2962603 (D.NM October 18, 2025) (granting stay in authorized death penalty case due to lapse of CJA funding); *Federal Judiciary Budget Crisis and Government Shutdown Ends Funding for Indigent Defendants, Raising Serious Constitutional Concerns*, Death Penalty Information Center (October 2, 2025) (available at https://deathpenaltyinfo.org/federal-judiciary-budget-crisis-and-government-shutdown-ends-funding-for-indigent-defendants-raising-serious-constitutional-concerns) (discussing CJA funding crisis and recent stay ordered in Tsethlikai).

In this case, the basic tools necessary to prepare a meaningful and effective defense, includes the ability to investigate whether Mr. Ahemeid's claims regarding the specifics of his DGSE interrogation can be corroborated.  In our supplemental letter, dated, October 27, 2025 (filed

ex parte and under seal), we detail the efforts we have made to corroborate Mr. Ahemeid's claims, including the leads that still must be followed. We can state publicly that the investigation cannot be conducted domestically and must take place abroad, just as the Government's investigation in this case has occurred as well.

To do this requires funding, and, as discussed above and ex parte, CJA funding lapsed months ago and the undersigned CJA counsel can no longer shoulder the burden of those costs. We simply cannot do it any longer, and indeed, were forced to pause our international investigation in early August. Just as in Tsethlikai, we have "grave concerns about the ability to effectively represent [the defendant] as required by the Sixth Amendment and to uncover the necessary mitigating information for the jury to make the individualized determination with the 'heightened reliability' required by the Eighth Amendment." Tsethlikai, 2025 WL 2962603, at *2, citing, Ford v. Wainwright, 477 U.S. 399, 414 (1986) (Court's consideration of capital cases has been characterized by "heightened concern for fairness and accuracy").

Indeed, our concerns run even deeper than Tsethlikai, since the CJA funding lapse impacts not only the penalty phase of Mr. Ahemeid's case, but goes directly to the guilt/innocence phase as well. Without the ability to conduct an international investigation, not only is Mr. Ahemeid deprived of his right to conduct an effective mitigation investigation, but also to corroborate claims that may be determinative of whether the primary evidence against him on the capital counts – his statements – were the product of torture, and therefore must be suppressed due to having been obtained in violation of Mr. Ahemeid's Constitutional rights. See United States v. Karake, 443 F.Supp.2d 8, 14 (D.DC 2006) (in case where defendants were detained abroad, subjected to physical and psychological abuse, and subsequently interrogated by U.S. law enforcement, the court suppressed defendants' statements notwithstanding Miranda rights having been given,

concluding that the statements "were the product of coercion and therefore inadmissible"); see also United States v. Karake, Docket No. CRIM.A. 02-00256 ESH, 2007 WL 8045732 (D.DC Feb. 7, 2007) (dismissing indictment without prejudice upon Gov't motion after Gov't argued that it was "[u]nable to proceed to trial without the suppressed statements").

Here, like in Tsethlikai, the issue is straightforward: the CJA funding lapse has hit a point where it is now impacting Mr. Ahemeid's Sixth Amendment right to effective representation, or at least it will if this Court denies the stay and requires the defense to file its suppression motion before we have been able to restart and complete our international investigation – something we simply cannot do until CJA payments have resumed.

**B.      This Court should not ignore the possibility that the Attorney General will attempt to reverse the prior decision not to seek death in this case**

This Court has appeared skeptical that the present Attorney General may lawfully reverse the prior Attorney General's decision not to seek the death penalty in this case.  See, e.g., Tr. 4 (this Court correctly observing, "I have [looked into whether courts have permitted the Attorney General to take back a prior decision not to seek the death penalty].  So far I am not finding any. I am finding lots of saying no."); see also United States v. Spurlock, 782 F.Supp.3d 987 (D.Nev. 2025) (striking the Government's Notice of Intent to Seek the Death Penalty, which had been issued by Attorney General Bondi as a reversal of Attorney General Biden's prior decision not to seek the death penalty); United States v. Constanza-Galdomez, 787 F.Supp.3d 131 (D.MD 2025) (same); United States v. Cole & Smith, Docket No. 1:23-CR-0016, --- F.Supp.3d ---, 2025 WL 2592515 (D.VI September 7, 2025) (same); United States v. Dangleben, Docket No. 3:23-cr-0072, 2025 WL 2647195 (D.VI September 15, 2025) (same); United States v. Merrell, Docket No. 3:20-CR-46-1, 2025 WL 2911170 (GROH) (N.D.W.V. October 7, 2025) (same).  **To date, there are**

**no cases to have held otherwise,** and the defense stands ready to litigate this issue should the Attorney General seek to reverse the prior no-seek decision in this case.

However, the fact remains that until a decision is reached on the death penalty, either by an affirmation of the prior no-seek or after litigation of a no-seek reversal, this case must be treated as the potential death penalty case that it is. See *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913, 995 (2003) (hereinafter, the "ABA Guidelines"), Commentary to ABA Guideline 10.2 ("Counsel must continue to treat the case as capital 'until the imposition of the death penalty is no longer a legal possibility.'"), quoting, History of ABA Guideline 1.1, 31 HOFSTRA L. REV. at 921. Indeed, the ABA Guidelines are "the defining architecture for any measure of effective performance" of defense counsel in a capital case. Russell Stetler, W. Bradley Wendel, *The Tenth Anniversary of the ABA Capital Defense Guidelines: The Road Traveled and the Road to be Traveled: Part One: The ABA Guidelines and the Norms of Capital Defense Representation*, 41 HOFSTRA L. REV. 635, 696 (2013); see also Padilla v. Kentucky, 559 U.S. 356, 366 (2010) ("We have long recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like … are guides to determining what is reasonable.…'"). And as such is the case, the heightened requirements of a capital case further justify the partial stay sought herein by the defense.

The bedrock principle of capital jurisprudence is that "death is different." This view of capital cases informs and guides the entire body of capital jurisprudence and capital-case litigation. Simply stated, death-penalty cases are not the same as other cases and cannot be treated the same as other cases. See Harris v. Alabama, 513 U.S. 504, 516 n.1 (1995) (Stevens, J., dissenting) (citing seven separate decisions, noting, "Our opinions have repeatedly emphasized that death is a

16

fundamentally different kind of penalty from any other that society may impose"); see also Harmelin v. Michigan, 501 U.S. 957, 994 (1991) (because "death is different", the Supreme Court has "imposed protections that the Constitution nowhere else provides"); Sampson v. United States, 832 F.3d 37, 43 (1st Cir. 2016) (noting that "an already significant legal question is even more so in the context of a capital case, because 'death is [] different.'").

Commencing with the 1976 quintet of cases that mark the beginning of post-Furman death-penalty jurisprudence, the Supreme Court has taken numerous opportunities to emphasize its recognition of the difference between death as a punishment and all others. In Woodson, for example, striking down North Carolina's initial post-Furman death-penalty scheme, the Court observed:

> The penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.

Woodson v. North Carolina, 428 U.S. 280, 305 (1976). The following year, in Gardner v. Florida, 430 U.S. 339 (1977), the proposition was reiterated:

> [D]eath is a different kind of punishment from any other which may be imposed in this country. From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.

Gardner, 430 U.S. at 357-58.

The notion that "death is different" is not simply the dramatic recitation of an obvious truth. Rather, the principle triggers sharply increased levels of judicial attention to every step of the process through which the irrevocable sanction of death is sought and carried out. The post-

17

Furman Court has described capital jurisprudence as mandating a "heightened standard of reliability" for the entire process through which a government marshals the legal and moral authority to terminate a life.  The need for heightened reliability is "the natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different." Ford, 477 U.S. at 411.  As stated in Caldwell v. Mississippi, 472 U.S. 320 (1985), "[T]he qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." Id. at 329; see also Monge v. California, 524 U.S. 721, 731 (1998) (reiterating the "acute need for reliability in capital sentencing proceedings").

In practice, the death penalty should be reserved for the worst of the worst.  See Roper v. Simmons, 543 U.S. 551, 568 (2005) ("Capital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'"), quoting, Atkins v. Virginia, 536 U.S. 304, 319 (2002).  In Kennedy v. Louisiana, 128 S.Ct. 2641, 2649 (2008), the Court reiterated the principle that, "Evolving standards of decency must embrace and express respect for the dignity of the person, and the punishment of criminals must conform to that rule."  Otherwise, "When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint." Kennedy, 128 S.Ct. at 2650.

One aspect of a constitutional death-penalty scheme is that virtually no limitation may be placed on the right of the accused to present for the sentencer's consideration all relevant mitigating evidence.  This established tenet of capital jurisprudence is rooted in Lockett v. Ohio, 438 U.S. 586, 604 (1978), where, two years after Gregg, a plurality of the Court held that "in all but the rarest kind of capital cases," a sentencing authority could not "be precluded from

18

considering, as a mitigating factor, any aspect of a defendant's character or record ... as a basis for a sentence less than death" (emphasis and footnote omitted); see also Skipper v. North Carolina, 476 U.S. 1 (1986); Eddings v. Oklahoma, 455 U.S. 104, 112 (1982). In McCleskey v. Kemp, 481 U.S. 279 (1987), the Supreme Court held that a constitutional death-penalty scheme:

> cannot limit the sentencer's consideration of *any relevant circumstance* that could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider *any relevant information* offered by the defendant.

McCleskey, 481 U.S. at 305-06 (emphasis added); see also Green v. Georgia, 442 U.S. 95 (1979) (evidence rules may not be invoked to bar otherwise relevant mitigating evidence). "Any relevant information," in Mr. Ahemeid's case, includes any evidence we are able to obtain through our international investigation that might corroborate his claims of being tortured at DGSE.

In Buchanan v. Angelone, 522 U.S. 269 (1998), Chief Justice Rehnquist, writing for a majority of the Court 20 years after Lockett, stated:

> [I]n the [penalty] phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination.
>
> * * *
>
> In the [penalty] phase, our cases have established that the sentencer may not be precluded from considering any constitutionally relevant mitigating evidence.

Buchanan, 522 U.S. at 276 (citations omitted). In Williams v. Taylor, 529 U.S. 362, 398 (2000), the Court noted that mitigating evidence can serve to lessen a defendant's "moral culpability" even where such evidence "does not undermine or rebut the prosecution's death-eligibility case."

The unbroken line of cases supporting liberal admission of mitigating evidence was extended by Tennard v. Dretke, 542 U.S. 274 (2004), where the Court rejected the notion,

19

originating with the Texas Court of Criminal Appeals and repeatedly endorsed by the Fifth Circuit, that evidence is not mitigating unless there is a nexus between the evidence and the crime. In Tennard, a six-member majority of the Court reversed the Fifth Circuit and bluntly criticized that court's longstanding practice of imposing a restrictive standard of relevance for mitigating evidence at the penalty-phase of Texas capital cases. Tennard reiterated that the threshold of relevance for mitigating evidence is minimal, stating:

> When we addressed directly the relevance standard applicable to mitigating evidence in capital cases in McKoy v. North Carolina, 494 U.S. 433, 440-441, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (1990), we spoke in the most expansive terms. We established that the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" than in any other context, and thus the general evidentiary standard – " 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence' "– applies. Id., at 440, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (quoting New Jersey v. T. L. O., 469 U.S. 325, 345, 83 L. Ed. 2d 720, 105 S. Ct. 733 (1985)). We quoted approvingly from a dissenting opinion in the state court: " 'Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.' " 494 U.S., at 440, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (quoting State v. McKoy, 323 N. C. 1, 55-56, 372 S.E.2d 12, 45 (1988) (opinion of Exum, C. J.)). Thus, a State cannot bar "the consideration of ... evidence if the sentencer could reasonably find that it warrants a sentence less than death." 494 U.S., at 441, 108 L. Ed. 2d 369, 110 S. Ct. 1227.
>
> Once this low threshold for relevance is met, the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital defendant's mitigating evidence. Boyde v. California, 494 U.S. 370, 377-378, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990) (citing Lockett v. Ohio, 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978); Eddings v. Oklahoma, 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982); [Penry v. Lynaugh], 492 U.S. 302, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (1989)); see also Payne v. Tennessee, 501 U.S. 808, 822, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991) ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death.... [V]irtually no limits are

20

placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." (quoting Eddings, supra, at 114, 71 L. Ed. 2d 1, 102 S. Ct. 869)).

Tennard, 542 U.S.at 284-85.

In Smith v. Texas, 543 U.S. 37, 45 (2004), decided five months after Tennard, the Court reiterated its rejection of the "nexus" requirement, stating, "[w]e rejected the Fifth Circuit's 'nexus' requirement in Tennard...."  More recently, the Court reaffirmed this point in an opinion authored by Justice Alito:

> [O]ur cases have firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future.

Abdul-Kabir v. Quarterman, 550 U.S. 233, 246 (2007); see also Ayers v. Belmontes, 549 U.S. 7, 21 (2006), where the Court described a jury's penalty-phase task as weighing "the finite aggravating factors against the *potentially infinite mitigators*" (emphasis added).

As Judge Urias discussed while granting the stay application advanced in Tsethlikai,

> [T]he role of mitigation work in capital cases is fundamental…. The American Bar Association has developed specific guidelines for capital defense practice, and as Defendant argues, courts have routinely applied these guidelines when assessing the reasonableness of defense counsel's representation. See Doc. 101 at 7 (citing Padilla v. Kentucky, 559 U.S. 356, 366 (2010) ("We long have recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable ...' ")). **The ABA Guidelines "require comprehensive records collection and multiple in-person meetings with clients and witnesses in both fact and mitigation investigation."** Doc. 101 at 9 (citing to American Bar Ass'n, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 31 HOFSTRA L. REV. 913 (2003) ("Guidelines") Guideline 10.7; American Bar Ass'n, Supplementary Guidelines for the Mitigation Function of Defense Teams in Capital Cases, 36 HOFSTRA L. R EV. 677 (2008) ("Supplementary Guidelines"), Guideline 10.11). As Defendant

21

outlines, the Supplementary Guideline 10.11 addresses the "requisite mitigation functions of the defense team," and these include:

• undertaking an "ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record ... or other factors which may provide a basis for a sentence less than death" 10.11(B);

• conducting "in-person, face-to-face, one-on-one interviews" with biopsychosocial history witnesses or any witness "who would support a sentence less than death,"

• "[m]ultiple interviews [which] will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation" 10.11(C);

• uncovering comprehensive documentary evidence of the client's biopsychosocial history for counsel's use, 10.11(D);

• aiding counsel with the selection and preparation of testifying witnesses, lay and expert, 10.11(E);

• gathering documentary support for lay and expert witness testimony, including biopsychosocial history records, 10.11(F), and aiding counsel in gathering and preparing demonstrative evidence that "humanize the client or portray him positively" 10.11(G). "The collection of corroborating information from multiple sources—a time-consuming task—is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence." Guideline 10.7 cmt.6.

Tsethlikai, 2025 WL 2962603, at *3-*4.

At present, the Government has yet to disclose evidence responsive to the discovery demands we have made which we believe will result in evidence corroborating Mr. Ahemeid's claim that he was tortured, both physically and emotionally, at DGSE. Certain of those requests remain *sub judice* before the Court. Nonetheless, regardless of what evidence the Government ultimately does or does not disclose responsive to those requests, it would be fundamentally unfair and unjust to require the defense to proceed without first having had the opportunity to restart and

22

complete our own investigation. That cannot be done, however, without funding, and defense counsel should not be required to shoulder that burden, particularly since so much of our income remains indefinitely deferred.

To be clear, we are each solo practitioners. We do not work for large law firms who can front the funding for us. Nor do we have "bank line[s]" (Tr. 12) that can cover these costs. And, unlike those court personnel who have only begun to see their income deferred as of October 19, 2025, see Memorandum, dated, October 24, 2025 (annexed hereto as, "Exhibit C"), at 2; see also Tr. 8, *we have not been paid on this case, or any other CJA case, in months*. As recognized by the Cardone Report, supra, "It is unfair to delay paying attorneys[.]"

### C.    An international investigation is both costly and time-consuming

Annexed hereto as, "Exhibit D," is a Declaration from Susan Garvey, National Mitigation Coordinator for the Administrative Office of the U.S. Courts' Habeas Assistance and Training ("HAT") Project, explaining that international defense investigations are both costly and time-consuming. As Ms. Garvey explains:

> The tasks attendant to these aspects of investigation, as I explain, are labor intensive and are almost always dependent on systems outside the control of defense counsel. Investigating in other countries requires substantially more time, much more money, and the assembling of a larger team and/or service providers. This is especially true in cases where the death penalty is or may be sought.

Exhibit D ¶ 2.

> On a practical level, before an overseas investigation can commence, counsel and the defense team must take several initial steps that will enable them to conceptualize a plan and identify resources needed to move forward. Counsel should immediately consult the State Department's "Do Not Travel" Advisory List to determine whether the country (or countries) in which investigation must be conducted are on it. Currently and since 2023, Mali has been on the list with a detailed State Department page devoted to explaining the extreme dangers associated with traveling there.

> When travel is discouraged and dangers noted, it is still possible to conduct investigation, but that requires more research, often a significant, additional expenditure of funds, and of course more time.
>
> … The goal is to identify in-country individuals who can advise on how most safely to perform investigations and who might assist investigators the team sends…
>
> After identifying individuals, counsel then needs to consult with them on multiple levels including but not limited to background on the country; whether they can assist either an investigator sent from overseas or identify someone local who is better-suited; systems for gathering any available records; and insights into the numerous safety issues implicated by foreign investigation. Safety is always paramount and it is frequently the case that individuals traveling to unsafe countries to conduct investigation procure insurance against kidnapping and ransom, particularly in areas like Mali where those realities are identified dangers.

Exhibit D ¶ 10-12 (footnotes omitted).

> With the immense additional time associated with establishing in country contacts and assistance, comes increased costs. In my experience, foreign investigation costs at least double and takes twice as long. And if investigation occurs in multiple foreign countries, the costs and time required balloon.

Exhibit D ¶ 13.

"In both a capital and non-capital case, counsel at every stage [have] an obligation to conduct thorough and independent investigations related to the issues of both guilt and penalty." Exhibit D ¶ 15, <u>citing</u>, Guideline 10.7, ABA Guidelines, 31 HOFSTRA L. REV. at 1015; Standard 4-4.1, *ABA Standards for Criminal Justice: Prosecution and Defense Function* (3d ed. 1993) (available                                                                                          at https://dids.nv.gov/uploadedFiles/didsnvgov/content/Resources/ABAStandardsfortheDefenseFunction(1).pdf) (last accessed, October 25, 2025).

Further, if, as here, a capital crime occurred overseas, "counsel of course [have] the duty

to conduct the fact investigation, including exploring any circumstances that give rise to pre-trial motions, in that country.  Undertaking this endeavor comes with additional complications.  Tools that capital counsel routinely rely on such as discovery, the Federal Freedom of Information Act, and access to physical evidence may be ineffective or unavailable." Exhibit D ¶ 15.

Of great relevance here:

> [T]he difficult task of locating witnesses is infinitely more complicated in foreign countries.  In the United States, multiple tiers of personal identifiers (such as driver's licenses and social security numbers) are collated in database and provided to entities and individuals, albeit sometimes at a cost.  Such systems are unlikely to exist in countries [like Mali] prone to geo-political instability and ravaged by crime.  Counsel will likely have to rely on contacts made in country to track down people in person.  Assuming counsel can locate individuals, persuading them to assist can be a daunting task.  Fact witnesses may possess significant safety concerns, particularly if the information sought exposes ineptitude or malfeasance by foreign actors who pose a potential threat to the witness or their family.

Exhibit D ¶ 17; see also Exhibit D ¶¶ 18-52 (discussing the additional complications attendant to an international *mitigation* investigation, specifically in a capital case such as this).

Federal courts have consistently recognized that cases involving foreign investigations are significantly more costly and time-consuming than domestic investigations.  See, e.g., Kyla Shipping Co. v. Shanghai Zhenhua Heavy Industry Co. Ltd., Docket No. 09-00765-CB-N, 2012 WL 1565634, at *7 (S.D. Ala. Apr. 30, 2012) (As a general rule, "Cases involving foreign parties and witnesses, not to mention substantial amounts of evidence located in a foreign country, are significantly more complex and time-consuming than most cases and require a disproportionate amount of judicial resources.").  Indeed, Congress has explicitly acknowledged the time-consuming nature of foreign investigations through statutory provisions designed to address these inherent delays.

25

For example, in United States v. Meador, 138 F.3d 986 (5th Cir 1988), the Fifth Circuit examined 18 U.S.C. § 3292, which allows for the suspension of criminal statute of limitations and Speedy Trial Act periods when foreign evidence is needed. The court explained that "[t]he purpose of 18 U.S.C. § 3292, apparent from its structure and legislative history, is to compensate for 'delays attendant in obtaining records from other countries.'" Meador, 138 F.3d at 994, quoting, H.R.Rep. No. 98-907, at 2-3 (1984), reprinted in 1984 U.S.C.C.A.N. 3579; see also Meador, 138 F.3d at 992 (explaining that Section 3292 was enacted "to extend statute of limitation and Speedy Trial Act deadlines when evidence located in foreign countries must be obtained"), quoting, H.R.Rep. No. 98-907, at 2-3, reprinted in 1984 U.S.C.C.A.N. 3182. This statutory framework represents legislative recognition that foreign investigations inherently require additional time that would otherwise prejudice prosecutions under standard limitations periods. Such reasoning should be no different to prevent prejudice to the defense. See U.S. Const., Amend. V ("No person shall … be deprived of life, liberty, or property, without due process of law…."). Moreover, the court's reasoning in Meador confirms that courts recognize foreign investigation delays as a legitimate and distinct procedural burden requiring special accommodations when the circumstances dictate – and such is the case *even absent* CJA funding lapses or government shutdowns.

## IV.    Conclusion

Accordingly, based upon all the above-stated reasons, Defendant Fawaz Ould Ahmed Ould Ahemeid, by and through counsel, respectfully requests a stay of the scheduling of Rule 12(b)(3)(A)(ii),(iii) and 12(b)(3)(C) motions and trial until: (1) the Attorney General reaches a decision on whether to seek the death penalty in this case (and, if the prior decision not to seek the death penalty is reversed, litigation on a motion to strike the Notice of Intent is complete); (2) CJA funding has been restored; and (3) the defense has been given sufficient time to restart and

26

complete our international investigation.

        As always, we thank the Court for its time and consideration.

Dated: New York, New York
       October 27, 2025

                                      Respectfully submitted,

                                      Michael K. Bachrach
                                      Anthony Cecutti
                                      Kestine Thiele

                                      *Attorneys for Defendant*
                                      *Fawaz Ould Ahmed Ould Ahemeid*

27