UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

UNITED STATES,

    v.                                         20 Cr. 502 (BMC)

FAWAZ OULD AHMED OULD AHEMEID,

        Defendant

----------------------------------------------------------X

**DEFENDANT'S MOTION TO STRIKE THE MARCH 25, 2026, NOTICE OF INTENT TO SEEK THE DEATH PENALTY IN LIGHT OF THE GOVERNMENT'S PRIOR NOVEMBER 25, 2024, NOTICE OF ITS INTENTION *NOT* TO SEEK THE DEATH PENALTY**

MICHAEL K. BACHRACH, ESQ.
224 West 30th Street, Suite 302
New York, New York 10001
(212) 929-0592
michael@mbachlaw.com

ANTHONY CECUTTI, ESQ.
217 Broadway, Suite 707
New York, New York 10007
(917) 741-1837
anthonycecutti@gmail.com

KESTINE THIELE, ESQ.
305 Broadway, Suite 700
New York, New York 10007
(212) 542-3860
kestine@kthielelaw.com

*Attorneys for Defendant Fawaz Ould Ahmed Ould Ahemeid*

## Table of Contents

Table of Authorities ......................................................................................................... iii

Preliminary Statement ..........................................................................................................1

Introduction ...........................................................................................................................1

Procedural History and Charges ........................................................................................4

Argument ............................................................................................................................13

    Point I

    Title 18, United States Code, Section 3593(a) Does Not Authorize a Reversal of a
    Prior Decision by the Department of Justice *Not* to Seek the Death Penalty ...................13

    Point II

    This Court Should Strike the Government's March 25, 2026, Notice Because
    "Good Cause" Does Not Exist for Its Filing ........................................................................18

    Point III

    This Court Should Strike the Government's March 25, 2026, Notice of Intent as
    Not Being Filed a "Reasonable Time" Before Any Capital Trial Date to Be Set in
    the Future ............................................................................................................................28

        A.    Lost Opportunity to Resolve this Case in a Manner that Would Preclude
               the Death Penalty .............................................................................................32

        B.    Psychological Harm Inflicted on Mr. Ahemeid ........................................................36

        C.    Lost Opportunities to Develop Guilt Phase and Penalty Phase Evidence
               and Mitigation ..................................................................................................40

        D.    Presumptive Prejudice .........................................................................................44

    Point IV

    The Government's November 25, 2024, No-Seek Notice Affirmatively Waived
    the Government's Ability to Thereafter File a Notice of Intent to Seek the Seath
    Penalty ................................................................................................................................48

Point V

The Government Is Estopped from Seeking the Death Penalty Under 18 U.S.C. § 3593(a) ............................................................................................................................51

    A.    Judicial Estoppel ............................................................................................51

    B.    Equitable Estoppel ..........................................................................................59

    C.    Promissory Estoppel .......................................................................................62

Point VI

Permitting the Government to Seek the Death Penalty Would Violate the Fifth Amendment's Due Process Clause ...............................................................................65

Point VII

Permitting the Government to Seek the Death Penalty Would Violate Mr. Ahemeid's Sixth and Eighth Amendment Right to Effective Assistance of Counsel and to Present a Meaningful Defense .............................................................................68

Point VIII

Permitting the Government to Seek the Death Penalty Would Violate the Eighth Amendment's Cruel and Unusual Punishments Clause.....................................................73

Conclusion ....................................................................................................................................76

## Exhibits

United States v. Hue,
Docket No. 2:24-cr-38-01-AWA-LRL
(E.D.VA April 14, 2026) (Doc. No. 243, therein) ..............................................................Exhibit A

Email from Gov't, dated, March 20, 2025........................................................................ Exhibit B

Declaration of Michael K. Bachrach, Esq., dated, April 27, 2026 ................................... Exhibit C

Declaration of Anthony Cecutti, Esq., dated, April 23, 2026............................................Exhibit D

Declaration of Sue Garvey, dated, October 25, 2025 ....................................................... Exhibit E

Brief for the National Association of Federal Defenders as Amicus Curiae in Support of Appellee, filed, November 7, 2025, United States v. Dangleben, Docket Nos. 25-2807, 25-2916 (3d Cir.) (Doc. No. 43, therein) ...............................................................................Exhibit F

**Table of Authorities**

FEDERAL CASES

Adelphia Recovery Trust v. Goldman, Sachs & Co.,
748 F.3d 110 (2d Cir. 2014)...................................................................................53, 54

Ake v. Oklahoma,
470 U.S. 68 (1985)......................................................................................................68

Arcadian Phosphates, Inc. v. Arcadian Corp.,
884 F.2d 69 (2d Cir. 1989)..........................................................................................63

Ashwander v. Tenn. Valley Auth.,
297 U.S. 288 (1936)....................................................................................................66

Austin v. Bell,
126 F.3d 843 (6th Cir. 1997) ......................................................................................71

AXA Marine Aviation, Ins. (UK) Ltd. v. Seajet Industries Inc.,
84 F.3d 622 (2d Cir. 1996)..........................................................................................54

Bamba v. W.I. Belvidere, Inc.,
579 F.2d 1067 (7th Cir. 1978) ....................................................................................59

Barcia v. Sitkin,
367 F.3d 87 (2d Cir. 2004)..........................................................................................46

Bates v. Long Island R. Co.,
997 F.2d 1028 (2d Cir. 1993)..............................................................51, 53, 54, 55, 56

Bates v. United States,
522 U.S. 23 (1997)......................................................................................................15

Beal v. Foster,
803 F.3d 356 (7th Cir. 2015) ......................................................................................75

Betterman v. Montana,
578 U.S. 437 (2016)....................................................................................................67

Borden v. United States,
593 U.S. 420 (2021)....................................................................................................11

Brady v. Maryland,
373 U.S. 83 (1963)................................................................................................47, 71

Brandt v. Hickel,
427 F.2d 53 (9th Cir. 1970) ...................................................................................51

Brown v. New York City Dept. of Educ.,
755 F.3d 154 (2d Cir. 2014).................................................................................64

Caldwell v. Mississippi,
472 U.S. 320 (1985).................................................................................................3

Chapman v. California,
386 U.S. 18 (1967).................................................................................................33

City of New York v. Shalala,
34 F.3d 1161 (2d Cir. 1994)..................................................................................60

Department of Homeland Security v. Regents of the University of California,
591 U.S. 1 (2020)...................................................................................................50

DeRosa v. National Envelope Corp.,
595 F.3d 99 (2d Cir. 2010)...............................................................53, 54, 55, 56

Doggett v. United States,
505 U.S. 647 (1992)........................................................................................44, 45

Doll v. Grand Union, Co.,
925 F.2d 1363 (11th Cir. 1991) ............................................................................64

Drozd v. INS,
155 F.3d 81 (2d Cir. 1998)....................................................................................59

Durr v. Shinseki,
638 F.3d 1342 (11th Cir. 2011) ......................................................................16, 24

Eddings v. Oklahoma,
455 U.S. 104 (1982)...........................................................................................3, 71

Estate of Carberry v. Commissioner of Internal Revenue,
933 F.2d 1124 (2d Cir. 1991)................................................................................59

Ford v. Wainwright,
477 U.S. 399 (1986)....................................................................................56, 69, 72

Giglio v. United States,
405 U.S. 150 (1972)...............................................................................................45

iv

Gregg v. Georgia,
428 U.S. 153 (1976)...............................................................................................66

Harmelin v. Michigan,
501 U.S. 957 (1991)...............................................................................................71

Harris v. Alabama,
513 U.S. 504 (1995)...............................................................................................71

Harris v. City of Philadelphia,
47 F.3d 1311 (3d Cir. 1995).................................................................................45

Hawkins v. Freeman,
195 F.3d 732 (4th Cir. 1999) ...............................................................................66

Intellivision v. Microsoft Corp.,
484 Fed.Appx. 616 (2d Cir. 2012).......................................................................53

Jama v. Immigration & Customs Enforcement,
543 U.S. 335 (2005)...............................................................................................15

Kaluczky v. City of White Plains,
57 F.3d 202 (2d Cir.1995).....................................................................................67

King v. St. Vincent's Hosp.,
502 U.S. 215 (1991)...............................................................................................22

McNally v. United States,
483 U.S. 350 (1987)...............................................................................................24

Merex A.G. v. Fairchild Weston Systems, Inc.,
29 F.3d 821 (2d Cir. 1994)..............................................................................62, 64

Neder v. United States,
527 U.S. 1 (1999)...................................................................................................33

New Hampshire v. Maine,
532 U.S. 742 (2001)...........................................................................51, 52, 53, 54, 56

Newman v. Graddick,
740 F.2d 1513 (11th Cir. 1984) ...........................................................................46

Niz-Chavez v. Garland,
593 U.S. 155 (2021)...............................................................................................50

v

Padilla v. Kentucky,
559 U.S. 356 (2010)..................................................................................36

Pereira v. Sessions,
585 U.S. 198 (2018)..................................................................................22

Raila v. United States,
355 F.3d 118 (2d Cir. 2004)......................................................................24

Ring v. Arizona,
536 U.S. 584 (2002)....................................................................................5

R.G. Group v. Horn & Hardart Co.,
751 F.2d 69 (2d Cir. 1984)........................................................................63

Rock Island, A. & L. R. Co. v. United States,
254 U.S. 141 (1920)..................................................................................50

Russello v. United States,
464 U.S. 16 (1983)....................................................................................15

Saffle v. Parks,
494 U.S. 484 (1990)....................................................................................3

Sampson v. United States,
832 F.3d 37 (1st Cir. 2016)........................................................................71

Santobello v. New York,
404 U.S. 257 (1971)..................................................................................45

Schmidt v. McKay,
555 F.2d 30 (2d Cir. 1977)........................................................................64

Shaffer v. Heitner,
433 U.S. 186 (1977)..................................................................................67

Skipper v. South Carolina,
476 U.S. 1 (1986)......................................................................................43

Spaziano v. Florida,
468 U.S. 447 (1984)..................................................................................72

St. Luke's Hospital Ass'n of Cleveland, Ohio, of Methodist Church v. United
States,
333 F.2d 157 (6th Cir. 1964) ....................................................................24

St. Regis Paper Co. v. United States,
368 U.S. 208 (1961)..............................................................................................50

Stringer v. Black,
503 U.S. 222 (1992)..............................................................................................27

Tennard v. Dretke,
542 U.S. 274 (2004)..............................................................................................71

Thomas v. Kuhlman,
255 F.Supp.2d 99 (EDNY 2003) ..........................................................................69

U.S. ex rel. Anti-Discrimination Center of Metro New York, Inc. v. Westchester
County, N.Y.,
712 F.3d 761 (2d Cir. 2013)...................................................................................46

United States for Use and Benefit of Noland Co. v. Wood,
99 F.2d 80 (4th Cir. 1938) .....................................................................................59

United States for the Use and Benefit of Humble Oil & Refining Co. v. Fidelity and
Casualty Co. of New York,
402 F.2d 893 (4th Cir. 1968) .................................................................................59

United States v. Black,
918 F.3d 243 (2d Cir. 2019)...................................................37, 39, 73, 74, 75

United States v. Boccanfuso,
882 F.2d 666 (2d Cir. 1989)...................................................................................60

United States v. Brown,
843 F.3d 74 (2d Cir. 2016).....................................................................................49

United States v. Cafaro,
Docket No. SSS 86 CR 245 (MJL),
1988 WL 138180 (SDNY Dec. 14, 1988) .............................................................63

United States v. Caraballo-Cruz,
52 F.3d 390 (1st Cir. 1995).....................................................................................49

United States v. Carter,
454 F.2d 426 (4th Cir. 1972) .......................................................................45, 76

United States v. Casseus,
282 F.3d 253 (3d Cir. 2002)...................................................................................14

United States v. Cerritos,
180 F.Supp.3d 432 (E.D.Va. 2016) ...................................................................14

United States v. Chatrie,
136 F.4th 100 (4th Cir. 2025) ...........................................................................66

United States v. Cole,
799 F.Supp.3d 438 (D.V.I. 2025) ............................................................... *passim*

United States v. Constanza-Galdomez,
787 F.Supp.3d 131, 136 (D.Md. 2025).......................................................... *passim*

United States v. Con-Ui,
Docket No. 3:13-CR-123 (ARC),
2016 WL 4140520 (M.D.Pa. Aug. 4, 2016) .....................................................47

United States v. Cuong Gia Le,
316 F.Supp.2d 343 (E.D.Va. 2004) ..................................................................19

United States v. Dangleben,
Docket No. 23 Cr. 072,
2025 WL 2647195 (D.V.I. Sept. 15, 2025) ....................................3, 18, 21, 25, 26, 48, 65

United States v. Dantzler,
771 F.3d 137 (2d Cir. 2014).............................................................................49

United States v. Doumanis,
Docket No. 17-CR-00087 (ALC),
2018 WL 623551 (SDNY Jan. 29, 2018) .........................................................63

United States v. Douglas,
525 F.3d 225 (2d Cir. 2008).............................................................................14

United States v. Ferebe,
332 F.3d 722 (4th Cir. 2003) ......................................................28, 29, 30, 31, 32, 46

United States v. Ferebe,
Docket No. L-97-0329,
2005 WL 1429261 (D.Md. June 16, 2005)......................................................28

United States v. Ghailani,
687 F.Supp.2d 365 (SDNY 2010).....................................................................47

United States v. Gomez,
617 F.3d 88 (2d Cir. 2010)................................................................................33

United States v. Gomez-Olmeda,
296 F.Supp.2d 71 (D.P.R. 2003).................................................................................76

United States v. Green,
Docket No. 12-CR-83S,
2018 WL 786185 (WDNY 2018) .................................................................................36

United States v. Hartwell,
73 U.S. 385 (1867)..............................................................................................22, 23

United States v. Hasting,
461 U.S. 499 (1983)............................................................................................32, 33

United States v. Haynes,
269 F.Supp.2d 970 (W.D.Tenn. 2003)..........................................................................5

United States v. Heatley,
39 F.Supp.2d 287 (SDNY 1998)..................................................................................62

United States v. Hue,
Docket No. 2:24-cr-38-01-AWA-LRL (E.D.VA April 14, 2026)
(Doc. No. 243, therein) ........................................................................... *passim*

United States v. Johnson,
117 F.4th 28 (2d 2024)................................................................................................33

United States v. Jones, et al.,
25 Cr. 345 (LJL) (SDNY) (Doc. No. 45, therein)..........................................................5

United States v. LaTray,
739 F.Supp. 88 (NDNY 1990)....................................................................................63

United States v. Littrell,
478 F.Supp.2d 1179 (C.D.Cal. 2007) .........................................................................66

United States v. Lopez-Matias,
522 F.3d 150 (1st Cir. 2008)...........................................................................4, 36, 60

United States v. Kaiser,
609 F.3d 556 (2d Cir. 2010)........................................................................................33

United States v. Matthews,
246 F.Supp.2d 137 (NDNY 2002)................................................................................5

United States v. McCullah,
76 F.3d 1087 (10th Cir. 1996) ....................................................................................27

United States v. McGill,
Docket No. 09 Cr. 2856,
2010 WL 1571200 (S.D.Cal. April 16, 2010)........................................................................2

United States v. Meehan,
Docket No. 2:22-cr-00002-JPH-CMM,
2026 WL 447431 (S.D.Ind. Feb. 17, 2026) ............................................................3, 52, 53

United States v. Merrell,
Docket No. 20 Cr. 046-1,
2025 WL 2911170 (N.D.W.Va. Oct. 7, 2025).....................................................................3

United States v. Olano,
507 U.S. 725 (1993)......................................................................................................49, 51

United States v. Paredes-Batista,
140 F.3d 367 (2d Cir. 1998)...............................................................................................60

United States v. Perez,
222 F.Supp.2d 164 (D.Conn. 2002).....................................................................................47

United States v. Perkins,
108 F.3d 512 (4th Cir. 1997) ..............................................................................................49

United States v. Petty,
Docket No. 1:25-cr-00123-CNS,
2025 WL 1333860 (D.Colo. May 7, 2025)..........................................................................47

United States v. Ponder,
347 F.Supp.2d 256 (E.D.Va. 2004) .....................................................................................31

United States v. Quinones,
313 F.3d 49 (2d Cir. 2002)....................................................................................................5

United States v. RePass,
688 F.2d 154 (2d Cir. 1982)................................................................................................59

United States v. Ron Pair Enterprises, Inc.,
489 U.S. 235 (1989)............................................................................................................23

United States v. Rosario,
237 F.Supp.2d 242 (EDNY 2002) .................................................................................62, 63

United States v. Saenz,
721 F.Supp.3d 188 (EDNY 2022) .......................................................................................47

x

United States v. Sattar,
Docket No. 02-395,
2003 WL 22510398 (SDNY Nov. 5, 2003)...........................................................................63

United States v. Spurlock,
782 F.Supp.3d 987 (D.Nev. 2025)................................................................ *passim*

United States v. St. Amour,
886 F.3d 1009 (11th Cir. 2018) .......................................................................................23

United States v. Suarez,
801 F.Supp.3d 872 (N.D.Cal. 2025) ...................................................................3, 13, 14, 18,
49, 53

United States v. Thompson,
921 F.3d 82 (2d Cir. 2019).............................................................................................49

United States v. Tsarnaev,
Crim. Action. No. 13-10200-GAO,
2013 WL 6196279 (D.Mass. Nov. 27, 2013) ...................................................................47

United States v. Waggoner,
339 F.3d 915 (9th Cir. 2003) ...............................................................................14, 18, 50

United States v. Wilk,
452 F.3d 1208 (11th Cir. 2006) ...................................................................28, 29, 30, 31

United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,
484 U.S. 365 (1988)........................................................................................................22

Watison v. Carter,
668 F.3d 1108 (9th Cir. 2012) .......................................................................................75

Whitley v. Albers,
475 U.S. 312 (1986)........................................................................................................75

Williams v. Taylor,
529 U.S. 362 (2000)........................................................................................................43

Williams v. Washington,
59 F.3d 673 (7th Cir.1995) .............................................................................................69

Woodson v. North Carolina,
428 U.S. 280 (1976)...................................................................................................66, 72

Zedner v. United States,
547 U.S. 489 (2006)........................................................................................................52

STATE CASES

Commonwealth v. Cosby,
252 A.3d 1092 (Pa. 2021)..................................................................................65

Hynes v. Tomei,
237 A.D.2d 52, 666 N.Y.S.2d 687 (N.Y. 2d Dept. 1997)...................................33

Johnson v. Baker,
139 P. 86 (Cal. 1914) ........................................................................................23

Miranda v. Contreras,
754 A.2d 277 (D.C. App. 2000)..........................................................................59

Moore v. State,
669 N.E.2d 733 (Ind. 1996) ..............................................................................32

Storms v. Stevens,
463 N.E. 401 (Ind. 1885) ...................................................................................23

STATUTES AND OTHER AUTHORITIES

18 U.S.C. § 2................................................................................................12, 69

18 U.S.C. § 2332....................................................................................12, 26, 69

18 U.S.C. § 924............................................................................................5, 11

18 U.S.C. § 3005................................................................................... *passim*

18 U.S.C. § 3006A..............................................................................16, 55

18 U.S.C. § 3591............................................................................5, 11, 12, 26, 70

18 U.S.C. § 3592............................................................................5, 11, 12, 26, 70

18 U.S.C. § 3593................................................................................... *passim*

18 U.S.C. § 3599...........................................................................2, 21, 22, 23

18 U.S.C. App. 3 § 2.......................................................................................47

28 U.S.C. § 2255.............................................................................................24

Fed.R.Crim.P. 12 ...........................................................................................10

Fed.R.Crim.P. 16 ................................................................................................47

Fifth Amend., U.S. Const.................................................................... 5, 65, 66, 67

Sixth Amend., U.S. Const.................................................................. 5, 68, 69, 73, 74

Eighth Amend., U.S. Const............................................................... 68, 69, 73, 75

Fourteenth Amend., U.S. Const .........................................................................67

Pub. L. 103-322, Title VI ("Death Penalty"), 108 Stat. 1982 (Sept. 13, 1994) .................21

Pub. L. 109-177, Title II, § 222(a), 120 Stat. 231 (March 9, 2006)..................................21

S.Rep.No. 96-823 (1980) ......................................................................................48

BLACK'S LAW DICTIONARY (10th ed. 2014) ........................................................64

RESTATEMENT (SECOND) OF AGENCY § 272 ......................................................45

RESTATEMENT (SECOND) OF CONTRACTS § 90 (1979).......................................63

RESTATEMENT (SECOND) OF CONTRACTS § 90 (1981).................................................63, 64

SUTHERLAND ON STATUTORY CONSTRUCTION § 46.05 (rev. 4th ed. 1984) .......................23

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1815 (1986)................................64

Guide to Judiciary Policy, Vol. 7A, Appx. 2A: *Model Plan for Implementation and Administration of the Criminal Justice Act*, XIV.B.10, at 25-31 (Sept. 2025 rev.) (available at https://www.uscourts.gov/file/vol07a-ch02-appx2apdf)................................2

Guide to Judiciary Policy, Vol 7., *Defender Services, Part A Guidelines for Administering the CJA and Related Statutes, Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations*) (available at https://www.uscourts.gov/administration-policies/judiciary-policies/guidelines-administering-cja-and-related-statutes-17#:~:text=all%20capital%20cases.-,%C2%A7%20610.20%20Judicial%20Conference%20Recommendations,on%20the%20judiciar y's%20public%20website)................................................................2, 25

Guideline 10.7, *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913, 1015 (2003) .................42, 70

Guideline 10.7, Commentary, *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA LAW REV. at 1020 (2023)....................................................................................70

Guideline 10.9.1, *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913, 1035 (2003) ........................35

Guideline 10.11, *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913, 1055 (2003) ........................70

Standard 4-4.1, *ABA Standards for Criminal Justice: Prosecution and Defense Function* (3d ed. 1993) (available at https://dids.nv.gov/uploadedFiles/didsnvgov/content/Resources/ABAStandardsfor theDefenseFunction(1).pdf) ...................................................................................................43

Standard 4-4.1, *ABA Standards for Criminal Justice: Prosecution and Defense Function* (2d ed. 1980).............................................................................................................43

Justice Manual § 9-10.000 ............................................................................................................2

Justice Manual § 9-10.030 ...............................................................................................16, 17, 64

Justice Manual § 9-10.040 ...............................................................................................16, 17, 26

Justice Manual § 9-10.120 .........................................................................................................36

Justice Manual § 9-10.130 ...........................................................................................................9

Justice Manual § 9-10.150 .................................................................................17, 21, 50, 60, 61, 64, 75

Attorney General Bondi Memorandum, dated, February 5, 2025, *Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions* (available at https://www.justice.gov/ag/media/1388561/dl) ......................8, 55, 58, 74, 75

Revised Plan of the United States District Court, Eastern District of New York, Pursuant to the Criminal Justice Ac of 1964 (18 U.S.C. § 3006A, as amended) (hereinafter, "EDNY CJA Plan"), § III (available at https://www.nyed.uscourts.gov/criminal-justice-act) ........................................................16

DOJ, Criminal Division, Capital Case Section, public website (available at https://www.justice.gov/criminal/capital-case-section)........................................................9

Russell Stetler, W. Bradley Wendel, *The Tenth Anniversary of the ABA Capital Defense Guidelines: The Road Traveled and the Road to be Traveled: Part One: The ABA Guidelines and the Norms of Capital Defense Representation*, 41 HOFSTRA L. REV. 635, 696 (2013)........................................................................................35

*Explosions and gunfire as armed groups launch coordinated attacks across Mali*, BBC News (April 25, 2026) (available at https://www.bbc.com/news/articles/clyx7nnrkqdo) ............................................................41

*Mali Imposes $10,000 visa bond on US visitors in tit-for-tat move*, BBC News (October 12, 2025) (available at https://www.bbc.com/news/articles/cx2729glzx8o) ............................................................40

*Mali and Burkina Faso impose travel ban on US citizens in tit-for-tat move*, BBC News (December 31, 2025) (available at https://www.bbc.com/news/articles/cgrdjx1d1vjo) ......................................................41, 72

*Mali: Events of 2025*, Human Rights Watch (2026) (available at https://www.hrw.org/world-report/2026/country-chapters/mali) ......................................................41

**Preliminary Statement**

Defendant Fawaz Ahemeid, by and through counsel, hereby moves this Court to strike the Government's Notice of Intent to Seek the Death Penalty (Doc. No. 159) (hereinafter, "Notice of Intent"), filed on March, 25, 2026 – *16 months after* the Government formally stated that it would *not* seek the death penalty in this case (Doc. No. 84) (hereinafter, "No-Seek Notice").  For the reasons that follow, Mr. Ahemeid respectfully submits that the Government's Notice of Intent must be stricken, and that the case must proceed non-capitally.

**Introduction**

The Government's March 25, 2026, Notice of Intent to Seek the Death Penalty attempts what no Attorney General prior to Attorney General Bondi had ever attempted before.  It defies longstanding precedent – both legal and practical – in an attempt to undermine long-understood notions of what is required to elevate a death-*eligible* case into one where the Government is permitted to seek the death penalty.  By simply ignoring its prior, formal, No-Seek Notice, the Government seeks a radical, highly disruptive, and cost-prohibitive departure from the manner in which Federal death penalty cases have been handled since the enactment of the Federal Death Penalty Act of 1994.  Doing so, however, is not permitted, as the Government's attempt to re-write the law of this case is barred by statute, equity, and the Constitution.

At the outset it should be understood that the Government is seeking this Court's "imprimatur [for] the creation of an entirely new regime for administration of the [Federal] death penalty, that ignores longstanding norms and practices," United States v. Constanza-Galdomez, 787 F.Supp.3d 131, 136 (D.Md. 2025) (internal quotation marks and citation omitted), in which the Government would be empowered to keep defendants and District Courts guessing about whether (and when) the Government will seek the death penalty even several years after the

1

Government has formally stated that it would *not* seek the death penalty in a given case. And, in that new regime, courts (and defendants) would be powerless to prevent such uncertainty.

Permitting the Government to proceed in that manner would work a radical change to longstanding norms and practices, reflected in Federal statutes, see 18 U.S.C. §§ 3005, 3599(a), policies of the Judicial Conference of the United States (one which the Department of Justice itself helped draft), see Guide to Judiciary Policy, Vol. 7A, Appx. 2A: *Model Plan for Implementation and Administration of the Criminal Justice Act*, XIV.B.10, at 25-31 (Sept. 2025 rev.) (available at https://www.uscourts.gov/file/vol07a-ch02-appx2apdf) (last accessed, April 15, 2026); Guide to Judiciary Policy, Vol 7., *Defender Services, Part A Guidelines for Administering the CJA and Related Statutes, Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations*) (available at https://www.uscourts.gov/administration-policies/judiciary-policies/guidelines-administering-cja-and-related-statutes-17#:~:text=all%20capital%20cases.-,%C2%A7%20610.20%20Judicial%20Conference%20Recommendations,on%20the%20judiciary's%20public%20website) (last accessed, April 15, 2026),[1] and even the Department of Justice's own Justice Manual, see Justice Manual § 9-10.000, *et seq*. (available at https://www.justice.gov/jm/jm-9-10000-capital-crimes) (last accessed, April 15, 2026).

Moreover, such a change would inject arbitrariness and fundamental unfairness into the area of our legal system in which courts "as much as is humanly possible" should take "extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process

---

[1] The Department of Justice helped draft the Guide to Judiciary Policy, Vol. 7, Pt. A, Ch. 6, § 670. See United States v. McGill, Docket No. 09 Cr. 2856, 2010 WL 1571200, at *3 (S.D.Cal. April 16, 2010) ("In September of 2007, the Judicial Conference of the United States approved a Criminal Justice Act Guideline, developed jointly by Department of Justice staff and defender services representatives, which recommends that the trial court establish a schedule for resolution of whether the government will seek the death penalty."), citing, *Guide to Judiciary Policy*, Vol. 7, Pt. A, Ch. 6, § 670.

that will guarantee … that the sentence was not imposed out of whim, passion, prejudice, or mistake." Caldwell v. Mississippi, 472 U.S. 320, 329 n.2 (1985), quoting, Eddings v. Oklahoma, 455 U.S. 104, 117-18 (1982) (O'Connor, J., concurring); see also Saffle v. Parks, 494 U.S. 484, 493 (1990) ("[A]bove all, capital sentencing must be reliable, accurate, and nonarbitrary").

Every court to have addressed this issue thus far has concluded that the Government's Notice of Intent must be stricken.  See United States v. Spurlock, 782 F.Supp.3d 987 (D.Nev. 2025); United States v. Constanza-Galdomez, supra, 787 F.Supp.3d 131 (D.Md. 2025); United States v. Cole, 799 F.Supp.3d 438 (D.V.I. 2025); United States v. Dangleben, Docket No. 23 Cr. 072, 2025 WL 2647195 (D.V.I. Sept. 15, 2025); United States v. Merrell, Docket No. 20 Cr. 046-1, 2025 WL 2911170 (N.D.W.Va. Oct. 7, 2025); United States v. Meehan, Docket No. 2:22-cr-00002-JPH-CMM, 2026 WL 447431 (S.D.Ind. Feb. 17, 2026); United States v. Hue, Docket No. 2:24-cr-38-01-AWA-LRL (E.D.VA April 14, 2026) (Doc. No. 243, therein) (annexed hereto as, "Exhibit A").[2]

Just as importantly, and as will be discussed in further detail in the pages that follow, these cases have found multiple reasons for striking the Government's Notice of Intent to Seek the Death Penalty, and have consistently agreed with the reasonings of the other decisions, all with the same resounding conclusion: what the Government attempts in this case cannot and should not be done. See also United States v. Suarez, 801 F.Supp.3d 872 (N.D.Cal. 2025) (in case where AG Bondi reaffirmed AG Garland's prior no-seek, the court nonetheless held, inter alia, that judicial estoppel

---

[2]    The Government has taken an appeal in Dangleben, which remains pending before the Third Circuit Court of Appeals.  The Government has declined to appeal the District Court's decisions striking the death penalty in Spurlock, Constanza-Galdomez, and Cole, to the Ninth, Fourth, and Third Circuits, respectively, and initially filed Notices of Appeal in Merrell and Meehan only to thereafter move to voluntarily dismiss its own appeals, motions which were granted by the Fourth and Seventh Circuits, respectively.  The Government's deadline to file a Notice of Appeal, if any, of the District Court's decision in Hue is May 14, 2026.  Only Dangleben is presently pending on appeal.

would preclude the Government from seeking the death penalty in the future and that the no-seek notice was irrevocable).

Accordingly, for the above reasons and those that follow, this Court should strike the Government's March 25, 2026, Notice of Intent *with prejudice* so that this case may then proceed as a non-capital case as had been intended by Attorney General Garland's decision not to seek the death penalty– a decision that was relied upon by both parties and by this Court. Cf. United States v. Lopez-Matias, 522 F.3d 150, 154 n.9 (1st Cir. 2008) ("Dismissal of the Notice is not as extreme as dismissal of an indictment. The government may still seek a conviction and the serious penalty of life imprisonment.").

**Procedural History and Charges**

On November 5, 2020, Mr. Ahemeid was charged in a six-count Indictment with offenses arising from his alleged membership in al-Qaeda in the Islamic Maghreb ("AQIM") and al-Murabitoun. See Indictment, filed, November 5, 2020 (Doc. No. 3). The Indictment accused Mr. Ahemeid of planning and committing three terrorist attacks in Mali: an attack on the La Terrasse restaurant in Bamako, Mali, on March 7, 2015, in which five people were killed; an attack on the Hotel Byblos in Sevare, Mali, on August 7, 2015, in which 13 individuals – including five United Nations workers – were killed; and an attack on the Radisson Blu Hotel in Bamako, Mali, on November 20, 2015, in which 20 victims were killed, including U.S. citizen Anita Ashok Datar.

Mr. Ahemeid was detained at a Malian intelligence facility in Bamako from April 2016 until December 2022, when he was extradited to the United States for prosecution on the November 5, 2020, Indictment. At this "black site," known as Direction Générale de la Sécurité d'Etat ("DGSE"), Mr. Ahemeid was tortured and repeatedly interrogated by multiple law enforcement agencies, which resulted in incriminating statements that will make up a substantial

4

portion (or possibly, bulk) of the Government's evidence in this case.[3]

Mr. Ahemeid's November 5, 2020, Indictment, notably omits "Special Findings" of aggravating factors as required by 18 U.S.C. §§ 3591, 3592, the absence of which prohibited the Government from seeking the death penalty absent the filing of a superseding indictment which included those findings.  See, e.g., Transcript, dated, September 30, 2025, United States v. Jones, et al., 25 Cr. 345 (LJL) (SDNY) (Doc. No. 45, therein), at 7 (the Government explaining, "So the way the indictment is currently charged we did not allege the special findings.  The 924(j) count is death eligible.  So at this point if we were to proceed on this indictment, it would not be a death-eligible case.  We are still waiting for final confirmation from Washington that we will not be directed to seek a superseding indictment that would allege the necessary special findings for a capital case.… But given the way the indictment is currently charged, it's technically not a death penalty case.").[4]

On December 10, 2022, Mr. Ahemeid was arraigned on the November 5, 2020, Indictment,

---

[3]     Upon information and belief, there is no dispute that Mr. Ahemeid was tortured while detained at DGSE, and that the FBI obtained incriminating statements from Mr. Ahemeid during his period of detention at that facility.  Still to be examined through separate litigation is the extent of United States participation and knowledge of the torture, as well as the impact such will have on the admissibility of Mr. Ahemeid's statements at trial.

[4]     The inclusion of "Special Findings" of aggravating factors is a required "element" of the offense, necessary to be found by a Grand Jury and alleged in the Indictment before the Government may pursue the death penalty as a potential punishment.  See United States v. Matthews, 246 F.Supp.2d 137 (NDNY 2002) (stating that Ring requires that "statutory aggravating factors 'must … be alleged in the indictment and found by a jury'"), quoting, United States v. Quinones, 313 F.3d 49, 53 n.1 (2d Cir. 2002) (in turn citing, Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428 (2002)); see also United States v. Haynes, 269 F.Supp.2d 970, 977 (W.D.Tenn. 2003) (holding that "the *mens rea* factors set forth in 18 U.S.C. § 3591(a)(2) and the aggravating factors defined in 18 U.S.C. § 3592(c) that make a defendant eligible for an increase in the maximum punishment from life imprisonment to death must be viewed as 'elements' of the offense triggering the Fifth and Sixth Amendment protections as described in Jones, Apprendi, Ring, and Harris."), citing, Ring, 122 S.Ct. at 2440, 2443.  As stated, these required "Special Findings" were not included in Mr. Ahemeid's November 5, 2020, Indictment.

and represented at the initial appearance by the Office of the Federal Defenders, with CJA counsel present but not yet appointed. CJA counsel was thereafter appointed *nunc pro tunc* to December 10, 2022, and hybrid representation ensued where Mr. Ahemeid was represented by the Office of the Federal Defenders, CJA Learned Counsel Anthony Cecutti, and CJA associate counsel Kestine Thiele.

On July 30, 2024, with the authorization not yet determined, the defense requested that the Court impose a deadline for the filing of the Government's Notice of Intent to Seek the Death Penalty, see Transcript, dated, July 30, 2024 (hereinafter, "7/30/24 Tr.") at 5, which the Government opposed, see id. at 6. Pressing the Government to reach a decision, this Court commented, "I just think the defendant is entitled to have this s[word] of Damocles, either confirm that it's really there or its not, and not to have it out there for four years." 7/30/24 Tr. 8. This Court also inquired whether the election might impact the decision-making process, see id. at 7, 13, and the Government assured this court, "To be clear, it is not my understanding that the outcome of the election would have any substantive effect on this review process." Id. at 13. This Court remained concerned regarding the impact of the 2024 election and pressed that the Court "want[ed] to get [a decision on the death penalty] done before there's any change in administration," which the Government agreed to communicate to the Attorney General's Office. Id. at 14; see also id. at 15 (this Court also stressing, "You don't have to wait until mid-December…. Implicit in what you're saying is that you're not, but if you can shorten that, shorten it.").

On October 30, 2024, this Court scheduled Mr. Ahemeid's trial to begin on October 14, 2025. See Transcript, dated, October 30, 2024 (hereinafter cited as, "10/30/24 Tr."), at 16. The intention appears to have been that the trial date being set was in anticipation of a non-capital trial. See, generally, 10/30/24 Transcript; cf. id. at 5 (this Court noting that it believed it "perfectly

6

feasible for there to be a determination" "before a new administration takes over").

Less than one month later, after what by that point had certainly become a lengthy, substantial, and thorough consideration, the Government provided notice to the Court and to the defendant that "the Attorney General ha[d] authorized and directed the government ***not*** to seek the death penalty against Fawaz Ould Ahmed Ould Ahemeid in the above-captioned matter." No-Seek Notice, dated, November 25, 2024 (Doc. No. 84) (emphasis added).

On December 19, 2024, AFD Jacobson and AFD Wells moved to withdraw as counsel "citing irreconcilable differences" with Mr. Ahemeid. Transcript, dated, December 19, 2024 (hereinafter cited as, "12/19/24" Tr.) at 3 (AFD Jacobson also noting, "Your Honor, I would just characterize the issue generally as a break down in communications and a lack of trust on Mr. Fawaz's part of the Federal Defenders. And so we don't object to his request to be relieved and for Mr. Cecutti and Ms. Thiele to continue on."). After confirming that Mr. Ahemeid did indeed wish to terminate the representation of AFD Jacobson and AFD Wells, this Court relieved both, see 12/19/24 Tr. 6, thereby having the impact of relieving the entire Office of the Federal Defender of New York, including a mitigation specialist, experts, and support staff (which included an Arabic-speaking paralegal).

On December 20, 2024, Michael K. Bachrach was appointed from this Court's CJA Terrorism Panel, to replace AFDs Jacobson and Wells. See Order, dated, December 20, 2024 (Doc. No. 87); see also 12/19/24 Tr. 4 (Mr. Cecutti explaining that he will be filing a request for the appointment of "someone who has security clearance and who is also on the terrorism panel").[5] Thereafter, non-Federal Defender support staff and experts had to be retained, now under the

---

[5]    The defense notes that Mr. Bachrach is also on this Court's CJA Capital Panel, though that was not the purpose of his appointment in this case, as also reflected in the fact that he was appointed on a CJA-20 (non-capital attorney appointment order), rather than a CJA-30 (capital attorney appointment order).

7

Criminal Justice Act, and an entirely new mitigation specialist was added to the defense team, as the case proceeded non-capitally with all eyes focused on upcoming non-capital motion deadlines.

On January 20, 2025, President Donald J. Trump was sworn in as the 47th President of the United States.

On February 5, 2025, Attorney General Bondi issued a Memorandum, *Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions* (available at https://www.justice.gov/ag/media/1388561/dl) (hereinafter cited as, "Bondi Memo.") (last accessed, April 15, 2026), wherein she instructed "[t]he Attorney General's Capital Review Committee … to review no-seek decisions in all pending capital-eligible cases (i.e., death-eligible cases that have not yet resulted in a conviction) **charged between January 20, 2021, and January 19, 2025.**" Bondi Memo. at 3 § III (emphasis added).

Based upon the time range stated in the Bondi Memo., this Court concluded that Mr. Ahemeid's case was "outside the period of review," Transcript, dated, February 12, 2025 (hereinafter, "2/12/25 Tr.") at 5.  Although the defense raised concern that Mr. Ahemeid's case would nonetheless be part of the review, the Government took the position that the case should proceed as if nothing had changed, arguing, "[I]t's our view that the case should proceed. And particularly, I think there are motions that can be briefed that have nothing to do with this issue and there's no reason to not be proceeding with those."  2/12/25 Tr. 7.  This Court relied upon Attorney General Garland's prior decision, coupled with the Government's position that the case should plow forward unhindered, to determine that the case would proceed as a non-capital case until the Court is told differently by the Government, holding, "I'm going to proceed on the assumption that when the government told me they were not seeking the death penalty that was the decision upon which I should plan the scheduling of this case." Id.

8

On March 20, 2025, the Government informed defense counsel by email that Attorney General Bondi was, in fact, reviewing Attorney General Garland's decision not to seek the death penalty in this case.  See Email from Gov't, dated, March 20, 2025 (annexed hereto as, "Exhibit B") (informing the defense that the Gov't "received notice yesterday that the Department of Justice's Capital Case Section (CCS) is reviewing the no-seek decision in US v. Ahemeid" and asking the parties "to propose a date approximately 90 days from today for the parties each (separately) to present to the CCS;" also informing the defense that if we wished to make a written submission to CCS, it was due "no less than one week before the CCS meeting").  The undersigned immediately informed Alan Nelson, 2d Cir. Case Budgeting Attorney, who, upon information and belief, in turn informed this Court by email on March 21, 2025.

Thereafter, the Attorney General's Capital Case Section ("CCS") scheduled defense counsel's meeting with the Attorney General's Review Committee on Capital Crimes ("AGRCCC") (referred to in Justice Manual as, "Capital Review Committee") for June 9, 2025, rendering a June 2, 2025, deadline for the filing of a written submission.[6]  Such meant that defense counsel was given only 74 days to prepare its written submission, and only 81 days to prepare its oral presentation.  The defense nonetheless met those deadlines.

On October 20, 2025, the Court sought an update on Attorney General Bondi's review of the prior no-seek decision.  See Transcript, dated, October 20, 2025 (hereinafter cited as, "10/20/25

---

[6]    "The CCS is primarily responsible for assisting the Attorney General's Review Committee on Capital Cases (AGRCCC) in its evaluation of capital cases submitted by United States Attorneys to the Department of Justice for review and recommendation to the Attorney General concerning the appropriateness of seeking the death penalty.  The CCS conducts a preliminary analysis of all cases in which the United States Attorney charges a defendant with a crime punishable by death and advises the AGRCCC of the factual and legal issues that are relevant to the Committee's recommendation to the Attorney General whether to seek the death penalty."  DOJ, Criminal Division, Capital Case Section, public website (available at https://www.justice.gov/criminal/capital-case-section) (last accessed, April 21, 2026); see also Justice Manual § 9-10.130 (describing role of the Capital Review Committee).

Tr."), at 3.  The Government responded that it "expected to have an answer that we can provide the Court by the end of next week [i.e., by October 31, 2025]." Tr. 4.  Unlike previously when the Government opposed setting a Notice of Intent deadline, see 7/30/24 Tr. 6, this time the Government sought one, see 10/20/25 Tr. 4 (the Gov't requesting, "And so if it's amenable to the Court … you can set a deadline for the end of next week for the government to file a letter [informing the Court whether Attorney General Garland's prior no-seek decision would be affirmed or attempted to be reversed]."). Given the change in how the prior Administration and the present Administration viewed the death penalty and when it should be sought, the defense opposed setting a deadline, explaining, "The reason for that is based upon what is happening across the country with capital cases is that when there is a deadline, there has been an increase in authorization decisions." Id. at 4 (the defense arguing against a deadline in an effort to avoid forcing Attorney General Bondi's hand); see also id. 5-6 (same).

At the same Court appearance, the Government sought an "expedited path … to do full briefing on [the] suppression motion," 10/20/25 Tr. 7, which the defense opposed raising the CJA funding crisis and explaining how it had been having an impact on the entire defense investigation, including in relation to the investigation necessary to support the anticipated suppression motion. See 10/20/25 Tr. 7-11.  This Court entertained briefing on the issue, and on November 7, 2025, granted Defendant's motion for a partial stay due to the CJA funding shortfall. See Order, dated, November 7, 2025 (Doc. No. 145).  The partial stay was only in relation to "the deadline for defendant's Rule 12(b)(3)(A)(ii)-(iii) and 12(b)(3)(C) motions, and trial," and only "until CJA funding has been restored and all deferred funds have been dispersed." Id. at 2.  The stay was not sought, nor granted, in relation to Attorney General Bondi's review of Attorney General Garland's

10

no-seek determination.[7]  CJA funding was restored shortly thereafter on November 12, 2025, and deferred payments were eventually made.[8]

On February 5, 2026, this Court granted Defendant's motion to dismiss Counts 2 and 3 of the Indictment, see Memorandum Decision and Order, filed, February 6, 2026 (Doc. No. 150) (dismissing the § 924(c) and § 924(j) counts following, inter alia, Borden v. United States, 593 U.S. 420, 423 (2021)), a decision which the Government declined to appeal, see Gov't letter, dated, March 6, 2026 (Doc. No. 152).

On March 11, 2026, during a status conference and without any prior indication that a decision had been reached, the Government provided oral notice to the Court, to Mr. Ahemeid, and to defense counsel, that Attorney General Bondi had directed the Government to seek the death penalty against Mr. Ahemeid notwithstanding Attorney General Garland's prior decision, notwithstanding the lack of an Indictment including the "Special Findings" required under 18 U.S.C. §§ 3591 and 3592, and notwithstanding the consistent caselaw holding that reversing a prior no-seek is not permitted.  See Transcript, dated, March 11, 2026 (hereinafter, "3/11/26 Tr."), at 4.

In response to the Government's oral notice, this Court directed the Government to file a formal written Notice of Intent to Seek the Death Penalty by March 25, 2026, see 3/11/26 Tr. 5. This Court likewise scheduled prompt briefing on the question of whether the Government may seek the death penalty after previously providing formal notice of the Attorney General's decision

---

[7]      Defendant's motion for a partial stay noted from the outset, "To be clear, this motion does not seek a stay of any motions that are already *sub judice*, nor does this motion seek to interfere with the timing of the Attorney General's decision whether to seek the death penalty."  Defendant's Motion for Partial Stay of Proceedings Due to Lapse in CJA Funding and Resulting Impact on Defense Investigation, dated, October 27, 2025 (Doc. No. 141), at 1 (emphasis in original).

[8]      The timing of the deferred payments depended on a number of factors not relevant to the present motion.  It was, however, months before defense counsel had been made whole.

that it had been directed *not* to do so.  Stated another way, the question presently before this Court is whether one Attorney General may reverse the decision of their predecessor not to seek the death penalty?  Id. at 4-6.[9]

On March 24, 2026, the Government filed a Superseding Indictment eliminating the dismissed counts and adding for the first time a "Special Findings" section pursuant to 18 U.S.C. §§ 3591 and 3592 as to Count 1, the Murder of Anita Ashok Datar in violation of 18 U.S.C. §§ 2332(a)(1) and 2.

On March 25, 2026 – exactly 16 months after the Government's notice that Attorney General Garland had directed it *not* to seek the death penalty – the Government reversed course providing notice to the Court and to the defendant that "the United States believes the circumstances in Count One of the Superseding Indictment are such that, in the event the defendant is convicted of Count One related to the death of victim Anita Ashok Datar, a sentence of death is authorized under 18 U.S.C. §§ 3591-98, and the United States will seek the death penalty for the following offense: the Murder of Anita Ashok Datar, 18 U.S.C. § 3223(a)(1) [sic]."  Notice of Intent to Seek the Death Penalty, dated, March 25, 2026 (Doc. No. 159), at 1.

---

[9]    It is defense counsels' understanding that the briefing presently scheduled is limited to the issue as described above, but not intended to include the plentitude of other challenges to the death penalty or to the Notice of Intent that would generally be filed after litigation of other death-penalty related issues such as capital case related discovery requests and/or a motion for an informative outline (also known as a penalty phase Bill of Particulars). As such, we reserve the right to submit additional challenges to the death penalty and to the Notice of Intent after such additional intervening litigation, all of which only becomes necessary if the present motion is denied.

**Argument**

**Point I**

**Title 18, United States Code, Section 3593(a) Does Not Authorize a Reversal of a Prior Decision by the Department of Justice *Not* to Seek the Death Penalty**

18 U.S.C. § 3593(a) provides:

> If, in a case involving an offense described in section 3591 [i.e., a federal offense carrying the death penalty as the maximum possible punishment], the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice –
>
> > (1)    stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and
> >
> > (2)    setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.
>
> The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information. The court may permit the attorney for the government to amend the notice upon a showing of good cause.

18 U.S.C. § 3593(a).

The defense respectfully submits that this Court should interpret 18 U.S.C. § 3593(a) in a manner that does not authorize the Government to reverse its prior formal decision *not* to seek the death penalty – that is, this Court should hold that a no-seek notice is irrevocable. See Suarez, 801 F.Supp.3d at 878 (holding that the Government's notice *not* to seek the death penalty is

13

"irrevocable"); cf. United States v. Waggoner, 339 F.3d 915, 918 (9th Cir. 2003) (in discussing the requirement that two counsel – including one "learned counsel" – be appointed in a capital case under 18 U.S.C. § 3005, the court noted "the government's *irrevocable decision* not to pursue the death penalty" when it filed a notice that it was not seeking the death penalty) (emphasis added); United States v. Cerritos, 180 F.Supp.3d 432, 438-39 (E.D.Va. 2016) (citing Waggoner with approval).[10]  "This is because 'after the government declare[s] that it [will] no longer seek the death penalty, the [defendants are] no longer capital defendants.'" Suarez, 801 F.Supp.3d at 878, quoting, Waggoner, 339 F.3d at 917-18 (in turn quoting, United States v. Casseus, 282 F.3d 253, 256 (3d Cir. 2002)); see also United States v. Douglas, 525 F.3d 225, 237 (2d Cir. 2008) ("[O]nce the government has formally informed the court and the defendant of its intention not to seek the death penalty, the matter is no longer a capital case within the meaning of § 3005 and that section does not require the district court to continue the appointment of a second attorney.").

Importantly, the Government's decision to renege on its prior No-Seek Notice finds no support in the text of 18 U.S.C. § 3593(a), which carefully delineates the circumstances under which a notice of intent to seek the death penalty may be issued or amended, but is wholly silent on the issue of reversing a prior decision not to seek death.  By its plain terms, the statute is framed exclusively in terms of "case[s] involving an offense described in Section 3591, [where] the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified," 18 U.S.C. § 3593(a). The statute makes no explicit reference to a notice by

---

[10]    See also Hue, supra (Exhibit A), at 24 & n.19 (holding, "Rather than conclude that § 3593(a) does not permit revocation of notices indicating a decision not to seek the death penalty *per se*, the Court concludes *in this case*, the Government cannot revoke its decision to not seek the death penalty against Mr. Hue because any such revocation is without good cause and untimely," and then noting, "The Court is not persuaded that the FDPA permits the Government to amend a no-seek notice. However, as noted above, for the purposes of this Order, the Court assumes *arguendo* that a no-seek notice may be amended and is therefore subject to the good cause requirement.") (emphasis added).

14

the Government declining to seek death. That textual limitation is significant: where Congress speaks in specific terms, courts "ordinarily resist reading words or elements into a statute that do not appear on its face." <u>Bates v. United States</u>, 522 U.S. 23, 29 (1997).  As the Supreme Court has stated: "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983) (brackets in original and citation omitted).

That limitation is reinforced by the statute's amendment provision. Subsection (a) explicitly permits the Government to amend the factors "for which notice is provided under *this* subsection [18 U.S.C. § 3593(a)]" (emphasis added), referencing only notices of intent to *seek* the death penalty.  In order words, Congress authorized incremental modification of an existing capital notice – not a wholesale reversal of a prior decision.  Stated another way, 18 U.S.C. § 3593(a) creates a specific mechanism for an amendment made in a defined context; as such, that mechanism should not be extended beyond its stated bounds. As the Supreme Court has long held, "We do not lightly assume that Congress has omitted from its adopted text requirements [something] that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." <u>Jama v. Immigration & Customs Enforcement</u>, 543 U.S. 335, 342 (2005).

Where, as here, Congress expressly imposed a "good cause" requirement for amendments to notices of intent to seek the death penalty, it is implausible that it would leave unaddressed the far more significant question of whether the Government may reverse a prior no-seek determination, particularly when the statute is framed exclusively in terms of notices of intent to *seek* the death penalty.  That Congress omitted any framework for issuing and amending no-seek

15

notices strongly suggests that Section 3593(a) does not authorize what the Government has attempted to do here.  Moreover, since, the statute requires good cause for such a relatively minor change in the Government's position (i.e., amending aggravating factors already included in a Notice of Intent to Seek the Death Penalty), then it would be absurd for the Government to be permitted to engage in a complete reversal of its decision *not* to seek the death penalty after it had filed a formal unconditional notice that it would not seek the death penalty 16 months earlier.  See, e.g., Durr v. Shinseki, 638 F.3d 1342, 1349 (11th Cir. 2011) ("Because the legislature is presumed to act with sensible and reasonable purpose, a statute should, if at all possible, be read so as to avoid an unjust or absurd conclusion.").

Beyond the plain face of the statute, the Department of Justice, as reflected in its Justice Manual, clearly believes that a no-seek notice is implicitly required by § 3593(a) in view of the requirements of a related statute, 18 U.S.C. § 3005, which mandates appointment of two defense counsel (at least one of whom is a qualified "learned counsel") in a federal death penalty case.[11]

As the Justice Manual provides:

> **9-10.030 - Purposes of the Capital Case Review Process**
>
> The review of cases under this Chapter culminates in a decision to seek, *or not to seek*, the death penalty against an individual defendant.  Each such decision must be based upon the facts and law applicable to the case and be set within a framework of consistent and even-handed national application of Federal capital sentencing laws….
>
> **9-10.040 - Consultation With the Capital Case Section**
>
> Prior to seeking an indictment for an offense potentially punishable by death, the United States Attorney or Assistant Attorney General

---

[11]    In this District, the Criminal Justice Act Plan requires *both* attorneys referenced in 18 U.S.C. § 3005 to be capitally qualified and appointed with that in mind.  See Revised Plan of the United States District Court, Eastern District of New York, Pursuant to the Criminal Justice Act of 1964 (18 U.S.C. § 3006A, as amended) (hereinafter, "EDNY CJA Plan"), §§ III(D)(1)-III(D)(2) (available at https://www.nyed.uscourts.gov/criminal-justice-act) (last accessed, April 15, 2026).

shall consult with the Capital Case Section….

\*       \*       \*

**9-10.150 - Post-Decision Actions**

In any case in which the Attorney General has directed the filing of a notice of intention to seek the death penalty, the United States Attorney or Assistant Attorney General shall not file or amend the notice until the Capital Case Section has approved the notice or the proposed amendment. The notice of intention to seek the death penalty shall be filed as soon as possible after transmission of the Attorney General's decision to seek the death penalty.

The United States Attorney or Assistant Attorney General should promptly inform the district court and counsel for the defendant once the Attorney General has made the ***final decision*** [one way or the other]. Expeditious communication is necessary ***so that the court is aware***, ***in cases in which the Attorney General directs the United States Attorney or Assistant Attorney General not to seek the death penalty***, that appointment of counsel under 18 U.S.C. § 3005 is not required or is no longer required. In cases in which the Attorney General directs the United States Attorney or Assistant Attorney General to seek the death penalty, the district court and defense counsel should be given as much opportunity as possible to make proper scheduling decisions.

Justice Manual §§ 9-10.030, 9-10.040, 9-10.150 (emphasis added).

In particular, in order to relieve District Courts of their statutory obligation under 18 U.S.C. § 3005, the Justice Manual requires the filing of a no-seek notice "so that the court is aware, in cases in which the Attorney General directs the United States Attorney or Assistant Attorney General ***not*** to seek the death penalty, that appointment of counsel under 18 U.S.C. § 3005 is not required or is no longer required." Justice Manual § 9-10.150 (emphasis added).

Equally important, the Department of Justice views this notice as the Attorney General's "final decision" with respect to the Government's authority to seek the death penalty under 18 U.S.C. § 3593. See Justice Manual § 9-10.150 ("The United States Attorney or Assistant Attorney General should promptly inform the district court and counsel for the defendant once the Attorney

17

General has made *the final decision* [about whether the Department will or will not seek the death penalty].") (emphasis added).  Although the Justice Manual itself does not create any enforceable rights for defendants, the Justice Manual does support Mr. Ahemeid's interpretation of § 3593(a).

For these reasons, this Court should find the Government's November 25, 2024, No-Seek Notice *irrevocable* and should strike the Government's March 25, 2026, Notice of Intent – regardless of whether the Government's Notice has been filed within a "reasonable time" before a future trial date or is supported by "good cause" within the meaning of 18 U.S.C. § 3593(a), neither of which we concede.

**Point II**

**This Court Should Strike the Government's March 25, 2026, Notice Because "Good Cause" Does Not Exist for Its Filing**

As stated, the District Court in Suarez and the Ninth Circuit Court of Appeals in Waggoner, have held that a no-seek notice is irrevocable, and in Hue the District Court noted it is "not persuaded that the FDPA permits the Government to amend a no-seek notice," but "for the purposes of [its] Order … assumes *arguendo* that a no-seek notice may be amended and is therefore subject to the good cause requirement." Hue, supra (Exhibit A), at 24 & n.19.  At a minimum, this Court should join Hue and all other courts to have addressed this issue to hold that any amendment to a prior no-seek determination must be supported by "good cause". See Hue, supra (Exhibit A), at 24-25; Spurlock, 782 F.Supp.3d at 1015 ("[A]t a minimum, Section 3593(a) requires the government to make a showing of good cause why, under the facts and circumstances of the case, it should be permitted to amend a no-seek notice."); Constanza-Galdomez, 787 F.Supp.3d at 146 (same); Cole, 799 F.Supp.3d at 448 (same); Dangleben, 2025 WL 2647195, at *6 (same); see also 18 U.S.C. § 3593(a) (stating that "[t]he court may permit the attorney for the government to amend the notice upon a showing of *good cause*.") (emphasis added).  "In this context, 'good cause must

18

focus on the diligence of the government in uncovering new information contained in the Amended Death Notice and the timing of when that information was obtained.'" Hue, supra (Exhibit A), at 24, quoting, United States v. Cuong Gia Le, 316 F.Supp.2d 343, 348-49 (E.D.Va. 2004).

Importantly, all courts to have examined this issue have likewise held that a change in position based merely upon the judgment of a new Administration (or new Attorney General), rather than being based upon new facts or new evidence, does not satisfy the "good cause" requirements of 18 U.S.C. § 3593(a). See, e.g., Constanza-Galdomez, 787 F.Supp.3d at 142, 146-47 ("The government does not hide the ball here—the only reason for its flip-flop on the death penalty was the change in administration," which the court found to be insufficient to establish "good cause"); Spurlock, 782 F.Supp.3d at 1016 (noting that the death notice does not reflect "new information … [t]he essential facts supporting the current charges and aggravators have been known to the government since the original indictment[,] including "all three homicides charged in [the] case"); see also Cole, 799 F.Supp.3d at 448 (rejecting argument that "change in administration and the accompanying 'dramatic attitudinal charge' towards capital punishment" could qualify as an "exigent circumstance[]" to "justify an extension of a [Notice of Intent] deadline."). More is required.

Courts have consistently held that, at the very least, the "good cause" requirement of 18 U.S.C. § 3593(a) applies when the Government seeks to renege on its prior no-seek notice. As the Court explained in Constanza-Galdomez:

> The statute seems to contemplate a less dramatic change than the one in this case – the true amendment of a pre-existing death notice. The government insists that the statute does not say anything about a new death notice, even if a change in position, and that the government is not required to have good cause to entirely change its mind. True, it is a little dismissive to refer to the momentous switch from a formal no-seek notice to a death notice as a mere "amendment." But the purpose of Section 3593(a) is to ensure that

19

the government can only change its mind regarding a death notice when there is good cause to do so. If Congress is concerned by the lesser, surely it would also be concerned with the greater. This Court agrees with Defendants that the principles Congress outlined in Section 3593(a) apply equally to this case.

Constanza-Galdomez, 787 F.Supp.3d at 146-47.

Similarly, as the court in Spurlock held:

[T]he Court agrees with Defendant that [§ 3593(a)] must be read either to prohibit withdrawal of a no-seek notice altogether or to require good cause to do so. ***Reading the statute to allow reversal of a no-seek notice without good cause, as the government proposes, would run contrary to the fundamental principles of statutory construction and public policy.*** Under that reading, the government would be required to show good cause to amend a single aggravating factor under 18 U.S.C. § 3593(a)(2), but would be at total liberty to modify its representations in the far more significant manner – where a defendant's rights and a court's resources are most at stake – by deciding at any time, for any reason, to seek the death penalty, after formally declaring the opposite. This interpretation is nonsensical for many reasons, including because reversal of a no-seek decision involves the noticing of many new aggravating factors, which are clearly the central subject of 18 U.S.C. § 3593(a)(2)'s good cause requirement.

Spurlock, 782 F.Supp.3d at 1014 (emphasis added); see also Cole, 799 F.Supp.3d at 456 ("This Court finds the reasoning of both the Spurlock court and the Constanza-Galdomez court persuasive and aligned with the purpose of Section 3593 in establishing procedural protections for capital defendants. It simply cannot be – as the Government contends – that the filing of a No-Seek Notice represents a legal nullity, to which the [Federal Death Penalty Act] attaches no significance.").

In Cole, the court explained further:

[H]olding that the Government may amend a No-Seek Notice to a Seek Notice without good cause would create an "unworkable and contradictory" outcome, such that "defense counsel and the Court would have to continue to treat every single capital-eligible case as a death case, regardless of an earlier representation that the government would not seek death, lest the government attempt to reverse its decision at the last minute." [Spurlock,] 782 F.Supp.3d at

20

> 1008.  That is precisely the outcome that the FDPA seeks to prevent. Thus, this Court concludes that assuming, without deciding, that the FDPA permits the reversal of a No-Seek Notice into a Seek Notice, Section 3593 requires the Government to demonstrate good cause to do so.

Cole, 799 F.Supp.3d at 456; see also Dangleben, 2025 WL 2647195, at *6 ("[T]he statute requires that any amendment of notices to seek the death penalty must be based upon 'good cause.'  Because the stakes are much higher when amending a no-seek notice to convert it to a notice to seek the death penalty, the standards for amendment should be even more applicable when attempting to amend a no-seek notice.").

As previously noted, 18 U.S.C. § 3593(a) does not explicitly require formal notice of the Government's decision *not* to seek the death penalty against a particular defendant facing capital charges, yet one is filed (or announced orally on the record) in every death-eligible case where death is not sought.  This is because the Department of Justice – as reflected in the Justice Manual – believes such notice is implicitly required by 18 U.S.C. § 3593(a). The Justice Manual requires the Government to provide such notice "so that the [district] court is aware … that appointment of counsel under 18 U.S.C. § 3005 is not required or is no longer required." Justice Manual § 9-10.150.

Indeed, 18 U.S.C. § 3593(a)'s implicit notice requirement concerning no-seek decisions is essential to the fair administration of the Federal Death Penalty Act, as a result of the interplay among 18 U.S.C. §§ 3005, 3593, and 3599(a).  Significantly, Congress enacted both § 3593(a) and the current version of § 3005 in the same 1994 legislation.  See Pub. L. 103-322, Title VI ("Death Penalty"), 108 Stat. 1982 (Sept. 13, 1994).[12]  Therefore, § 3593(a)'s notice requirement must be interpreted in light of §§ 3005 and 3599(a), which impose special obligations on Federal courts in

---

[12]    Section 3599(a) was added in a 2006 act. See Pub. L. 109-177, Title II, § 222(a), 120 Stat. 231 (March 9, 2006).

Federal death penalty cases.  See 18 U.S.C. § 3005 (requiring the appointment of two counsel, at least one of which "shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours," and directing that "[t]he defendant shall be allowed, in his defense to make any proof that he can produce by lawful witnesses, and shall have the like process of the court to compel his witnesses to appear at his trial, as is usually granted to compel witnesses to appear on behalf of the prosecution"); see also 18 U.S.C. § 3599(a)(1) (providing that "[n]otwithstanding any other provision of law to the contrary, in every criminal action in which a defendant is charged with a crime which may be punishable by death, a defendant who is or becomes financially unable to obtain adequate representation … shall be entitled to the appointment of one or more attorneys and the furnishing of … other services"); 18 U.S.C. §§ 3599(b)-(f) (explaining the minimum experience necessary for such appointments in a capital case, the stages to which the appointments apply, and authorizing the process for compensating other services in capital case beyond counsel as well).

The three statutes, when interpreted holistically, demonstrate congressional intent that the Department of Justice, after capital charges are filed, must give timely notice – *one way or the other* – about its intent to seek the death penalty so as to enable a District Court to comply with its special statutory obligations in Federal death penalty cases (or to know that such obligations do not exist).  See Pereira v. Sessions, 585 U.S. 198, 199-200 (2018) (interpreting a statute based in part on how it operated with a "neighboring provision"); United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988) (stating that statutory interpretation is a "holistic endeavor"). "[I]n construing [a] statute [a] court should adopt that sense of words which best harmonizes with context and promotes [the] policy and objectives of legislature." King v. St. Vincent's Hosp., 502 U.S. 215, 221 n.10 (1991), citing, United States v. Hartwell, 73 U.S. 385,

22

396 (1867), and 2A C. Sands, SUTHERLAND ON STATUTORY CONSTRUCTION § 46.05 (rev. 4th ed. 1984); United States v. St. Amour, 886 F.3d 1009, 1014 (11th Cir. 2018) (same).[13]

Indeed, there should be little doubt that when considering 18 U.S.C. §§ 3005, 3593, and 3599, holistically, the clear policy of Congress is for the Government to give a timely notice – *one way or the other* – concerning whether it intends to seek the death penalty after death-eligible charges have been filed.  Otherwise, a court could not meaningfully implement Sections 3005, 3599(a), and 3599(b)-(f).

Although the literal language of 18 U.S.C. § 3593(a) refers to "good cause" to amend a notice of intent to *seek* the death penalty, this is one of the rare situations in which "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 242 (1989) (citation and

---

[13]    In Hartwell, the Court stated:

> The object in construing penal, as well as other statutes, is to ascertain the legislative intent. That constitutes the law. If the language be clear it is conclusive.  There can be no construction where there is nothing to construe.  The words must not be narrowed to the exclusion of what the legislature intended to embrace; but that intention must be gathered from the words, and they must be such as to leave no room for a reasonable doubt upon the subject.  It must not be defeated by a forced and over-strict construction.  The rule does not exclude the application of common sense to the terms made use of in the act in order to avoid an absurdity, which the legislature ought not to be presumed to have intended.

Hartwell, 73 U.S. at 395-96; see also Johnson v. Baker, 139 P. 86, 88-89 (Cal. 1914) ("A statute must be construed with reference to the object to be accomplished by it, and in ascertaining such object, it is proper to consider the necessity for its enactment…. [W]hatever is necessarily implied in a statute is as much a part of it as that which is expressed."); Storms v. Stevens, 463 N.E. 401, 403 (Ind. 1885) ("In the construction of statutes the prime object is to ascertain and carry out the purpose and intent of the legislature.  To do this the words used in the statute should be first considered in their literal and ordinary signification.  But if, by giving them such a signification, the meaning of the whole statute is rendered doubtful, or is made to lead to contradictions or absurd results, the whole statute must be looked to, and the intent, as collected therefrom, must prevail over the literal import of terms and detached clauses and phrases.").

internal quotation marks omitted).  If 18 U.S.C. § 3593(a) were interpreted to permit the Government to change its mind and pursue the death penalty after previously filing a formal notice of its intent *not* to seek the death penalty – without having good cause to do so – absurd results could result.  See Durr, 638 F.3d at 1349 ("Because the legislature is presumed to act with sensible and reasonable purpose, a statute should, if at all possible, be read so as to avoid an unjust or absurd conclusion.").

For instance, without a good-cause requirement, the Government could change its position not merely 16 months after filing a no-seek notice (as occurred in the instant case) but could do so 5 years or even 10 years after filing a no-seek notice. The latter scenario could realistically occur if the Government filed a no-seek notice, the defendant proceeded to a non-capital trial and was convicted (and received a life sentence), but eventually, either after a successful direct appeal or after succeeding in having his murder conviction vacated in a post-conviction proceeding under 28 U.S.C. § 2255 – and only then the Government changes its mind and decides to seek the death penalty at a retrial. Permitting the Government to change its position by filing a § 3593(a) notice at that juncture would surely be absurd based on the decade of detrimental reliance by the defendant.  In applying the absurdity canon of statutory interpretation to § 3593(a), this Court must consider how a particular interpretation would apply in other cases as well as the instant case.  See, e.g., Raila v. United States, 355 F.3d 118, 123 (2d Cir. 2004); St. Luke's Hospital Ass'n of Cleveland, Ohio, of Methodist Church v. United States, 333 F.2d 157, 163-64 (6th Cir. 1964). Finally, any question about what 18 U.S.C. § 3593(a) requires or prohibits should be resolved in a defendant's favor under the rule of lenity (particularly when the death penalty is at issue). See McNally v. United States, 483 U.S. 350, 359-360 (1987).

The potential for a death sentence creates multiple time-consuming and costly obligations

24

on the part of the Federal court system to administer – including locating Learned Counsel willing to be appointed, appointing a mitigation specialist and other types of specialized experts for capital cases, and creating budgets for travel (e.g., to interview witnesses or to conduct a capital mitigation investigation).  If a formal notice that the Government is *not* seeking the death penalty can be withdrawn *without* good cause, then the Federal judiciary loses its ability to fairly and efficiently administer the various statutory obligations and additional obligations created by the Judicial Conference of the U.S. Courts. See Guide to Judiciary Policy, Vol 7., *Defender Services, Part A Guidelines for Administering the CJA and Related Statutes, Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations*), supra; see also Brief for the National Association of Federal Defenders as Amicus Curiae in Support of Appellee, dated, November 7, 2025, United States v. Dangleben, Docket Nos. 25-2807, 25-2916 (3d Cir.) (Doc. No. 43, therein; also annexed hereto as, "Exhibit F"), at 3-4 ("If 'no-seek' notices could be revoked at will, every death-eligible prosecution would necessarily remain a capital case until trial. That outcome would not only undermine the federal judiciary's ability to manage its dockets but also—because nearly all death-eligible defendants qualify for CJA representation—impose enormous and unnecessary burdens on the federal defender program, drain judiciary resources, and exhaust the limited pool of capitally-qualified counsel.") (and see remainder of amicus brief for further discussion).

Therefore, even assuming *arguendo* that 18 U.S.C. § 3593(a) permits the Government to change its position after previously filing a no-seek notice, this Court at least must determine whether the Government can demonstrate "good cause" for reneging on its prior no-seek notice. It certainly cannot do so in this case, and every court to address this issue has found good cause lacking there as well.  See Spurlock, 782 F.Supp.3d at 1014-1016; Constanza-Galdomez, 787 F.Supp.3d at 146-47; Cole, 799 F.Supp.3d at 448; Dangleben, 2025 WL 2647195, at *6; Hue,

supra (Exhibit A), at *24-*25; see also Spurlock, 782 F.Supp.3d at 1014 ("A reversal of a no-seek decision spurs more radical structural changes to the proceedings than any other type of amendment.") (citation omitted); Dangleben, 2025 WL 2647195, at *6 ("Because the stakes are much higher when amending a no-seek notice to convert it to a notice to seek the death penalty, the standards for amendment should be even more applicable when attempting to amend a no-seek notice.").

To be sure, here, the Government unquestionably had knowledge of the relevant facts authorizing a potential Federal death penalty prosecution no later than November 5, 2020, when it originally indicted Mr. Ahemeid (Doc. No. 3). In fact, even just to charge Count 1, the Government was required to receive the approval of the Attorney General or Deputy Attorney General for the Criminal Division, see 18 U.S.C. § 2332(d), and was likewise required to consult with the Capital Case Section "[p]rior to seeking an indictment for an offense potentially punishable by death," Justice Manual § 9-10.040.[14] Yet the Government chose not to file a Superseding Indictment with the "Special Findings" necessary to seek death, see 18 U.S.C. §§ 3591, 3592, until March 24, 2026, and chose not to file a Notice of Intent to Seek the Death Penalty

---

[14]    18 U.S.C. § 2332 is a unique and rarely charged statute that cannot be relied upon absent Attorney General (or Deputy Attorney General) certification. See 18 U.S.C. § 2332(d) ("No prosecution of any offense described in this section shall be undertaken by the United States except on written certification of the Attorney General or the highest ranking subordinate of the Attorney General with responsibility for criminal prosecutions that, in the judgment of the certifying official, such offense was intended to coerce, intimidate, or retaliate against a government or a civilian population."). The March 25, 2026, Notice of Intent to Seek the Death Penalty alleges, inter alia, that the offense was committed to "cause the death of a person or to commit an act of terrorism," that Mr. Ahemeid "killed or attempted to kill more than one person in a single criminal episode," that the "actions were motivated by national bias, contempt, and hatred," and that the "actions were motivated by a desire to inspire and encourage others to commit violent acts," Notice of Intent, ¶¶ C(3), C(4), D(3), and D(4), all of which it is reasonable to conclude must have been considered during the charging process required for Count 1 of the November 5, 2020, Indictment, see 18 U.S.C. § 2332(d); see also Justice Manual § 9-10.040.

until March 25, 2026 – both over 5 years and 4 months after the initial Indictment had issued.

No facts have changed since Mr. Ahemeid was initially indicted on November 5, 2020, nor have new charges been added.  Count 1 is identical in both versions of the indictment.  In fact, two counts have since been dismissed, including one capital count, just one month prior to the Attorney General's course reversal, see Order, dated, February 6, 2026 (Doc. No. 150) (dismissing Counts 2 and 3 of the November 5, 2020, Indictment), meaning that the Government's case *for death* against Mr. Ahemeid has only gotten weaker, not stronger, since the Government provided its November 25, 2024, notice that the Attorney General had "authorized and directed the government *not* to seek the death penalty against" Mr. Ahemeid (Doc. No. 84) (emphasis added).[15]

The only notable thing that has changed in this case between the time the November 25, 2024, No-Seek Notice was filed and when that decision was attempted to be reversed through the March 25, 2026, Notice of Intent, is the election of President Trump and the confirmation of Attorney General Bondi.  However, as previously stated, every court to address this issue has held that a change in Administration (or Attorney General) does not satisfy the "good cause" requirement of 18 U.S.C. § 3593(a).  See Constanza-Galdomez, 787 F.Supp.3d at 142, 146-47; Spurlock, 782 F.Supp.3d at 1016; see also Cole, 799 F.Supp.3d at 448.

Therefore, for all of these reasons, "good cause" does not exist under 18 U.S.C. § 3593(a)

---

[15]    The Government's penalty phase case for death being weaker now because the jury will only be asked to impose death on one capital count, rather than two, and will therefore only need to consider evidence in relation to one capital count, not two.  The number of capital counts also has obvious psychological impact on jurors as well.  Cf. United States v. McCullah, 76 F.3d 1087, 1111 (10th Cir. 1996) ("[D]ouble counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally…. When the sentencing body is asked to weigh a factor twice in its decision, a reviewing court cannot 'assume it would have made no difference if the thumb had been removed from death's side of the scale.'"), quoting, Stringer v. Black, 503 U.S. 222, 232 (1992).

to permit the Government to amend its November 25, 2024, No-Seek Notice.

## Point III

**This Court Should Strike the Government's March 25, 2026,
Notice of Intent as Not Being Filed a "Reasonable Time" Before
Any Capital Trial Date to Be Set in the Future**

Assuming *arguendo* that 18 U.S.C. § 3593(a) does not categorically prohibit a reversal of

the Government's November 25, 2024, No-Seek Notice, this Court should nonetheless strike the

Government's March 25, 2026, Notice of Intent as having not been filed "a reasonable time before

the trial or before acceptance by the court of a plea of guilty…." 18 U.S.C. § 3593(a).

"Courts analyzing whether an NOI was filed within a 'reasonable time before trial' in

recent cases involving reversal of a prior no-seek notice have applied either [United States v.]

Ferebe[, 332 F.3d 722 (4th Cir. 2003)] or [United States v.] Wilk[, 452 F.3d 1208 (11th Cir.

2006)]." Hue, supra (Exhibit A), at *25, citing, Spurlock, 782 F.Supp.3d at 1018-22 (applying

Wilk); Constanza-Galdomez, 787 F.Supp.3d at 139-45 (applying Ferebe), Cole, 799 F.Supp.3d

460-67 (applying Ferebe); see also Hue, supra (Exhibit A), at *25-*31 (applying and adapting

Ferebe to account for lack of trial date). "However, both Ferebe and Wilk addressed circumstances

in which the death penalty remained a possibility for the duration of pretrial proceedings." Hue,

supra (Exhibit A), at *26, citing, inter alia, Wilk, 452 F.3d at 1223 (noting the government filed

the death notice "by the … deadline set by the district court"); United States v. Ferebe, Docket No.

L-97-0329, 2005 WL 1429261, at *2-3 (D.Md. June 16, 2005) (noting on remand that despite the

fact that "the government had not yet filed a Death Notice," "the case was on schedule for a death

penalty trial"); see also Spurlock, 782 F.Supp.3d at 1020 ("The mere existence of the no-seek

notice also distinguishes this case from Wilk, where 'from the start, all parties knew [it] was a

likely death penalty case[.]'"); Constanza-Galdomez, 787 F.Supp.3d at 141 ("Ferebe is ordinarily

28

applied in cases where the death penalty was always a possibility, but the government delayed filing a formal death notice.").

Here, as in Hue, "this case presents a materially different posture [than Ferebe or Wilk]: the Government initially filed the No-Seek Notice and only later filed the NOI." Hue, supra (Exhibit A), at *26. In Hue, the Notice of Intent was filed "after the Court's deadline to file such a notice had passed," id., whereas here there was no such deadline, although the Government had blown through the tentatively scheduled non-capital trial date of October 15, 2025 and had indicated that it anticipated a decision from the Attorney General by the end of October 2025. See 10/20/25 Tr. 4 (the Gov't explaining, "I was told this morning that we expect to have an answer that we can provide the Court by the end of next week [i.e., by October 31, 2025]."); see also 10/20/25 Tr. 7 (this Court observing, "We tentatively had a trial date set of October 15, but, obviously, we weren't able to do that because of the death penalty consideration.").[16]

Neither Ferebe nor Wilk, nor any of the recent cases until Hue, addressed this issue in the context of having either *no* Notice of Intent deadline, *no* trial date, or neither. In Hue, however, decided just two weeks ago, on April 14, 2026, the Court held that "***it is not constrained to find the NOI reasonable simply because no trial date has been set***. Nor would it be appropriate to

---

[16]    We acknowledge that the Court and the Government had been willing to set a Notice of Intent deadline at the October 20, 2025, status conference, but that none was set in light of defense counsel's opposition. See 10/20/25 Tr. 4-6. The Government had represented, however, that it expected a decision from the Attorney General "by the end of next week [i.e., by October 31, 2025]." 10/20/25 Tr. 4. The defense relied upon that representation when opposing the deadline, because the defense was concerned that a firm deadline could force the Attorney General's hand towards an attempted reversal of the prior no-seek determination, which the defense was trying to prevent. See 10/20/25 Tr. 4 (Mr. Cecutti: "The reason for [the defense opposition to a deadline] is based upon what is happening across the country with capital cases in that when there is a deadline, there has been an increase in authorization decisions."); see also 10/20/25 Tr. 5-6 (Mr. Bachrach: "Your honor – we expect an answer by the end of next week. We appreciate that greatly and hope to see it. But we also know that there's always a chance that they [referring to the Attorney General and the Government] might need another couple of days, and we don't want to put them in a position where they have a firm deadline.").

ignore the actual prejudice suffered by Defendant in evaluating timeliness." Hue, supra (Exhibit A), at *28 (emphasis added); see also Hue, supra (Exhibit A), at *29-*31 (finding the Notice of Intent "Objectively Unreasonable" and determining that "the NOI must be struck.").

As stated, in Ferebe there was an existing trial date when the Government filed its notice that it would seek the death penalty against the defendants. Conversely, there was no such *existing* trial date in Mr. Ahemeid's case. Nevertheless, the District Court in Hue loosely followed the four-factor test in Ferebe to conclude that the lack of a scheduled trial date does not foreclose or weaken the argument that the Government's March 25, 2026, Notice of Intent was *not made* "a reasonable time" before a future trial. See Hue, supra (Exhibit A), at *28; see also 18 U.S.C. § 3593(a).

In Ferebe, the Fourth Circuit explained that courts evaluating the reasonable timeliness of a notice of intent to seek the death penalty consider, "among other factors that may appear relevant, (1) the nature of the charges presented in the indictment; (2) the nature of the aggravating factors provided in the Death Notice; (3) the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects; and, in addition, (4) the status of discovery in the proceedings." Ferebe, 332 F.3d at 737. Both the Fourth Circuit in Ferebe and the Eleventh Circuit in Wilk, emphasized that "this inquiry is not exhaustive but instead requires a holistic assessment of all relevant circumstances." Hue, supra (Exhibit A), at *27, citing, Ferebe, 332 F.3d at 737, Wilk, 452 F.3d at 1221 n.23.

The District Court in Hue recognized that since neither Ferebe nor Wilk had trial dates, neither is a perfect fit for evaluating the timeliness when no trial date has been set. However, the lack of a trial date is simply one factor (among many) to consider in this Court's "unrestricted evaluation of all the circumstances." Wilk, 452 F.3d at 1221 n.23 (recognizing that Ferebe

30

articulated four factors "in evaluating the reasonable timeliness of a Death Notice," but noting that "those four factors [are] 'among other factors that may appear relevant[,]'" and concluding that additional factors may be considered), citing and quoting, Ferebe, 332 F.3d at 737 (additional citation omitted).  As the District Court noted in Hue, "If the death penalty is to be sought, the sooner everyone knows, the better.  This is the policy underlying § 3593 and the impetus for the Court's decision to hold the Government's feet to the fire [by encouraging them to file a NOI earlier rather than later]." Hue, supra (Exhibit A), at *28 (bracketed text added by Hue), quoting, United States v. Ponder, 347 F.Supp.2d 256, 263 (E.D.Va. 2004).

"Consistent with that reasoning, courts confronting reversals of no-seek notices have examined whether any new evidence justified the delay."  Hue, supra (Exhibit A), at *28, citing, Constanza-Galdomez, 787 F.Supp.3d at 141 (holding that the decision to seek the death penalty and reverse the prior no-seek determination was not supported by any new information or evidence that could justify delay or reversal); see also Cole, 799 F.Supp.3d at 461 (same).  Here, as in Hue, Constanza-Galdomez, and Cole, no new evidence exists, nor were any new facts uncovered, nor any new charges added to the indictment.

Further, under Ferebe, Wilk, and now Hue, the ultimate question is whether the March 25, 2026, Notice of Intent was "reasonable" in relation to any future capital trial date that may be scheduled, and with respect to that question, the most important circumstance relied upon by Hue – the only case decided thus far with no trial date – is the fact that the defendant had "suffered substantial and irreparable prejudice" by the Government's No-Seek Notice followed by its attempt to reverse that position, Hue, supra (Exhibit A), at *29, which, in Mr. Ahemeid's case, occurred *16 months later* – even longer than in Hue.[17]

---

[17]    In Ferebe, the Fourth Circuit held that a court need not consider prejudice in deciding whether the Government's notice of its intent to seek the death penalty was filed a reasonable time

31

Specifically, the District Court found that Hue "suffered substantial and irreparable prejudice" due to, inter alia, the fact that "[a]fter the Government filed its No-Seek notice on December 27, 2024, Mr. Hue reasonably believed that death was no longer a possible punishment." Hue, supra (Exhibit A), at *29, citing, Constanza-Galdomez, 787 F.Supp.3d at 146 ("The anxiety [that the three defendants] have experienced is no doubt significant given the government's abrupt change in position."). The District Court also focused on the fact that Hue had rejected a life plea after receiving his initial no-seek "because he believed death was off the table, and life in prison was the most extreme penalty he would possibly face." Hue, supra (Exhibit A), at *30.

Here, like Hue, Mr. Ahemeid has suffered several types of substantial and irreparable prejudice.

### A.    Lost Opportunity to Resolve this Case in a Manner that Would Preclude the Death Penalty

In assessing prejudice resulting from the Government's attempted reversal of its No-Seek Notice, this Court should engage in a *counterfactual* assessment of such prejudice – i.e., if the defense had known at the time of the no-seek notice that the Government would seek to renege on it after a new Administration assumed office on January 20, 2025, would they have taken different actions than they did without such knowledge? See United States v. Hasting, 461 U.S. 499, 510-11 (1983) ("The [harmless-error] question a reviewing court must ask is this: absent the prosecutor's allusion to the failure of the defense to proffer evidence to rebut the testimony of the victims, is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?"); see also Moore v. State, 669 N.E.2d 733, 739-40 (Ind. 1996) ("The State bears the burden

---

before trial. See Ferebe, 332 F.3d at 733-34. However, the Fourth Circuit did not prohibit a consideration of prejudice if a defendant chooses to make such a showing and also did not address the scenario of a case with no trial date, such as Mr. Ahemeid's case. See Hue, supra (Exhibit A), at *28 (holding, "Nor would it be appropriate to ignore the actual prejudice suffered by Defendant in evaluating timeliness.").

of proof and, with it, the risk of plausible uncertainty. [A] reviewing court must consider a *counterfactual question* – whether the jury would have convicted the defendant absent the comment.") (emphasis added), citing, Chapman v. California, 386 U.S. 18, 24 (1967), Hasting, 461 U.S. at 510-11; Neder v. United States, 527 U.S. 1 (1999) (employing an explicitly counterfactual test asking whether "the jury verdict would have been the same absent the error"); United States v. Johnson, 117 F.4th 28, 43 (2d 2024) (for non-constitutional errors, "error is harmless if it is highly probable that it did not contribute to the verdict"), quoting, United States v. Gomez, 617 F.3d 88, 95 (2d Cir. 2010) (in turn quoting, United States v. Kaiser, 609 F.3d 556, 573 (2d Cir. 2010)).

Thus, a distinct type of prejudice suffered by Mr. Ahemeid resulting from the Government's unexpected change in its position about the death penalty is the lost opportunity to have resolved his case with a non-capital plea bargain or a plea to the Indictment, which at the time would have carried with it a maximum sentence of life imprisonment. If Mr. Ahemeid and his counsel had known that the Department of Justice would renege on its November 25, 2024, No-Seek Notice after the January 20, 2025 presidential inauguration, or even that such was realistically under consideration, they would have been strongly incentivized to convince Mr. Ahemeid to plead guilty – pursuant to a plea agreement or directly to the Indictment – before the inauguration, and Mr. Ahemeid would have likewise been strongly incentivized to have done so, thus precluding the Government's ability to seek the death penalty under 18 U.S.C. § 3593(a) and the Double Jeopardy Clause. See 18 U.S.C. § 3593(a) (in order for the Government to be permitted to seek the death penalty, the Notice of Intent to Seek the Death Penalty must be filed "a reasonable time before the trial *or before acceptance by the court of a plea of guilty*") (emphasis added); see also Hynes v. Tomei, 237 A.D.2d 52, 55 n.1, 666 N.Y.S.2d 687, 689 n.1  (N.Y. 2d Dept. 1997)

(discussing a defendant's differing incentives to plea bargain in a case with a capital charge depending on whether the prosecution is seeking the death penalty), rev'd on other grounds, 706 N.E.2d 1201 (N.Y. 1998).

Here, there is also a realistic likelihood that Mr. Ahemeid would have pleaded guilty – either pursuant to a plea agreement or directly to the Indictment – prior to the change in Administrations, and certainly the Government would be unable to establish that it is "highly probable" that a plea would *not* have been entered, given that as part of the no-seek reevaluation process, Mr. Ahemeid stated his willingness to accept a guilty plea, if offered, in exchange for the Government's agreement *not* to seek the death penalty against him.  See Bachrach Declaration at ¶ 17.  (We also confirmed during our meeting with the Attorney General's Capital Review Committee that Mr. Ahemeid was willing to plead guilty to the Indictment, which would carry a Guidelines recommendation of life imprisonment, if a no-seek was offered.  Id.)  Surely, if Mr. Ahemeid was willing to accept that offer in June 2025, he would have been willing to do so between November 25, 2024, and January 20, 2025, if presented with the same potential outcomes.[18]

Further, as stated in the declarations of Mr. Ahemeid's attorneys:

> Had we believed prior to President Trump's inauguration that the next Attorney General (i.e., Attorney General Bondi) would seek to reevaluate Attorney General Garland's no-seek determinations and would in some instances attempt to reverse those decisions, we would have worked tirelessly to ensure that Mr. Ahemeid disposed of this case prior to President Trump's inauguration.  I also believe that we would have been able to convince Mr. Ahemeid to plead guilty – either pursuant to a plea agreement or directly to the Indictment – prior to the change in Administrations given the ease in which Mr. Ahemeid expressed a willingness to plead guilty in exchange for a no-seek reaffirmation as part of our supplemental

---

[18]   Notably, Mr. Ahemeid's offer to plead guilty to the Indictment in exchange for an agreement from the Government that it would not seek the death penalty, remained open throughout the reevaluation period and was never withdrawn by the defense.

34

mitigation submission in June 2025.

It is my strong professional opinion that any competent defense lawyer who knows that the death penalty realistically remains a possible punishment for his or her client would work tirelessly to resolve the case in a manner that permanently avoids the imposition of such penalty against their client, and such would certainly have been my goal for Mr. Ahemeid. Indeed, it still is.

Bachrach Declaration (Exhibit C) at ¶¶ 18-19.

Had I believed prior to President Trump's inauguration that the next Attorney General would reevaluate Attorney General Garland's no-seek decisions, and specifically, his no-seek decision in Mr. Ahemeid's case, I would have most certainly worked to reach a disposition by way of a guilty plea from Mr. Ahemeid prior to the change in administration.

Cecutti Declaration (Exhibit D) at ¶ 13.

As noted in Spurlock, Guideline 10.9.1 of the *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913, 1035 (2003) (hereinafter cited as, "ABA Guidelines" or "ABA Guideline X") (available at https://www.americanbar.org/content/dam/aba/administrative/death_penalty_representation/2003 guidelines.pdf) (last accessed, April 19, 2026), requires attorneys for capital defendants "to explore a plea agreement." Spurlock, 782 F.Supp.3d at 1011-12; see ABA Guideline 10.9.1(A), 31 HOFSTRA L. REV. at 1035 ("Counsel at every stage of the case have an obligation to take all steps that may be appropriate in the exercise of professional judgment in accordance with these Guidelines to achieve an agreed-upon disposition."); see also ABA Guideline 10.9.1(B)(9)(a) ("Specifically, counsel should know and fully explain to the client … benefits the client might obtain from a negotiated settlement, including … a guarantee that the death penalty will not be imposed.").[19]

---

[19] As this Court is aware, the ABA Guidelines are "the defining architecture for any measure of effective performance" of defense counsel in a capital case. Russell Stetler, W. Bradley Wendel,

Although the court refused to "speculate about the extent to which defense counsel or Spurlock himself would have made different decisions if the government had timely disclosed its intention to seek the death penalty," the court refused to "ignore that a case on a capital track would have involved material differences in defense preparations which cannot be recreated by merely further continuing proceedings." Spurlock, 782 F.Supp.3d at 1011-12; see also United States v. Lopez-Matias, supra, 522 F.3d 150, 158 (1st Cir. 2008) ("We are also mindful that the mere possibility of a death sentence has serious effects. It changes the bargaining calculus in plea negotiations, alters the structure and procedure of the trial itself, and may represent a shift in the course of events that is impossible to undo.") (citations and footnote omitted).[20]

## B.    Psychological Harm Inflicted on Mr. Ahemeid

Mr. Ahemeid has been subject to clearly foreseeable, inhumane treatment, caused by the Government's attempt to renege on its November 25, 2024, No-Seek Notice. The Second Circuit, as well as other courts, have recognized that defendants suffer a significant psychological harm resulting from the Government's delay in deciding whether to seek the death penalty. See, e.g., United States v. Green, Docket No. 12-CR-83S, 2018 WL 786185, at *11 (WDNY 2018) (in

---

*The Tenth Anniversary of the ABA Capital Defense Guidelines: The Road Traveled and the Road to be Traveled: Part One: The ABA Guidelines and the Norms of Capital Defense Representation*, 41 HOFSTRA L. REV. 635, 696 (2013); see also Padilla v. Kentucky, 559 U.S. 356, 366 (2010) ("We have long recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like … are guides to determining what is reasonable.…'").

[20]    In Lopez-Matias the First Circuit also stressed, "The [Justice] Manual does state, 'The death penalty may not be sought, and no attorney for the Government may threaten to seek it, solely for the purposes of obtaining a more desirable negotiating position,'" Lopez-Matias, 522 F.3d at 158 n.15, quoting, Justice Manual § 1-10.110 (now § 9-10.120 in present version of Justice Manual), something, to be clear, no one is suggesting the Government attempted here. However, the language of Justice Manual § 9-10.120, "is, of course, an implicit recognition of the power of a possible death sentence to induce a guilty plea. It should also function as a safeguard against misuse of the death penalty authorization in this way. *But it would be fantasy to think the admonition dilutes the negotiating leverage created by the threat of capital punishment.*" Lopez-Matias, 522 F.3d at 158 n.15.

dismissing an indictment on Constitutional speedy trial grounds, the court noted among other factors the "unique anxiety and concern that comes with the looming prospect of the death-penalty, a prejudice not easily measurable and one absent in the majority of criminal cases."), aff'd sub nom., United States v. Black, 918 F.3d 243, 265 (2d Cir. 2019) ("[The defendants] were forced for two years and ten months to worry over whether the government would seek not just their liberty, but their lives. The magnitude of the anxiety and concern incurred by this decision is great, and this consideration weighs heavily in our determination that the delay here prejudiced [the defendants]."). The Government's deliberate conduct here has inflicted an even more inhumane type of psychological trauma, given that Mr. Ahemeid has been forced to *twice* wait for the Government to decide his fate, and worse, he was forced to do so the second time after being told that the Government had already rendered a final decision that it would not seek the death penalty against him. See Constanza-Galdomez, 787 F. Supp.3d at 146 ("The anxiety [that the three defendants] have experienced is no doubt significant given the government's abrupt change in position.").

To be clear, Mr. Ahemeid had been placed in a particularly unique and vulnerable position. He was originally detained pretrial in Mali at DGSE, where he was tortured both physically and psychologically by people acting in an official capacity in order to extract information and confessions from him on multiple occasions. He was subjected to extreme physical abuse, such as beatings and forced stress positions, and extreme psychological abuse, such as death threats, verbal abuse, sexual threats, and forced nakedness, along with deprivation of food, water, and sleep, stress to the senses through exposure to extreme heat and cold, blind folding, isolation, and forced witnessing of torture and death of others. Since that time, those experiences continue to traumatize him.

That type of unconscionable abuse forms the background of his experience in pretrial detention in the United States at MDC Brooklyn, where he has not been tortured in the traditional sense, but has nonetheless been placed in a situation where the continuing manifestations of his prior trauma (e.g., nightmares, stress, and extreme anxiety) have been multiplied by U.S. officials acting in their official capacity, namely the Government vis-à-vis the Department of Justice, by being first told the Death Penalty would not be sought, then told several months later that the Attorney General's final decision was being reconsidered, and then waiting another year to be told that the death penalty would be sought after all.  This all comes after having already waited nearly two years for Attorney General Garland to have made his initial decision on the matter – waiting periods both then and now that are the equivalent of purgatory.

For Mr. Ahemeid, the experience of being arrested, tortured, and detained at DGSE without any explanation or knowing what the future held for him not only completely disrupted his sense of safety, trust, self-esteem, and intimacy, but also destroyed his sense of power and control, leaving him with significant symptoms of PTSD, anxiety, and depression.  Given his history of severe trauma, this new series of events (i.e., after having waited approximately two years to learn that the Government would not be seeking the death penalty, to then learn a few months later that the decision was being reconsidered, and then ultimately over a year later to learn the decision had been reversed and that the Government would in fact be seeking his execution), further compounded the manifestations of his earlier trauma, aggravating his earlier symptoms of PTSD depression.

For Mr. Ahemeid, by their very nature, these recent events have echoed the impact of his experiences of torture while detained at DGSE – not knowing why and not knowing what the future holds – and have resulted in a new round of psychological torture, and, at the very least,

38

have built upon and worsened his existing stress and anxiety.  As observed by Mr. Cecutti:

> After being notified of Attorney General Bondi's decision to review the prior "no seek" decision, we met with Mr. Ahemeid.  We told him about the decision and need to prepare an additional or supplemental written submission.  This required ongoing meetings with a newly retained mitigation specialist and us.  While he engaged in the process, he did so reluctantly and with increased fatigue, distress and pessimism.
>
> Following the filing of our written submission and CCS meeting, we continued to meet with Mr. Ahemeid.  However, as months passed without a decision or any information regarding the decision, he began to withdraw and disengage.  From my observations, Mr. Ahemeid became increasingly depressed and anxious.  Further, he appeared to be under growing emotional and psychological distress as he awaited a decision as to whether Attorney General Bondi would seek the death penalty against him.
>
> On October 20, 2025, a status conference occurred.  The Court sought an update on Attorney General Bondi's review of the prior no-seek decision.  The government indicated that it expected a decision by the end of next week (i.e., by October 31, 2025).  This update provided some measure of relief to Mr. Ahemeid.
>
> When October 31, 2025 came and went, and no decision had been made, Mr. Ahemeid declined further, emotionally and psychologically.  He became further withdrawn and disengaged.  He also appeared to be suffering from increased depression and anxiety.  His trauma and mental health symptoms were actively present, and he continued to struggle to live with the uncertainty of his fate.

Cecutti Declaration (Exhibit D) at 16-19.

The background of the impact of Mr. Ahemeid's detention at DGSE, coupled with the anxiety and psychological impact of waiting two years for Attorney General Garland to make his decision, followed by learning that such decision was being reevaluated, and then having to wait an additional year for Attorney General Bondi to render her decision, is worse than what was suffered by the defendants in <u>Black</u>, *a case where the indictment itself was dismissed*, not merely the Notice of Intent as sought in the instant motion.  See <u>Black</u>, 918 F.3d at (affirming dismissal

of indictment on constitutional Speedy Trial Clause grounds due to trial delay that included "two years and ten months" waiting for a decision from the Attorney General "while the government dangled the prospect of a capital prosecution").

        **C.**      **Lost Opportunities to Develop Guilt Phase and Penalty Phase Evidence and Mitigation**

Since November 25, 2024, when the No-Seek Notice was filed, Mr. Ahemeid has suffered significant prejudice as the result of lost opportunities to develop guilt phase and penalty phase evidence and mitigation. While it has long been the case that Mali was designated by the State Department as a Level Four travel advisory, meaning that the Government advised U.S. citizens not to travel there, such did not constitute a complete prohibition. Such opportunity, however, has been unavailable to defense counsel. After initial attempts to obtain travel visas were denied by Mali (without prejudice to reapplication) when sought by defense counsel in 2024, see Cecutti Declaration at ¶ 9, *in response to the present Administration's immigration policies, Mali has now made it literally impossible for U.S. citizens to enter the country*, see also Cecutti Declaration at ¶ 9 n.2 ("In 2025, we again explored the possibility of traveling to Mali and intended to renew our attempts at obtaining visas. We learned, however, that we can no longer apply for visas, nor enter the country for any purpose. This remains true today").

First, Mali made visas more difficult to obtain by imposing a $10,000 visa bond for U.S. Citizens – a fee that was instituted while CJA payments were not taking place due to the CJA funding crisis. See *Mali Imposes $10,000 visa bond on US visitors in tit-for-tat move*, BBC News (October 12, 2025) (available at https://www.bbc.com/news/articles/cx2729glzx8o) (last accessed, April 16, 2026) (explaining that such has been imposed "in response to a similar requirement the Trump administration has imposed on its citizens").[21] Then, while still waiting for Attorney

---

[21]    See, generally, Defendant's Motion for Partial Stay of Proceedings Due to Lapse in CJA

General Bondi to complete her reevaluation of Attorney General Garland's no-seek determination, Mali imposed *a complete prohibition* on entry of U.S. citizens. See *Mali and Burkina Faso impose travel ban on US citizens in tit-for-tat move*, BBC News (December 31, 2025) (available at https://www.bbc.com/news/articles/cgrdjx1d1vjo) (last accessed, April 16, 2026) (explaining that such had likewise occurred "in response to a similar move by the Trump administration").

There is no indication when, or even if, this prohibition will be lifted, and until it is, defense counsel and our mitigation specialist cannot enter the country for any purpose – not for guilt phase investigation, not for penalty phase investigation. Any future investigation in Mali, also assumes the safety of defense counsel could be assured or at least protected to some reasonable extent – something that appears unlikely at present. See *Mali: Events of 2025*, Human Rights Watch (2026) (available at https://www.hrw.org/world-report/2026/country-chapters/mali) (last accessed, April 16, 2026) (explaining, inter alia, "The human rights situation in Mali deteriorated in 2025, as attacks against civilians by Islamist armed groups and abusive counterinsurgency operations by Malian armed forces and associated foreign fighters continued. By late August [2025], over 737,000 Malians were displaced within and outside of the country and 1.5 million people faced acute food insecurity." Also discussing ongoing armed forces attacks directed at – and killing – civilians throughout the year.); see also *Explosions and gunfire as armed groups launch coordinated attacks across Mali*, BBC News (April 25, 2026) (available at https://www.bbc.com/news/articles/clyx7nnrkqdo) (last accessed, April 26, 2026) (reporting that on Saturday, April 25, 2026, *as this motion was being written*, "Explosions and sustained gunfire were reported in Mali's capital Bamako as armed groups launched co-ordinated [sic] attacks across

---

Funding and Resulting Impact on Defense Investigation, dated, October 27, 2025 (Doc. No. 141) (discussing the timing of the deferment of CJA payments and the impact it had on Mr. Ahemeid's defense).

the country into Sunday…. The UK's foreign office has advised against all travel to Mali following the attacks, adding that Bamako International Airport has been temporarily closed.").[22]

Regardless of the armed attacks occurring in Mali as this motion is being drafted, the impact of the Malian travel ban on Mr. Ahemeid's ability to investigate guilt and penalty phase defenses prevents an even greater obstacle that cannot be overstated. As explained in the Declaration of Sue Garvey, dated, October 25, 2025 (annexed hereto as, "Exhibit E"):[23]

> In both a capital and non-capital case, counsel at every stage has an obligation to conduct thorough and independent investigations related to the issues of both guilt and penalty. If the capital crime occurred overseas, counsel of course has the duty to conduct the fact investigation, including exploring any circumstances that give rise to pre-trial motions, in that country. Undertaking this endeavor comes with additional complications. Tools that capital counsel routinely rely on such as discovery, the Federal Freedom of Information Act (FOIA), and access to physical evidence may be ineffective or unavailable. For example, if the principal law enforcement agents who investigated the crime are not Americans, then the disclosure obligations at the crux of criminal prosecutions may not be operational or optimal.

Garvey Declaration (Exhibit E) at ¶ 15, citing, ABA Guideline 10.7 (Duty to Investigate), 31 HOFSTRA L. REV. at 1015, also citing, Standard 4-4.1, *ABA Standards for Criminal Justice: Prosecution and Defense Function* (3d ed. 1993) (hereinafter cited as, "ABA Standards")

---

[22]    Because armed attacks are occurring across Mali as this motion is being written, it is impossible to assess what impact those attacks will have on the defense investigation (e.g., whether potential guilt or penalty phases witnesses will be killed during these attacks); this is an evolving situation. At the very least, these events complicate defense investigation, with the potential to significantly prejudice Mr. Ahemeid's defense – a separate and distinct form of prejudice in addition to the ongoing retaliatory travel ban against U.S. citizens.

[23]    Ms. Garvey is the National Mitigation Coordinator for the Administrative Office of the U.S. Courts' Habeas Assistance and Training ("HAT") Project. Her Declaration was originally annexed as Exhibit D to Defendant's October 27, 2025, Motion for Partial Stay of Proceedings Due to Lapse in CJA Funding and Resulting Impact on Defense Investigation (Doc. No. 141). We re-annex it here as Exhibit E due to its equal relevance to the present motion and for the convenience of the Court.

(available                                                                                          at

https://dids.nv.gov/uploadedFiles/didsnvgov/content/Resources/ABAStandardsfortheDefenseFun

ction(1).pdf) (last accessed, April 19, 2026).  Furthermore:

> The prevailing standard of care requires capital defense attorneys to conduct a thorough independent investigation to explore all avenues that might lead to mitigating evidence. See, e.g., Williams v. Taylor, 529 U.S. 362, 396 (2000) (citing 1980 ABA Criminal Justice Standards, Standard 4-4.1 cmt. at 4-55, in assessing the effectiveness of trial counsel's performance). The breadth of information considered mitigating is as extensive as the characteristics of the client, the facts of the client's entire life, circumstances surrounding the crime and the client's rehabilitative efforts since arrest. See, e.g., Skipper v. South Carolina, 476 U.S. 1, 4-5 (1986).

Garvey Declaration (Exhibit E) at ¶ 26; see also Point VII, infra (providing examples of how Mr.

Ahemeid's penalty phase investigation has been specifically impacted by the Malian travel ban);

see also, generally, Garvey Declaration (Exhibit E) (providing extensive discussion of the process

involved in conducting defense investigations in foreign countries and the difficulties, hurdles, and

impediments, that can specifically arise in such circumstances in a capital case).

In light of the travel bans that began during the period between the November 25, 2024,

No-Seek Notice, and the March 25, 2026, Notice of Intent, bans which continue to this day – not

to mention the worsening security concerns in Mali beginning in 2025 and hitting a peak as counsel

presently types – Mr. Ahemeid has lost the opportunity to develop guilt and penalty phase evidence

and mitigation.  Stated simply, while the defense investigation in Mali was always going to be

difficult, the Government's decision to reverse its earlier no-seek has had the consequence of

turning a difficult investigation into an impossible one.  Such forms a significant additional

prejudice to Mr. Ahemeid's defense and creates unfair advantages for the Government.

43

### D.      **Presumptive Prejudice**

Apart from the actual prejudice that Mr. Ahemeid has suffered, the Government's filing of its Notice of Intent to Seek the Death Penalty 16 months after its No-Seek Notice, coupled with its deliberate decision to renege on its prior formal notice that it was not seeking the death penalty, has also presumptively prejudiced Mr. Ahemeid. See Doggett v. United States, 505 U.S. 647, 656-57 (1992).

Doggett involved a constitutional speedy trial analysis in a case involving six years of unnecessary pretrial delay caused by the Government's negligence in arresting the defendant after his indictment. The Court presumed that the delay prejudiced the defendant:

> Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial [in a timely manner] occupies the middle ground. While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him…. [S]uch is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness ... and its consequent threat to the fairness of the accused's trial…. When the Government's negligence thus causes delay six times as long as that generally sufficient to trigger judicial review [i.e., six years] … and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence … nor persuasively rebutted, the defendant is entitled to relief.

Doggett, 505 U.S. at 656-58 (citations and internal quotation marks omitted); see also Constanza-Galdomez, 787 F.Supp.3d at 145-46 (citing Doggett for proposition that "[a] delay exceeding one year is 'presumptively prejudicial'").

The Court's reasons in Doggett for presuming prejudice in the speedy trial context likewise support presuming prejudice under 18 U.S.C. § 3593(a)'s timeliness standard in view of the Government's delay in announcing its intent to seek the death penalty (particularly coupled with

44

its prior no-seek notice filed 16 months earlier). Indeed, such a presumption applies even more forcefully here because the Government's actions have not been merely negligent, as they were in Doggett. Instead, they have been deliberate.

Any counterargument that the current leadership of the Department of Justice cannot be responsible for the actions of the former Administration's departmental leadership would contradict the Supreme Court's well-established rule that the acts, statements, and knowledge of one prosecutor are attributable to other prosecutors in the same case. See Giglio v. United States, 405 U.S. 150, 154 (1972) ("The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government."), citing, RESTATEMENT (SECOND) OF AGENCY § 272; see also Santobello v. New York, 404 U.S. 257, 262 (1971) (attributing one prosecutor's plea-bargain promise to a second prosecutor in the same office who had been unaware of the first prosecutor's promise when the second prosecutor breached the plea agreement at the defendant's sentencing); United States v. Carter, 454 F.2d 426, 427-28 (4th Cir. 1972) (en banc) (holding that a promise made by a Federal prosecutor in one judicial District on which a defendant relied is enforceable against a Federal prosecutor in a different District).

Although the Department of Justice may change its charging and sentencing policies in a new Administration and treat future litigants differently than litigants in past cases, it may not do so in a specific pending criminal case when a prior formal representation was made and its reversal would prejudice that specific defendant. See Harris v. City of Philadelphia, 47 F.3d 1311, 1327 (3d Cir. 1995) ("[T]he election of a new administration does not relieve it of valid obligations assumed by previous administrations. Just as the [new administration] would not have been free to break its contract with a vendor or other contractor because of the election of a new

45

administration, so too changes in administrative policy alone do not permit the [new administration] to unilaterally default on its obligations to the court and other litigants."); accord U.S. ex rel. Anti-Discrimination Center of Metro New York, Inc. v. Westchester County, N.Y., 712 F.3d 761, 771 (2d Cir. 2013) ("We now explicitly hold what we implied in Barcia: a local government is not relieved of its obligations under a consent decree taken on by a previous administration merely because new local officials will and do take office."), referencing, Barcia v. Sitkin, 367 F.3d 87 (2d Cir. 2004); Newman v. Graddick, 740 F.2d 1513, 1516-17 (11th Cir. 1984).

*　　*　　*

"Finally, the Ferebe factors, even as adapted [by the District Court in Hue], weigh against the Government." Hue, supra (Exhibit A), at *30.  Here, as in Hue, "The nature of the charges has not changed since the outset of the case.  The aggravating factors likewise present nothing new. The Government [will be able to] identif[y] no newly discovered evidence to justify its reversal." Id. at *30-*31. In Hue, the defendant had "not had reasonable time to conduct his own discovery on mitigation and on defenses to the aggravating factors," id. at *31, whereas here the circumstances are even worse, the defense has *lost* opportunities to investigate both guilt and penalty phase issues, and there is no telling when, or even if, that will change. See Point III(C), supra.

Additionally, similar to Hue, where it was "unclear what discovery, if any, has been produced to Defendant with regard to the sentencing phase," Hue, supra (Exhibit A), at *31, here the Government has failed to disclose essential evidence relevant to both the guilt and the penalty phases, see Defendant's Emergency Motion for Immediate Disclosure of Discovery Relevant to Attorney General Bondi's Evaluation of Whether to Maintain or Seek to Reverse Attorney General Garland's Prior Decision Not to Seek the Death Penalty in this Case, and for Relief Pursuant to 18

46

U.S.C. App. 3 § 2, dated, May 13, 2025 (Doc. No. 120), at 4 (seeking evidence relating to three categories of information that have *still* not been disclosed: (1) the conditions of confinement under which Mr. Ahemeid was held and subjected to at DGSE; (2) the methods of interrogation, "enhanced interrogation," and/or torture that Mr. Ahemeid was subjected to at DGSE; (3) the United States government's role in Mr. Ahemeid's interrogation, "enhanced interrogation," and/or torture at DGSE, including which USIC agencies were involved, how they were involved, and how long each individual interrogation, enhanced interrogation, and or torture practice took place; and (4) any memorialized basis for why the United States government waited seven years between Mr. Ahemeid's arrest in Mali and subsequent indictment in the United States.").[24]

---

[24]    The Government has taken the position that it "has already complied with its discovery obligations with respect to the first three categories of information the defendant requests in the instant motion," and that the defense is not entitled to discovery of the fourth. Gov't Resp. Letter, dated, May 23, 2025 (Doc. No. 127), at 2. To be clear, the Government has provided the defense with ***absolutely no discovery*** responsive to these essential categories of penalty phase evidence. To the extent the Government still believes that it has "complied with its discovery obligations," the Government may have a fundamental misunderstanding of what is required in a capital case – certainly now that this case has been authorized. See United States v. Saenz, 721 F.Supp.3d 188, 193 (EDNY 2022) ("The filing of the Notice of Intent to Seek the Death Penalty, standing alone, represents a material change in the interests at stake and the scope of the Government's obligations under Rule 16 and Brady."), citing, United States v. Perez, 222 F.Supp.2d 164, 168 (D.Conn. 2002) (filing of Notice of Intent changes scope of discovery such that "the Government's Brady obligations include disclosure of, inter alia, mitigating evidence") (additional citation omitted); see also United States v. Tsarnaev, 2013 WL 6196279, at *4 (D.Mass. Nov. 27, 2013) (holding that the Government's discovery obligations under Rule 16(a)(1)(E)(i) applies to "information material to defense preparation for the penalty phase."); United States v. Petty, 2025 WL 1333860, at *1 (D.Colo. May 7, 2025) ("the Court finds persuasive Mr. Petty's argument that he need only establish a 'substantial basis for claiming that a mitigating factor will apply at the penalty phase ... to invoke' the government's 'obligation under Brady and its progeny to produce any evidence which is material to that mitigating factor.'"), quoting, United States v. Con-Ui, 2016 WL 4140520, at *3 (M.D.Pa. Aug. 4, 2016); cf. United States v. Ghailani, 687 F.Supp.2d 365 (SDNY 2010) (holding "responsible officials within the DoJ who were involved in making the series of decisions [at issue in the discovery motion] were sufficiently involved with the prosecution properly to be considered 'the government' for Rule 16 purposes[] even if those officials had no other involvement with [the defendant's investigation or prosecution.... [F]or purposes of this Rule 16 motion, the term 'government' includes individuals at DoJ who participated in advising on or making the decisions regarding [the defendant's] prosecution[, and] Rule 16(a)(1)(E) requires that the government disclose these documents to the defense to the extent

Mr. Ahemeid has also *lost* the opportunity to plead guilty in a manner that would not expose him to the death penalty, see Point III(A), supra, has suffered significant psychological harm, see Point III(B), supra, and has been presumptively prejudiced, see Point III(D), supra. "In short, '[n]othing has changed [for the Government] other than the favorable position of the new administration regarding pursuit of the death penalty,'" Id. at *31, quoting, Constanza-Galdomez, 787 F. Supp. 3d at 143, yet so much has changed for the worse for Mr. Ahemeid.

Mr. Ahemeid respectfully submits that this Court should reach the same conclusion as the District Court did in Hue: "Taken together, these considerations compel the conclusion that the [Notice of Intent to Seek the Death Penalty] was not filed within a reasonable time under § 3593(a)," notwithstanding the fact that the tentative trial date had not been reset.  Hue, supra (Exhibit A), at *31.  Accordingly, as in Hue, "the NOI must be struck." Id.

## Point IV

**The Government's November 25, 2024, No-Seek Notice Affirmatively Waived the Government's Ability to Thereafter File a Notice of Intent to Seek the Seath Penalty**

Even assuming *arguendo* that 18 U.S.C. § 3593(a) does not itself prevent the Government from seeking the death penalty after filing a no-seek notice, the Government's No-Seek Notice nonetheless affirmatively and irretrievably *waived* its ability to thereafter seek the death penalty. See Spurlock, 782 F.Supp.3d at 1005 (finding the "government 'intentionally relinquished or abandoned' any challenge to the [] deadline, or at least forfeited any objection, by failing to timely raise it") (citation omitted); see also Dangleben, 2025 WL 2647195, at *4-*5 (reaching same

---

that they are within the possession, custody, or control of 'the government' as here defined and not otherwise protected from disclosure.") (footnote omitted); S.Rep.No. 96-823 at 9 (1980) ("the defendant should not stand in a worse position, because of the fact that classified information is involved, than he would without the [Classified Information Procedures] Act.").

conclusion); Suarez, 801 F.Supp.3d at 879 (finding Gov't has waived ability to reverse no-seek in the future); Hue, supra (Exhibit A), at *22-*23 & n.18 ("Because the Government neither withdrew nor sought to amend its No-Seek Notice, and then filed its NOI well beyond the February 20, 2025 deadline without requesting an extension, the Court finds that it waived its right to seek the death penalty in this case.") (citation omitted).

The Supreme Court has long explained that "waiver is the intentional relinquishment or abandonment of a known right," which "extinguish[es]" that right. United States v. Olano, 507 U.S. 725, 733 (1993) (noting that "forfeiture is the failure to make the timely assertion of a right," while "waiver is the intentional relinquishment or abandonment of a known right"); see also United States v. Dantzler, 771 F.3d 137, 146 n.5 (2d Cir. 2014) (explaining that "courts applying waiver doctrine have focused on strategic, deliberate decisions that litigants consciously make"). Both the Government and criminal defendants are subject to the waiver doctrine. See, e.g., United States v. Thompson, 921 F.3d 82, 85 n.4 (2d Cir. 2019) (applying waiver to the Government); United States v. Brown, 843 F.3d 74 (2d Cir. 2016) (applying waiver to criminal defendant); see also, e.g., United States v. Caraballo-Cruz, 52 F.3d 390, 393 (1st Cir. 1995) (referring to waiver, "[W]hat is sauce for the defendant's goose is sauce for the government's gander."); United States v. Perkins, 108 F.3d 512, 516 & n.15 (4th Cir. 1997) (applying the same forfeiture/waiver analysis to a claim of error asserted by the Government for the first time on appeal as the court applies to a claim raised by a defendant for the first time on appeal).

The Government's formal statement in a court filing that it does not intend to satisfy statutory requirements operates as an irrevocable waiver of the Government's ability in the future to seek to satisfy those procedural requirements. See Suarez, 801 F.Supp.3d at 879 ("The Department of Justice's own Justice Manual indicates that the purpose of the no-seek notices filed

49

by the Government was to communicate to the Court and Defendants that 'the Attorney General has made the *final decision*' not to seek the death penalty. The Government was fully aware of the weight that such a notice carries and at no point indicated an intention to deviate from its practice of ascribing finality to no-seek notices.  Because more than a year has now passed since the Government's first no-seek notice, the Court agrees with Defendants that the Government has waived its right to seek the death penalty in this case."), citing, Justice Manual § 9-10.150 (emphasis added); cf. United States v. Waggoner, 339 F.3d 915, 918 (9th Cir. 2003) (in discussing requirement that two counsel – including one "learned counsel" – be appointed in a capital case under 18 U.S.C. § 3005, the court noted "the government's *irrevocable decision* not to pursue the death penalty" when it filed a notice that it was not seeking the death penalty) (emphasis added).

"Justice Holmes famously wrote that '[m]en must turn square corners when they deal with the Government.' … But it is also true, particularly when so much is at stake, that 'the Government should turn square corners in dealing with the people.'" Department of Homeland Security v. Regents of the University of California, 591 U.S. 1, 24 (2020), quoting, Rock Island, A. & L. R. Co. v. United States, 254 U.S. 141, 143 (1920), and St. Regis Paper Co. v. United States, 368 U.S. 208, 229 (1961) (Black, J., dissenting); see Hue, supra (Exhibit A), at *32 (restating same as, "If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them."), quoting, Niz-Chavez v. Garland, 593 U.S. 155, 172 (2021).

Here, the Government filed a formal written notice of the Attorney General's knowing, voluntary, thoughtful, and intentional, decision and direction *not* to seek the death penalty against Mr. Ahemeid in this case.  That alone is sufficient to waive the right to take a contrary position, since the filing of a "final decision" *not* to seek the death penalty, see Justice Manual § 9-10.150,

50

is an "intentional relinquishment or abandonment of a known right," which "extinguish[es]" that right, Hue, supra (Exhibit A), at *22, quoting, Olano, 507 U.S. at 733. Moreover, at no point did the Government move to withdraw the November 25, 2024, No-Seek Notice, nor seek leave from the Court to amend its prior filing – "even though it is well understood that such procedural mechanisms exist in federal court." Hue, supra (Exhibit A), at *23 n.18. "To say to [Mr. Ahemeid], whose li[fe] [is] at stake, 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government." Constanza-Galdomez, 787 F.Supp.3d at 147, quoting, Brandt v. Hickel, 427 F.2d 53, 57 (9th Cir. 1970).

Accordingly, for all these reasons, the Government's November 25, 2024, formal no-seek notice (Doc. No. 84), waived the Government's ability to thereafter seek to reverse that decision.

## Point V

### The Government Is Estopped from Seeking the Death Penalty Under 18 U.S.C. § 3593(a)

In addition to having waived its ability to file an 18 U.S.C. § 3593(a) notice of its intent to seek the death penalty, the Government is estopped from doing so. There are at least three different types of estoppel that apply here – judicial estoppel, equitable estoppel, and promissory estoppel.

### A.    Judicial Estoppel

The doctrine of judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken in a prior legal proceeding. See New Hampshire v. Maine, 532 U.S. 742 (2001); Bates v. Long Island R. Co., 997 F.2d 1028 (2d Cir. 1993). The doctrine is intended to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment" and "playing fast and loose" with the courts. Maine, 532 U.S. at 749-50; see also Bates, 997 F.2d at 1038 (explaining that the doctrine of judicial estoppel doctrine serves two distinct purposes: it

51

preserves the sanctity of the oath "by demanding absolute truth and consistency in all sworn positions," and it protects judicial integrity "by avoiding the risk of inconsistent results in two proceedings."); see also Cole, 799 F.Supp.3d at 469 ("The Government cannot be allowed to play 'fast and loose' with decisions involving life and death."), citing, Spurlock, 782 F.Supp.3d at 1013, Constanza-Galdomez, 787 F.Supp.3d at 148-49. "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken[.]" Zedner v. United States, 547 U.S. 489, 504 (2006).

All courts to have ruled on the issue have concluded that the doctrine of judicial estoppel applies to the situation at bar, where the Government attempts to seek the death penalty after previously giving formal notice that it would not, and in each instance the court has stricken the Notice of Intent. See Hue, supra (Exhibit A), at *31-*35; Meehan, 2026 WL 447431, at *2-*6; [25] Constanza-Galdomez, 787 F.Supp.3d at 147-48, Spurlock, 782 F.Supp.3d at 1009-13. Here, for essentially the same reasons that the District Courts gave in applying the judicial estoppel doctrine in each of those cases, this Court should hold that the Government is judicially estopped from seeking the death penalty against Mr. Ahemeid.

As explained by the District Court in Constanza-Galdomez, applying the three-part test laid out in Maine:

> The Supreme Court laid out three factors for courts to consider in New Hampshire v. Maine, 532 U.S. 742 (2001): (1) "a party's later position must be clearly inconsistent with its earlier position;" (2) a court must "inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial

---

[25] Notably, in Meehan, the Court granted the motion to strike the Notice of Intent **solely** on judicial estoppel grounds, see Meehan, 2026 WL 447431, at *6, and observed, "the court therefore does not address Mr. Meehan's other arguments…." Meehan, 2026 WL 447431, at *6 n.3.

52

> acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) a court must ask "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."
>
> All three of those factors favor applying judicial estoppel here. A notice of intent to seek the death penalty is the direct opposite of the prior statement by the government that it would not. This Court effectively accepted that statement in managing this case as a non-capital RICO case for its duration. Finally, and most concerning to this Court in this case, allowing the government to reverse course would impose an unfair detriment on the defense.

Constanza-Galdomez, 787 F.Supp.3d at 147-48; accord Spurlock, 782 F.Supp.3d at 1009; Suarez, 801 F.Supp.3d at 876-77; Meehan, 2026 WL 447431, *3; Hue, supra (Exhibit A), at *33-*34.

The Supreme Court "has made clear that judicial estoppel is a flexible doctrine, without fixed requirements," Intellivision v. Microsoft Corp., 484 Fed.Appx. 616, 620 (2d Cir. 2012), citing, Maine, 532 U.S. at 749, which in the Second Circuit has generally resulted in either the three-element test discussed in Maine, or a two-element test that omits the prejudice (or "unfair advantage" or "unfair detriment") element, depending on the circumstances in which the issue is raised. See Adelphia Recovery Trust v. Goldman, Sachs & Co., 748 F.3d 110, 116 (2d Cir. 2014) (discussing inconsistency in Second Circuit precedent where some cases do not require prejudice, while other cases have required a showing of "unfair advantage") (citations omitted); compare Bates, 997 F.2d at 1038 (presenting a two-part test that contains neither a prejudice requirement, nor an unfair advantage nor unfair detriment requirement), with DeRosa v. National Envelope Corp., 595 F.3d 99, 103 (2d Cir. 2010) (presenting a three-part test that adds an "unfair advantage" element).

Under the two-part test: "the party against whom [judicial] estoppel is asserted must have argued an inconsistent position in a prior proceeding" and "the prior inconsistent position must

have been adopted by the court in some manner." Bates, 997 F.2d at 1038; see also AXA Marine Aviation, Ins. (UK) Ltd. v. Seajet Industries Inc., 84 F.3d 622 (2d Cir. 1996) (holding that a party invoking judicial estoppel must show both an inconsistent factual position in a prior proceeding and adoption of that position by the court). Under the three-part test, the first two elements are the same, but some courts have added the third requirement that the party taking the inconsistent position must gain an unfair advantage in doing so. See DeRosa, 595 F.3d at 103. In Adelphia, the Second Circuit explained, "Although we have recognized that '[t]ypically' the application of judicial estoppel requires showing unfair advantage against the party seeking estoppel, we have not required this element in all circumstances." Adelphia, 748 F.3d at 116 (citations omitted). The court grounded this flexible approach in Maine's admonishment that "the application of the judicial estoppel doctrine depends heavily on the 'specific factual context[]' before the court." Adelphia, 748 F.3d at 116, Maine, 531 U.S. at 751.

Under either the two-part test or the three-part test, the Notice of Intent to Seek the Death Penalty against Mr. Ahemeid must be stricken.

As stated, the first element of judicial estoppel requires that the party against whom judicial estoppel is sought to have taken a clearly inconsistent position in an earlier legal proceeding. See Maine, 532 U.S. at 743; Bates, 997 F.2d at 1038; DeRosa, 595 F.3d at 103. Here, without question, the Government's March 25, 2026, Notice of Intent to Seek the Death Penalty, is "clearly inconsistent with its earlier [November 25, 2024] position," Maine, 532 U.S. at 743, directing the Government *not* to seek the death penalty. Compare Notice of Intent, dated, March 25, 2026 (Doc. No. 159), with No-Seek Notice, dated, November 24, 2024 (Doc. No. 84). Indeed, the two positions are not merely inconsistent, they are diametrically opposed.

The second element — that the prior inconsistent position was adopted by the court "in

54

some manner," Bates, 997 F.2d at 1038; DeRosa, 595 F.3d at 103, is once again easy to establish here.  Indeed, there can be no question that this Court adopted and relied upon the Government's November 25, 2024, No-Seek Notice.

First, this Court permitted the Federal Defenders to withdraw from this case without any discussion of whether the No-Seek Notice could thereafter be reversed, see 12/19/24 Tr. 3, 6. Second, when this Court thereafter appointed Mr. Bachrach as an additional counsel on this case, this Court did so due to the national security aspects of this case, including Mr. Bachrach's active security clearance and membership on this District's CJA Terrorism Panel, not for Mr. Bachrach's capital experience.  See 12/19/24 Tr. 4 (in response to Mr. Cecutti's request for the appointment of additional counsel "who has security clearance and who is also on the terrorism panel," this Court initially questioning, "My only question is do we need that?  Do we need more than two counsel *now that it's not a capital case*?") (emphasis added).  Further, before appointing Mr. Bachrach, this Court inquired whether CJA counsel could "handle this case on your own," a question which implicitly recognized that in light of the Attorney General's decision *not* to seek the death penalty, two attorneys were no longer required under 18 U.S.C. § 3005, and instead the appointment of additional counsel was now governed by the sound discretion of this Court under 18 U.S.C. § 3006A(e)(1).

Thereafter, on February 12, 2025, when defense counsel raised the parameters of Attorney General Bondi's February 5, 2025, Memorandum, *Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions* (available at https://www.justice.gov/ag/media/1388561/dl) (last accessed, April 15, 2026), this Court again relied upon the Government's prior November 25, 2024, No-Seek Notice, to conclude, "I'm going to proceed on the assumption that when the government told me they were not seeking the death

55

penalty that was the decision upon which I should plan the scheduling of this case…. I'm not going to proceed on the assumption that [the] ambiguity in the memo means that we have to be frozen or slowed even, waiting for further explanation from the administration." 2/12/25 Tr. 7-8.

Under the two-part test followed in Bates, the analysis ends here and judicial estoppel is clearly established. But even were this Court to choose to apply the three-part test annunciated in DeRosa and Maine, the Government's actions in this case must still be judicially estopped. The third factor, "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped," Maine, 532 U.S. at 751 (citations omitted); see also DeRosa, 595 F.3d at 103 (defining same element as, whether "the party asserting the two positions would derive an unfair advantage against the party seeking estoppel"), clearly is present here as well. The Government's "inconsistent position" here "derive[s] an unfair advantage or impose[s] an unfair detriment on [Mr. Ahemeid]," Maine, 532 at 751; see also DeRosa, 595 F.3d at 103, since, among other things, it has the effect of increasing the maximum sentence to which Mr. Ahemeid faces from a sentence of life imprisonment to the death penalty – a punishment that the Supreme Court has long described as "the most irremediable and unfathomable of penalties." Ford v. Wainwright, 477 U.S. 399, 411 (1986).

Even beyond the increase in potential punishment, the Government would derive additional unfair advantages, which would impose additional unfair detriment (in the form of actual and presumptive prejudice) on the defense if the Government is not estopped from seeking the death penalty. For example, and as discussed in further detail in relation to the question of timeliness, see Point III(A), infra, the ability to reverse a prior no-seek decision would deprive Mr. Ahemeid of the opportunity to dispose of this case through a guilty plea – either pursuant to a plea agreement or directly to the indictment – which would have precluded the imposition of the death penalty.

56

Stated simply, had Mr. Ahemeid been aware that the Government could reverse the Attorney General's formal notice of its intent *not* to seek the death penalty, Mr. Ahemeid would have been heavily incentivized to plead guilty – with or without a plea agreement – prior to such reversal having occurred, and defense counsel would have been heavily incentivized to convince him to do so. Had Mr. Ahemeid pleaded guilty, the maximum sentence that the Government could have sought would have been life imprisonment, not death. See 18 U.S.C. § 3593(a) (requiring Notice of Intent to Seek the Death Penalty to be filed "a reasonable time before the trial *or before acceptance by the court of the plea of guilty*") (emphasis added); see also Point III(A), infra (for further discussion). Allowing the Government to reverse its prior No-Seek Notice, however, deprives Mr. Ahemeid of the ability to take action on his own to foreclose the death penalty by pleading guilty while the No-Seek Notice was still in place. Id.

Further, Mr. Ahemeid has also suffered significant psychological harm during the pendency of Attorney General Bondi's reevaluation, see Point III(B), infra (for further discussion), and during this time has likewise lost opportunities to develop defense evidence supportive of both the guilt and penalty phases of this case, see Point III(C), infra (for further discussion). Mr. Ahemeid has also been presumptively prejudiced, see Point III(D), infra (for further discussion).

As the District Courts in Constanza-Galdomez, Hue, and Cole concluded:

> [T]he government decided—certainly not by inadvertence or accident—to reverse course on an issue of critical importance, involving [the Defendant's life] … with full knowledge that the reversal would have a chaotic impact on the progression of this case. The government cannot play fast and loose with decisions involving life and death. Despite the government's repeated assertions to the contrary, our legal system has always recognized that death is different. ***We demand the most from the government when it seeks to impose an irrevocable penalty*** … it would be impossible to provide [the Defendant] with a capital trial that upholds [his] constitutional and statutory rights … ***Courts are constitutionally required to intervene when the government oversteps its bounds.***

57

> ***It has done so here.  If the government cannot provide [the Defendant] with a capital trial that preserves [his] rights, this Court will not hold one.***

Hue, supra (Exhibit A), at *35 (emphasis added), quoting, Constanza-Galdomez, 787 F. Supp. 3d at 148–49 (internal quotation marks omitted by Hue); Cole, 799 F.Supp.3d at 469 (same).

Here, the Government's March 25, 2026, Notice of Intent is diametrically inconsistent with – indeed, the complete opposite of – the Government's prior November 25, 2024, No-Seek Notice. This Court relied on the Government's no-seek notice by managing this case as a non-capital case and arranging this Court's calendar in reliance of the no-seek notice.  See Transcript, dated, December 19, 2024, at 3-6 (permitting the Federal Defenders to withdraw, discussing next steps in the case now that it was non-capital, and agreeing to consider the appointment of new counsel from the District's non-capital CJA Terrorism Panel); Order, dated, December 20, 2024 (Doc. No. 87) (non-capital CJA-20 appointment of Mr. Bachrach); Transcript, dated, February 12, 2025, at 5-8 (making clear, even after the issuance of the Bondi memo., that the case would proceed as a non-capital case until told otherwise, "I'm going to proceed on the assumption that when the government told me they were not seeking the death penalty that was the decision upon which I should plan the scheduling of this case." "I'm not going to proceed on the assumption that ambiguity in the memo means that we have to be frozen or slowed even, waiting for further explanation from the administration."); see also Spurlock, 782 F.Supp.3d at 1010 ("The Court has adopted and relied on the July 2024 No-Seek Notice in …. explicit and implicit ways …."); accord Constanza-Galdomez, 787 F. Supp.3d at 148 ("A notice of intent to seek the death penalty is the direct opposite of the prior statement by the government that it would not. This Court effectively accepted that statement in managing this case as a non-capital RICO case for its duration."); Hue, supra (Exhibit A), at *33-*34 ("the Court accepted and relied on the Government's position by

58

managing this case as a non-capital case in the nearly ten months between the filing of the No-Seek Notice and the NOI"). And, as discussed above in the context of timeliness, Mr. Ahemeid was prejudiced by the Government's actions, *and* the Government has gained unfair advantages as well.  See, Points III, supra.

For all of these reasons, and as ***every court*** to rule on this issue in this context has thus far concluded, this Court should hold that the Government is judicially estopped from reversing its prior decision not to seek the death penalty.

### B.    Equitable Estoppel

Equitable estoppel applies when one party has "lull[ed] another into a false security and into a position he would take only because of such conduct." Bamba v. W.I. Belvidere, Inc., 579 F.2d 1067, 1071 (7th Cir. 1978). "To establish equitable estoppel it is not necessary that actual fraud be shown.  It is only necessary to show that the person estopped, by his statements or conduct, misled another to his prejudice." United States for Use and Benefit of Noland Co. v. Wood, 99 F.2d 80, 82 (4th Cir. 1938); accord United States for the Use and Benefit of Humble Oil & Refining Co. v. Fidelity and Casualty Co. of New York, 402 F.2d 893, 897 (4th Cir. 1968); see also Miranda v. Contreras, 754 A.2d 277, 281 (D.C. App. 2000) ("As colleagues at bar and officers of the court, and to ensure the efficient, accurate and just operation of judicial proceedings, counsel must be able reasonably to rely on representations made by fellow counsel in the context of litigation.").

The defense acknowledges equitable estoppel carries a higher bar than judicial estoppel, and "is not available against the government 'except in the most serious of circumstances,'" Drozd v. INS, 155 F.3d 81, 90 (2d Cir. 1998), quoting, United States v. RePass, 688 F.2d 154, 158 (2d Cir. 1982), "and is applied 'with the utmost caution and restraint,'" id., quoting, Estate of Carberry v. Commissioner of Internal Revenue, 933 F.2d 1124, 1127 (2d Cir. 1991). This reflects the

principle that "estoppel would frustrate the Government's ability to enforce the law and, in turn, undermine the public interest in full enforcement of the law." United States v. Boccanfuso, 882 F.2d 666, 669 (2d Cir. 1989) (citation omitted).  But moving to strike a Notice of Intent is different from moving to dismiss an indictment.  See Lopez-Matias, 522 F.3d at 154 n.9 ("The government may still seek a conviction and the serious penalty of life imprisonment," and "the remedy is not so 'drastic,' 'extraordinary,' 'draconian,' or 'extreme,', as the outright dismissal of serious criminal charges.") (citations omitted).  Here, as in Lopez-Matias, and every case rejecting Attorney General Bondi's attempts to reverse a prior no-seek determination, the public interest in obedience to law will still be satisfied by a potential sentence of up to life imprisonment on Count One of the Superseding Indictment – a sentence Attorney General Garland determined to be sufficient, but not greater than necessary, to serve the purposes of punishment in this case.

Within the Second Circuit, courts apply a two-part test when evaluating whether equitable estoppel can be held against the Government in a criminal case: "where the party can establish both that the Government made a misrepresentation upon which the party reasonably and detrimentally relied and that the Government engaged in affirmative misconduct." United States v. Paredes-Batista, 140 F.3d 367, 375 (2d Cir. 1998), quoting, City of New York v. Shalala, 34 F.3d 1161, 1168 (2d Cir. 1994).  While the burden is heavy, see Boccanfuso, 882 F.2d at 669, the bar can be met in the present case.

Here, the Government made a misrepresentation of fact by filing a "final decision" notifying the Court and the defense that Attorney General would not – meaning *never* – seek the death penalty in this case.  See Justice Manual § 9-10.150; see also November 25, 2024, No-Seek Notice.  If the decision were not final, the Justice Manual prohibited its filing.  Id.  Importantly, Mr. Ahemeid could not have known that the decision could be reversed, since the Justice Manual

specifically directs "[t]he United States Attorney [to] promptly inform the district court and counsel for the defendant once the Attorney General has made the final decision" not to seek the death penalty "so that the court is aware, in cases in which the Attorney General directs the United States Attorney … not to seek the death penalty, that appointment of counsel under 18 U.S.C. § 3005 is not required or is no longer required," Justice Manual § 9-10.150, which is exactly what occurred here, as evidenced by the Court questioning whether additional counsel was still necessary "now that it's not a capital case," 12/19/24 Tr. 4, and Mr. Cecutti's request for the appointment of counsel to replace the Federal Defenders "who has security clearance and who is also on the terrorism panel," id.

Second, the defense detrimentally relied upon – and was prejudiced by – the Attorney General's November 25, 2024, No-Seek Letter in a number of ways. Defense counsel immediately shifted our attention away from the potential penalty phase of a capital trial to a non-capital investigation, specifically, the next investigative steps needed to prepare Mr. Ahemeid's anticipated suppression motion, and made no effort to plead the case out – either pursuant to a plea agreement or directly to the Indictment – prior to the end of the prior Administration or the issuance of Attorney General Bondi's February 5, 2025, Memorandum. See Point III(A), supra. During the 16-month delay, defense counsel and our mitigation specialist also lost the ability to travel to Mali in support of our guilt phase and penalty phase investigations. See Point III(C), supra. And Mr. Ahemeid has been significantly traumatized during this period of time: first, when he learned that the Government was considering a course of action that had **never** previously been taken; second, when he waited 16 long months in veritable purgatory with the "sword of Damocles" once again hanging over his head, and then by the Government's ultimate decision to advance this previously unheard of and unconscionable task. See Point III(C), supra. Additionally, Mr.

61

Ahemeid has been presumptively prejudiced by Attorney General Bondi's affirmative misconduct, attempting to reverse a prior, formal, no-seek decision, see Point III(D), supra, which is nothing short of an "affront to fundamental constitutional, statutory, and equitable principles." Hue, supra (Exhibit A), at *15 (internal citation omitted).

Accordingly, based upon the Government's formal November 25, 2024, notification of the Attorney General's decision *not* to seek the death penalty against Mr. Ahemeid in this case, this Court should also apply the doctrine of *equitable* estoppel to strike the March 25, 2026, Notice of Intent. Clearly, when the Government filed its No-Seek Notice, Mr. Ahemeid and his defense team relied on it to their detriment, and Mr. Ahemeid has been greatly prejudiced as a result.

### C.    **Promissory Estoppel**

The Second Circuit has long recognized the doctrine of promissory estoppel, see Merex A.G. v. Fairchild Weston Systems, Inc., 29 F.3d 821, 824 (2d Cir. 1994) (discussing the history of the promissory estoppel doctrine in the United States), and District Courts within this Circuit have likewise long applied traditional contract law principles — including promissory estoppel — in the criminal law context. See, e.g., United States v. Rosario, 237 F.Supp.2d 242 (EDNY 2002) (Raggi, Circuit J., sitting by designation); United States v. Heatley, 39 F.Supp.2d 287 (SDNY 1998) (Sotomayor, J.). This occurs most often in evaluating whether a plea or immunity agreement has been breached but is applicable to the present situation as well. As such, and as will be discussed below, the Government's March 25, 2026, Notice of Intent should also be barred under the doctrine of promissory estoppel.

The elements of promissory estoppel are generally defined as: (1) a clear and definite promise; (2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) which does induce actual and reasonable action or

forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise. See RESTATEMENT (SECOND) OF CONTRACTS § 90 (1979); United States v. Cafaro, Docket No. SSS 86 CR 245 (MJL), 1988 WL 138180, at *5 (SDNY Dec. 14, 1988) (citation omitted) (describing four elements as "(1) a clear and unambiguous promise; (2) reliance by the party to whom the promise is made; (3) such reliance is both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance."); Rosario, 237 F.Supp.2d at 248 (describing it as a *three*-part test based upon RESTATEMENT (SECOND) OF CONTRACTS § 90 (1981): (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained as a result of the detrimental reliance), also citing, Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir. 1989) (applying same *three*-part test);[26] see also United States v. LaTray, 739 F.Supp. 88, 95 (NDNY 1990) ("As a general rule, for promissory estoppel to attach to a given situation, there must be reasonable and detrimental reliance upon a clear promise."), citing, R.G. Group v. Horn & Hardart Co., 751 F.2d 69, 78 (2d Cir. 1984); cf. United States v. Doumanis, Docket No. 17-CR-00087 (ALC), 2018 WL 623551, at *1 (SDNY Jan. 29, 2018) (explaining that even when "no actual agreement is determined to exist, according to principles of promissory estoppel, the Government can be held to any clear and unambiguous promise of immunity it makes to a defendant, upon which the defendant reasonably relied to his or her detriment."), quoting, United States v. Sattar, Docket No. 02-395, 2003 WL 22510398, at *2 (SDNY Nov. 5, 2003).

Here, the Government's November 25, 2024, No-Seek Notice was a "clear and definite promise" that the Government would *not* seek the death penalty. A "promise" is "[t]he

---

[26] On close inspection, the three-part test and the four-part test are, in a practical sense, one and the same, since the second element of the three-part test incorporates as one the second and third elements of the four-part test.

manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made." BLACK'S LAW DICTIONARY (10th ed. 2014); see also Brown v. New York City Dept. of Educ., 755 F.3d 154, 165 (2d Cir. 2014) (defining "promise" as "a declaration that one will do or refrain from doing something specified"), quoting, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1815 (1986).

The Government's November 25, 2024, No-Seek Notice, clearly qualified as a "promise" because it was a clear manifestation of an intention to refrain from acting in a specified manner, conveyed in such a way that Mr. Ahemeid and his defense team were entirely justified in understanding that an irrevocable *commitment* not to seek the death penalty had been made. This is particularly true in view of the Justice Manual § 9-10.030 and the fact that the Department of Justice previously had treated its no-seek notices as "final decisions," see Justice Manual § 9-10.150.[27] Further, the Government had a reasonable expectation that Mr. Ahemeid and his defense team would rely to their detriment on that promise (by, among other things, seeking to go to trial

---

[27]    That fact that there was no "consideration" (or mutuality of obligation) does not foreclose the application of the promissory estoppel doctrine. See, e.g., Merex A.G. v. Fairchild Weston Systems, Inc., supra, 29 F.3d 821, 824 (2d Cir. 1994) (discussing the history of the promissory estoppel doctrine in the United States), citing, RESTATEMENT (SECOND) OF CONTRACTS § 90 (1981) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."), Schmidt v. McKay, 555 F.2d 30, 36 (2d Cir. 1977). "This is known as the theory of detrimental reliance." Merex A.G., 29 F.3d at 824. Indeed, by definition, the promissory estoppel doctrine applies when there is lack of consideration or lack of mutuality or for any other reason that precludes an action for breach of contract, but where a party has detrimentally relied on another party's promise. Id.; see also Doll v. Grand Union, Co., 925 F.2d 1363, 1372 (11th Cir. 1991) (stating that the "doctrine of promissory estoppel … was designed specifically to address cases where [a party] has no legally enforceable rights but has suffered a loss due to reliance on the defendant's promises"); BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "promissory estoppel" as, "The principle that a promise made without consideration may nonetheless be enforced to prevent injustice if the promisor should have reasonably expected the promisee to rely on the promise….").

since a plea to life imprisonment would result in the same worst-case scenario as a conviction after a non-capital trial).  Mr. Ahemeid and his defense team did in fact so rely to their detriment on the No-Seek Notice (e.g., lost plea opportunity and lost investigative opportunities), as discussed supra at Points III(A), III(C).  And the only way to avoid this detriment (i.e., prejudice to the defendant and unfair advantages to the Government), is to enforce the Government's no-seek promise by striking the Government's attempt to renege on that promise 16 months later.

*    *    *

Accordingly, and for the reasons discussed above, the Government should be estopped from seeking the death penalty against Mr. Ahemeid – either on the basis of judicial estoppel, equitable estoppel, promissory estopped, or some combination of the above.

**Point VI**

**Permitting the Government to Seek the Death Penalty Would
Violate the Fifth Amendment's Due Process Clause**

Failure to enforce the Government's promise would not only result in a severe inequity; it also would violate Due Process.  See Dangleben, 2025 WL 2647195, at *7, n.8 (holding, "[T]he Court finds that late-filed notice of intent does not honor the procedural due process afforded by the Fifth Amendment.  The Government's argument that 'the initial notice was not a promise.  It was not negotiated for consideration ...' does not warrant serious attention."); see also Constanza-Galdomez, 787 F.Supp.3d at 147 ("The government possesses no special authority to go back on its word to a court."); cf. Commonwealth v. Cosby, 252 A.3d 1092, 1135 (Pa. 2021) (Due Process is violated "when the decision not to prosecute is unconditional, is presented as absolute and final, or is announced in such a way that it induces the defendant to act in reliance thereupon").[28]

---

[28]    In Constanza-Galdomez, the District Court recognized that the case "raises obvious

Moreover, the Government's "arbitrary and capricious" conduct in this case – initially giving formal notice that it would *not* seek the death penalty and then reneging on that representation 16 months later – "shocks the conscience" and, thus, violates Due Process.  See Hawkins v. Freeman, 195 F.3d 732, 742 (4th Cir. 1999) (en banc) (noting that the "kind of executive conduct that fairly can be said to 'shock the conscience' … and be 'fatally arbitrary in the constitutional sense' … involves 'abusing [executive] power, or employing it as an instrument of oppression'"); United States v. Littrell, 478 F.Supp.2d 1179, 1192 (C.D.Cal. 2007) (striking the Government's "arbitrary and capricious" Notice of Intent to seek the death penalty as a violation

---

constitutional concerns, particularly as to the Due Process Clause," but "decline[d] to make 'grand constitutional pronouncements,'" because it could decide the motion "on statutory and estoppel grounds." Constanza-Galdomez, 787 F.Supp.3d at 148 n.5; see also Hue, supra (Exhibit A), at 34 n.21 (after barring the Government from seeking the death penalty against Hue based upon the doctrine of *judicial* estoppel, the Court noted that it "makes no ruling on equitable or promissory estoppel," nor Hue's additional constitutional challenges, "given the multitude of statutory justifications for striking the death notices in this case"), citing, Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other grounds upon which the case may be disposed of."); United States v. Chatrie, 136 F.4th 100, 101 (4th Cir. 2025) (Diaz, C.J., concurring) ("[J]udicial modesty sometimes counsels that we not make grand constitutional pronouncements merely because we can.").

That being said, the District Court in Constanza-Galdomez nonetheless added:

> This dispute is about due process. To be clear, the Executive is entitled to charge cases as it sees fit, and Congress has authorized the Department of Justice to seek the death penalty in qualifying cases. But "[w]hen a defendant's life is at stake," courts are required to be "particularly sensitive to insure that every safeguard is observed." Gregg v. Georgia, 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). That is because "the penalty of death is qualitatively different from a sentence of imprisonment, however long." Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The Founders recognized as much by distinguishing between deprivations of life, liberty, and property in the Due Process Clause of the Fifth Amendment.

Constanza-Galdomez, 787 F.Supp.3d at 136.

of Due Process); see also Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir.1995) (government conduct that is "arbitrary, conscience-shocking, or oppressive in a constitutional sense" violates substantive Due Process); Shaffer v. Heitner, 433 U.S. 186, 212 (1977) (Due Process violated when the conduct of the Government "offends traditional notions of fair play and substantial justice").

Here, the Government's unjustifiable, prejudicial delay in seeking the death penalty, particularly after it initially explicitly announced that the Government would not seek death, has substantially and irreparably prejudiced Mr. Ahemeid's ability to defend himself at a capital trial (including, most significantly, at the capital sentencing phase).

As discussed in further detail at Point III(C), supra, events outside of Mr. Ahemeid or defense counsel's control, but very much the product of the U.S. government's control, namely, President Trump's immigration enforcement policies, resulted in a tit-for-tat travel ban wherein U.S. citizens may no longer travel to Mali *for any purpose*.  Even once such ban is (hopefully) lifted, the degradation of civilian safety within Mali over the past 16 months further compromises counsel's ability to conduct effective guilt and penalty phase investigations.  Id.; cf. Betterman v. Montana, 578 U.S. 437, 448 n.12 (2016) ("For inordinate delay in sentencing, although the Speedy Trial Clause does not govern, a defendant may have other recourse, including, in appropriate circumstances, tailored relief under the Due Process Clauses of the Fifth and Fourteenth Amendments…. Relevant considerations may include the length of and reasons for delay, the defendant's diligence in requesting expeditious sentencing, **and prejudice**.") (emphasis added).

Therefore, for all of these reasons, this Court should strike the Government's March 25, 2026, Notice of Intent, as a violation of Mr. Ahemeid's Fifth Amendment right to Due Process.

**Point VII**

**Permitting the Government to Seek the Death Penalty Would Violate Mr. Ahemeid's Sixth and Eighth Amendment Right to Present a Meaningful Defense**

The Sixth Amendment guarantees, "In all criminal prosecutions, the accused shall enjoy the right … to have the assistance of counsel for his defense." Amend. VI, U.S. Const. The Supreme Court has held this to mean that criminal defendants are not only guaranteed the right to counsel but also are entitled to effective representation and access to the tools necessary for a meaningful defense. See Ake v. Oklahoma, 470 U.S. 68, 76 (1985) (listing cases). As the Supreme Court unequivocally explained in Ake:

> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.

Ake, 470 U.S. at 77.

In this case, the basic tools necessary to prepare a meaningful and effective defense, includes investigating the crime scene and whether Mr. Ahemeid's claims regarding the specifics of his DGSE interrogation can be corroborated. To do this requires access to the crime scene (even now) and the ability to conduct a mitigation investigation *in-person* in relation to the conduct occurring at DGSE. Due to events occurring outside of Mr. Ahemeid and defense counsels' control, however, we cannot do either. See Point III(C), supra (discussing, inter alia, Malian travel ban against U.S. citizens imposed in response to President Trump's immigration policies; also discussing increased safety and security concerns in light of, inter alia, increased incidents of terrorism and paramilitary attacks on civilians in Mali beginning in 2025 and continuing to present).

68

The inability to conduct a penalty phase investigation in Mali creates grave concerns about our ability to effectively represent Mr. Ahemeid, as required by the Sixth Amendment to uncover the necessary mitigating information for the jury to make the individualized determination required in an authorized death penalty case and consistent with the "heightened reliability" required by the Eighth Amendment. See Ford, 477 U.S. at 414 (Supreme Court's consideration of capital cases has been characterized by "heightened concern for fairness and accuracy").

Without defense counsels' ability to conduct an international investigation in Mali, Mr. Ahemeid is deprived of his right to conduct an effective investigation of the Government's aggravating factors, by depriving counsel of the ability to conduct, inter alia, a crime scene investigation.  See Thomas v. Kuhlman, 255 F.Supp.2d 99, 107 (EDNY 2003) (Weinstein, J.) ("Where the nature of the crime scene is material to the defense, counsel may be deemed ineffective for having failed to investigate it properly."), citing, Williams v. Washington, 59 F.3d 673, 680–81 (7th Cir.1995) (ineffective assistance in part for failure to investigate crime scene where doing so would have revealed evidence that, "given the layout of the home and the relatively crowded conditions, the alleged assault could not have taken place as claimed").

The lack of a crime scene investigation in this case would likely be viewed as "harmless error" in the context of a conviction on Count One, assuming this were a non-capital case, since the elements of Count One can be established through an aiding and abetting theory that does not necessarily require his presence at the Radisson Blu Hotel when Ms. Datar was killed. See Count One, Superseding Indictment (alleging commission of offense under 18 U.S.C. § 2332(a)(1) *and* 18 U.S.C. § 2). However, a crime scene investigation has now become ***essential*** to Mr. Ahemeid's penalty phase defense in light of the March 25, 2026, Notice of Intent, which alleges two statutory threshold factors (a/k/a "gateway" factors) that would require Mr. Ahemeid's own individual

69

conduct, rather than that of his co-conspirators:

> 1.    FAWAZ OULD AHMED OULD AHEMEID, also known as "Ibrahim Idress" and "Ibrahim Dix," ***intentionally killed Anita Ashok Datar***. 18 U.S.C. § 3591(a)(2)(A).
>
> 2.    FAWAZ OULD AHMED OULD AHEMEID, also known as "Ibrahim Idress" and "Ibrahim Dix," ***intentionally inflicted serious bodily injury that resulted in the death of Anita Ashok Datar***. 18 U.S.C. § 3591(a)(2)(B).

Notice of Intent (Doc. No. 159), at ¶¶ (B)(1), (B)(2) (emphasis added).  Given that there has been ***absolutely no discovery*** produced thus far indicating that Mr. Ahemeid "intentionally killed" Ms. Datar, or "intentionally inflicted serious bodily injury that resulted in the death" of Ms. Datar, nor has ***any discovery*** been produced indicating that Mr. Ahemeid was even present for the Radisson Blu attack that resulted in Ms. Datar's death, based upon the two "threshold factors" alleged only for the first time in the March 25, 2026, Notice of Intent, an investigation of the crime scene has now become necessary so that the defense can independently investigate potential defenses to the statutory threshold factors alleged and enumerated under 18 U.S.C. §§ 3591(a)(2)(A) and 3592(a)(2)(B).  See ABA Guideline 10.7(A), 31 HOFSTRA LAW REV. at 1015 ("Counsel at every stage have an obligation to conduct thorough and *independent* investigations relating to the issues of both guilty and penalty.") (emphasis added); ABA Guideline 10.11(A), 31 HOFSTRA LAW REV. at 1055 ("As set out in Guideline 10.7(A), counsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation *or rebuts the prosecution's case in aggravation*.") (emphasis added); ABA Guideline 10.7, Commentary, 31 HOFSTRA LAW REV. at 1020 ("The Scene: Counsel should view the scene of the alleged offense as soon as possible. This should be done under circumstances as similar as possible to those existing at the time of the alleged incident (e.g., weather, time of day, and lighting conditions.") (emphasis in original); ABA Guideline 10.7(A), 31 HOFSTRA LAW REV. at 1021

70

("Nor may counsel 'sit idly by, thinking that investigation would be futile.'"), citing, inter alia, Austin v. Bell, 126 F.3d 843, 849 (6th Cir. 1997) (counsel's failure to investigate and present mitigating evidence at the penalty phase of the trial "because he did not think that it would do any good" constituted ineffective assistance); cf. Brady v. Maryland, supra, 373 U.S. 83, 84 (1963) (affirming reversal of conviction and sentence where prosecution suppressed extrajudicial statement in which severed co-defendant "admitted the actual homicide," thereby corroborating Brady's defense that he "participat[ed]" in the murder but that his co-defendant "did the actual killing").

The effectiveness of Mr. Ahemeid's mitigation investigation would likewise be directly impaired by depriving counsel and our mitigation specialist of the ability to conduct an in-person mitigation investigation related the conditions of confinement and torture practices at DGSE – issues that would unquestionably qualify as mitigating evidence for the jury's consideration during the penalty phase of this now authorized capital case. See, e.g., Tennard v. Dretke, 542 U.S. 274, 285 (2004) ("[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances.") (brackets in original), quoting, Eddings v. Oklahoma, supra, 455 U.S. 104, 114 (1982).

As this Court knows well, the bedrock principle of capital jurisprudence is that "death is different." Harmelin v. Michigan, 501 U.S. 957, 994 (1991) (because "death is different", the Supreme Court has "imposed protections that the Constitution nowhere else provides"); see also Harris v. Alabama, 513 U.S. 504, 516 n.1 (1995) (Stevens, J., dissenting) (citing seven separate decisions, noting, "Our opinions have repeatedly emphasized that death is a fundamentally different kind of penalty from any other that society may impose"); Sampson v. United States, 832 F.3d 37, 43 (1st Cir. 2016) (noting that "an already significant legal question is even more so in

71

the context of a capital case, because 'death is [] different.'").

The notion that "death is different" is not simply the dramatic recitation of an obvious truth. Rather, the principal triggers sharply increased levels of judicial attention to every step of the process through which the irrevocable sanction of death is sought and carried out. The post-Furman Supreme Court has described capital jurisprudence as mandating a "heightened standard of reliability" for the entire process through which a government marshals the legal and moral authority to terminate a life. Ford, 477 U.S. at 411, citing, Spaziano v. Florida, 468 U.S. 447, 456 (1984). Indeed, the need for heightened reliability is "the natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different." Ford, 477 U.S. at 411, citing, Woodson, 428 U.S. at 305.

When, as here, a capital crime is alleged to have occurred overseas, "counsel of course [have] the duty to conduct the fact investigation, including exploring any circumstances that give rise to pre-trial motions, in that country. Undertaking this endeavor comes with additional complications. Tools that capital counsel routinely rely on such as discovery, the Federal Freedom of Information Act, and access to physical evidence may be ineffective or unavailable," Garvey Declaration (Exhibit E) at ¶ 15, thus furthering the importance of an in-person mitigation investigation – none of which can presently take place in Mali, since, during the 16 months that have elapsed between the No-Seek Notice and the Notice of Intent, the ability for defense counsel or Mr. Ahemeid's mitigation specialist to examine the crime scene and/or conduct a mitigation investigation in Mali have been banned specifically in response to actions taken by the U.S. government. See *Mali and Burkina Faso impose travel ban on US citizens in tit-for-tat move*, BBC News (December 31, 2025), supra, (explaining that the Malian travel ban of U.S. citizens had been imposed "in response to a similar move by the Trump administration").

Accordingly, since the defense is not in the same investigative position today as it would have been had the Attorney General *sought* death in 2024, and since the U.S. government's own actions directly contributed to the reason why the defense can no longer complete this essential aspect of its guilt and penalty phase investigations, the "heightened reliability" required in a death penalty case justifies imposing the only course correction that can meaningfully restore Mr. Ahemeid's Sixth and Eighth Amendment rights: the March 25, 2026, Notice of Intent should be stricken so that the case may proceed non-capitally as intended by Attorney General Garland's prior no-seek determination.

## Point VIII

### Permitting the Government to Seek the Death Penalty Would Violate the Eighth Amendment's Cruel and Unusual Punishments Clause

In additional to the statutory and equitable arguments raised above, allowing the Government to seek the death penalty now, 16 months after having informed him – formally, in writing, and on the record – that it would not be seeking the death penalty, would violate Mr. Ahemeid's Eighth Amendment right to protection against cruel and unusual punishment.

Stated simply, the period of time in which Mr. Ahemeid was forced to wait for the Government's decision on whether it would seek the death penalty against him, is itself prejudicial in a constitutional sense. As the Second Circuit held in Black, "In addition to the psychological effects of pre-trial custody, [the defendants] were forced for two years and ten months to worry over whether the government would seek not just their liberty, but their lives. The magnitude of the anxiety and concern incurred by this decision is great, and this consideration weighs heavily in our determination that the delay here prejudiced [the defendants]." Black, 918 F.3d at 265 (examining prejudice in the analogous context of a defendant's right to a speedy trial under the

73

Sixth Amendment).

Here, Mr. Ahemeid was initially charged in a six-count Indictment, including two death-eligible capital counts, on November 5, 2020. At the time, he was being detained in Mali. In and around December 2022, he was extradited to United States custody and then arraigned on his Indictment on December 10, 2022. He has been in U.S. custody at MDC Brooklyn ever since. On November 25, 2024, nearly two years later – specifically, 23 months and 15 days – the Government filed a notice that "the Attorney General has authorized and direct the government *not* to seek the death penalty" against Mr. Ahemeid in this case (Doc. No. 84) (emphasis added). Approximately two months later, on February 5, 2025, Attorney General Bondi's Memorandum *Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions* was issued, and approximately six weeks after that, on March 20, 2025, the Government informed defense counsel by email that the Attorney General's Capital Case Section was reviewing the prior no-seek decision. See Exhibit B. Then, after another year in, essentially, purgatory, the Government filed its March 25, 2026, Notice of Intent to Seek the Death Penalty.

Even excluding the period between the February 5, 2025, Bondi Memo. and the Government's March 20, 2025 email (since, during that period, the Attorney General's intention to include Mr. Ahemeid's case in the reevaluation cohort had not been confirmed), that still means that Mr. Ahemeid has had to wait *nearly three years*[29] to learn whether the U.S. Government will seek to execute him for crimes he has already received the death penalty for in Mali. That's 1,084 days "worry[ing] over whether the government would seek not just [his] liberty, but [his] li[fe]," Black, 918 F.3d at 265.[30]

---

[29]    Specifically, *35 months and 20 days* (23 months and 15 days + 12 months and 5 days).

[30]    We note that in Black the Second Circuit affirmed the District Court's decision to dismiss the entire indictment against all three death-eligible defendants on Sixth Amendment Speedy Trial

What the Government has done here is both *cruel* (indeed, inhumane) and certainly *unusual*. Before the February 5, 2025, Bondi Memorandum – directing the Department of Justice to reevaluate capital cases in which the previous Administration had formally disclaimed its intent to seek the death penalty – the Government had *never* done so before. As discussed, at Point I, supra, the Justice Manual clearly states that a decision *not* to seek the death penalty is a "final decision," and that language has not been altered even to this date, see Justice Manual § 9-10.150, notwithstanding other changes to the Justice Manual having been made during this Administration, see Preface, Justice Manual § 9-10.000, *et seq.* (noting that the Government's death penalty protocols have been "revert[ed] to the Justice Manual provisions as they existed before January 20, 2021"). Such conduct has wantonly inflicted psychological trauma in violation of the Eighth Amendment, on a defendant who already had been subject to significant trauma while detained in Mali. See Whitley v. Albers, 475 U.S. 312, 319 (1986); Beal v. Foster, 803 F.3d 356, 357-58 (7th Cir. 2015) (holding that the Eighth Amendment prohibits unjustified infliction of physical *or* psychological pain), citing, Watison v. Carter, 668 F.3d 1108, 1112 (9th Cir. 2012).

For these reasons (coupled with the more detailed discussion in Point III(B), supra, of the psychological harm suffered by Mr. Ahemeid while twice waiting for the Attorney General to decide whether to seek the death penalty against him), we respectfully submit that an additional ground in which to strike the March 25, 2026, Notice of Intent, is the clear violation of Mr. Ahemeid's Eight Amendment right to be free of cruel and unusual punishment.

---

Clause grounds, of which the extensive delay waiting for a decision on the death penalty, and the psychological impact of such delay, played a prominent role. See Black, 918 F.3d 264-66 (also noting, "[W]e recognize that prejudice to building a meritorious defense was modest, but the consequences of an extensive delay between indictment and trial nonetheless exacerbated the anxiety of the accused and impacted the defense.").

**Conclusion**

The legal dispute at issue is not merely about a blatant violation of Mr. Ahemeid's rights. In a broader way, "At stake is the honor of the government [and] public confidence in the fair administration of justice…" Carter, 454 F.2d at 428; cf. United States v. Gomez-Olmeda, 296 F.Supp.2d 71, 73 (D.P.R. 2003) (holding that the "prosecutorial mismanagement [in a capital case] not only implicates the rights of a defendant and transgresses the boundaries of fair play, but also jeopardizes the proper functioning of the judicial system").

As so aptly stated by the court in Constanza-Galdomez:

> This case presents an unusual and extreme situation because the government has directly contravened its prior representations to the Defendants and this Court. The government asks this Court to treat its belated attempt to seek the death penalty like any other change in a charging document. This Court [should] not cast aside decades of law, professional standards, and norms to accommodate the government's pursuit of its agenda. Of course, elections have consequences, and this administration is entitled to pursue the death penalty in cases where it can do so in accordance with constitutional and statutory requirements. But this is not one of them.

Constanza-Galdomez, 787 F.Supp.3d at 146.

Accordingly, for all of the reasons discussed above, either individually or collectively, this Court should strike the Government's March 25, 2026, Notice of Intent *with prejudice*.

Dated: New York, New York
      April 27, 2026

                      Respectfully submitted,

                      Michael K. Bachrach
                      Anthony Cecutti
                      Kestine Thiele

                      *Attorneys for Defendant*
                      *Fawaz Ould Ahmed Ould Ahemeid*

76