## DECLARATION OF ANTHONY CECUTTI, ESQ.

I, Anthony Cecutti, Esq., declare that the following statements are true and correct, under the penalty of perjury, based upon my personal knowledge and belief:

1. I am a criminal defense attorney licensed to practice in the State of New York since 2006. I am also admitted to practice in the Southern District of New York, the Eastern District of New York, the Second Circuit Court of Appeals and the Third Circuit Court of Appeals. While at Brooklyn Law School, I externed at the Federal Defenders, Eastern District of New York and interned at Mental Hygiene Legal Services and the Center for Capital Litigation ("CCL") in Columbia, South Carolina. At CCL, I worked on death penalty cases involving those who suffered from serious mental illness.

2. Prior to graduating law school in 2005, I attended Columbia University's School of Social Work ("CUSSW"). I earned my Master of Science in Social Work Degree in 2002. While at CUSSW, I engaged in clinical practice by way of individual and group therapy at an outpatient mental health clinic in Bedford Stuyvesant, Brooklyn. There, I participated in the treatment of those who were diagnosed with depression, anxiety, psychotic disorders, substance abuse and trauma-related conditions, such as post-traumatic stress disorder ("PTSD"). I also interned at and was later employed by the Bronx Defenders, a public defender office in the South Bronx, as a client advocate or social worker.

3. After law school, I worked in private practice at the law firm of Romano & Kuan, PLLC. There, I largely represented those charged with criminal offenses in state court. During this time, I became a member of the Assigned Counsel Plan ("ACP") in New York City and was appointed to represent those charged with state crimes. In 2009, I started my own law practice. In 2011, I participated in the Southern District of New York's Criminal Justice Act ("CJA") Mentoring Program, and in 2019, the Southern District of New York's CJA Capital Mentoring Program.

4. I am currently on the CJA Panels in the Eastern District and Southern District of New York. Based upon my prior experience and training, I have been specifically appointed to represent those charged with crimes who suffer from serious mental health conditions.

5. I also serve on the Capital Panels of both Districts and am on the Terrorism Panel in the Eastern District of New York. I have been appointed as counsel in 11 death-eligible matters.

6. I was appointed to serve as Learned Counsel for the defendant, Fawaz Ould Ahmed Ould Ahemeid in *United States v. Ahemeid*, No. 20 Cr. 502 (BMC).

7. On December 9, 2022, Mr. Ahemeid was extradited from Mali to the United States. He made his initial appearance in the Eastern District of New York on December 10, 2022.

1

**Exhibit D**

Along with counsel for the Federal Defenders, I, and associate counsel Kestine Thiele, also appeared on behalf of Mr. Ahemeid.[1]

8. Following our appointments, we, along with Federal Defenders reviewed discovery, investigated the allegations against Mr. Ahemeid and conducted a mitigation investigation. Our tasks were principally aimed at preparing a mitigation submission to convince Attorney General Garland not to seek the death penalty against Mr. Ahemeid. On December 31, 2023, we submitted our mitigation submission to the United States Attorney's Office, Eastern District of New York.

9. In 2024, we continued to investigate the allegations against Mr. Ahemeid and conduct our mitigation investigation. We attempted to travel to Mali, where the offenses Mr. Ahemeid is charged with are alleged to have occurred. It is also a country where significant information related to potential mitigation lies. However, our applications for visas were denied. We were instructed that we could re-apply, but did not do so right away due to an increase in terrorism activity. As such, we paused our efforts.[2]

10. On November 25, 2024, we received notice that Attorney General Garland directed the government not to seek the death penalty against Mr. Ahemeid.

11. While awaiting Attorney General Garland's decision, we continued to regularly visit Mr. Ahemeid. Midway through 2024, Mr. Ahemeid's functioning further declined. He appeared to be experiencing worsening psychological distress, depression and anxiety. During this time, a conflict arose between him and Federal Defenders. Ms. Thiele and I continued to meet with Mr. Ahemeid. Based on such conflict, on December 19, 2024, the Court relieved Federal Defenders. Since the case was no longer capital, the next critical stage in Mr. Ahemeid's case involved litigating suppression issues, specifically whether his prior statements should be suppressed because they were obtained by way of torture.

12. At no point did I seriously consider the possibility that an Attorney General from a new administration could reverse course and seek the death penalty against Mr. Ahemeid. Throughout Mr. Ahemeid's case, I regularly consulted with the Federal Death Penalty Resource Counsel Project ("the Project"). Following Attorney General Garland's decision not to seek the death penalty against Mr. Ahemeid, I spoke with the Project and discussed the possibility of a new Attorney General reversing Attorney General Garland's decision. I was informed that no Attorney General had ever done so. I was further informed that such a possibility was not likely legal.

---

[1] On December 10, 2022, we met with Mr. Ahemeid in the cell block at the courthouse. He was noticeably thin and in distress. We soon learned that he had been detained and tortured over nearly seven years at Direction Générale de la Sécurité d'Etat (DGSE), a "black site," in Bamako, Mali.

[2] In 2025, we again explored the possibility of traveling to Mali and intended to renew our attempts at obtaining visas. We learned, however, that we can no longer apply for visas, nor enter the country for any purpose. This remains true today. As such, we cannot travel to Mali to conduct important work in Mr. Ahemeid's case.

**Exhibit D**

13. Guideline 10.9.1 of the ABA Guidelines provides that "[c]ounsel at every stage of the case have an obligation to take all steps that may be appropriate in the exercise of professional judgment … to achieve an agreed upon disposition." Since no Attorney General had ever reversed the "no seek" decision of a prior Attorney General, I did not believe it was necessary to discuss a resolution by way of a guilty plea with the government or with Mr. Ahemeid to avoid the possibility of the death penalty. Had I believed prior to President Trump's inauguration that the next Attorney General would reevaluate Attorney General Garland's no-seek decisions, and specifically, his no-seek decision in Mr. Ahemeid's case, I would have most certainly worked to reach a disposition by way of a guilty plea from Mr. Ahemeid prior to the change in administration.

14. In December 2024, anticipating the Federal Defenders being relieved, I contacted Michael Bachrach, Esq. to inquire as to his availability to serve as co-counsel in Mr. Ahemeid's case. I sought Mr. Bachrach's assistance since he was a member of the Terrorism Panel in the Eastern District of New York and had active security clearance. He also had experience litigating suppression issues involving those who had been tortured, and classified information.

15. On March 20, 2025, the government informed us by email that Attorney General Bondi decided to review Attorney General Garland's decision not to seek the death penalty against Mr. Ahemeid. We were asked to provide our availability to make a presentation in approximately 90 days to the Department of Justice's Capital Case Section ("CCS"), and that if we wished to make a written submission to the CCS, it was due no less than one week before the CCS meeting. The CCS scheduled our meeting for June 9, 2025 in Washington D.C., with our written submission due by June 2, 2025.

16. After being notified of Attorney General Bondi's decision to review the prior "no seek" decision, we met with Mr. Ahemeid. We told him about the decision and need to prepare an additional or supplemental written submission. This required ongoing meetings with a newly retained mitigation specialist and us. While he engaged in the process, he did so reluctantly and with increased fatigue, distress and pessimism.

17. Following the filing of our written submission and CCS meeting, we continued to meet with Mr. Ahemeid. However, as months passed without a decision or any information regarding the decision, he began to withdraw and disengage. From my observations, Mr. Ahemeid became increasingly depressed and anxious. Further, he appeared to be under growing emotional and psychological distress as he awaited a decision as to whether Attorney General Bondi would seek the death penalty against him.

18. On October 20, 2025, a status conference occurred. The Court sought an update on Attorney General Bondi's review of the prior no-seek decision. The government indicated that it expected a decision by the end of next week (i.e., by October 31, 2025). This update provided some measure of relief to Mr. Ahemeid.

19. When October 31, 2025 came and went, and no decision had been made, Mr. Ahemeid declined further, emotionally and psychologically. He became further withdrawn and

**Exhibit D**

disengaged. He also appeared to be suffering from increased depression and anxiety. His trauma and mental health symptoms were actively present, and he continued to struggle to live with the uncertainty of his fate.

20. On March 11, 2026, another status conference occurred. Without any prior indication that a decision had been reached, the government announced during the conference that Attorney General Bondi had directed it to seek the death penalty against Mr. Ahemeid.

Dated: New York, New York
April 23, 2026

Anthony Cecutti, Esq.

4

**Exhibit D**