Nos. 25-2807, 25-2916

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,

Appellant

v.

RICHARDSON DANGLEBEN, JR.,

Appellee

Appeal from orders entered in the
United States District Court of the Virgin Islands
Divisions of St. Thomas and St. John at
No. 3:23-cr-0072.

BRIEF FOR THE NATIONAL ASSOCIATION OF
FEDERAL DEFENDERS AS AMICUS CURIAE IN
SUPPORT OF APPELLEE

| | |
|---|---|
| SHELLEY M. FITE<br>  Co-Chair, Amicus Committee<br>DANIEL HABIB<br>JUDITH MIZNER<br>  Members, Amicus Committee<br>National Association Of<br>Federal Defenders | ELISA A. LONG<br>Federal Public Defender<br><br>RENEE PIETROPAOLO<br>Assistant Federal Public Defender<br>*Counsel of Record*<br><br>Federal Public Defender<br>Western District of Pennsylvania<br>1001 Liberty Avenue, Suite 1500<br>Pittsburgh, PA 15222<br>(412) 644-6565 |

**Exhibit F**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................ii

INTEREST OF THE AMICUS CURIAE ................................................................. 1

INTRODUCTION ................................................................................................... 3

ARGUMENT ........................................................................................................... 5

I.      The government's filing of "no-seek" notices—a critical,
        longstanding practice that the federal courts and
        defender offices rely on to manage costs—is embedded in
        case law, the Judiciary Guide, and DOJ's own manual. ................. 5

II.     Accepting the government's legal position in this appeal would
        severely disrupt the federal judiciary's management of capital
        cases and generate potentially exorbitant costs. ........................... 17

CONCLUSION ...................................................................................................... 25

CERTIFICATE OF BAR MEMBERSHIP .............................................................. 26

CERTIFICATE OF COMPLIANCE ...................................................................... 27

CERTIFICATE OF SERVICE ............................................................................... 28

i

**Exhibit F**

# TABLE OF AUTHORITIES

**Cases**

*Erlinger v. United States,*
  602 U.S. 821 (2024) ...................................................................... 2

*In re Sterling-Suarez,*
  306 F.3d 1170 (1st Cir. 2002)................................................. 7, 9, 19

*United States v. Ball,*
  2006 WL 8570266 (D.D.C. Oct. 19, 2006)...................................... 15

*United States v. Boone,*
  245 F.3d 352 (4th Cir. 2001) ........................................................ 10

*United States v. Bowers,*
  No. 2:18-cr-292 (W.D. Pa. 2023) ..................................................... 1

*United States v. Casseus,*
  282 F.3d 253 (3d Cir. 2002)................................................. 10, 11, 19

*United States v. Cerritos,*
  180 F. Supp. 3d 432 (E.D. Va. 2016) ............................................. 10

*United States v. Christensen,*
  No. 2:17-cr-20037 (C.D. Ill. 2019) ................................................... 1

*United States v. Cole,*
  ___ F. Supp. 3d ____, 2025 WL 2592515
  (D.V.I. Sept. 7, 2025) .............................................................. 20, 21

*United States v. Cordova,*
  806 F.3d 1085 (D.C. Cir. 2015) ......................................... 7, 9, 10, 19

**Exhibit F**

*United States v. Council*,
No. 4:17-cr-866 (D.S.C. 2019)............................................................ 1

*United States v. Cramer*,
No. 1:16-cr-26 (E.D. Tex. 2018)......................................................... 1

*United States v. Douglas*,
525 F.3d 225 (2d Cir. 2008)...................................................... 9, 11, 19

*United States v. Frye*,
372 F.3d 729 (5th Cir. 2004) ............................................................. 15

*United States v. Furrow*,
100 F. Supp. 2d 1170 (C.D. Cal. 2000) ............................................. 15

*United States v. Grimes*,
142 F.3d 1342 (11th Cir. 1998) .................................................... 11, 19

*United States v. Hall*,
506 F. App'x 245 (4th Cir. 2013)....................................................... 10

*United States v. Rivas-Moreiera*,
2023 WL 11960650 (E.D. Tex. Oct. 7, 2023) ................................... 15

*United States v. Robinson*,
275 F.3d 371, 384 (4th Cir. 2001)..................................................... 10

*United States v. Saipov*,
No. 1:17-cr-722 (S.D.N.Y. 2023)......................................................... 1

*United States v. Slone*,
969 F. Supp. 2d 830 (E.D. Ky. 2013) ............................................... 15

*United States v. Spurlock*,
782 F. Supp. 3d 987 (D. Nev. 2025)............................................ 20, 21

**Exhibit F**

*United States v. Storey,*
    1997 WL 51394 (D. Kan. Jan. 29, 1997)........................................ 15

*United States v. Suarez,*
    ___ F. Supp. 3d. ____, 2025 WL 2710094
    (N.D. Cal. Sept. 23, 2025).............................................................. 20

*United States v. Tsarnaev,*
    No. 13-10200 (D. Mass. 2015) ......................................................... 1

*United States v. Tsarnaev,*
    2013 WL 5701582 (D. Mass. Oct. 18, 2013) ................................... 15

*United States v. Valle-Lassalle,*
    36 F. Supp. 2d 445 (D. P.R. 1999)................................................. 15

*United States v. Waggoner,*
    339 F.3d 915 (9th Cir. 2003) ...................................................... 9, 10

*United States v. Wilk,*
    366 F. Supp. 2d 1178 (S.D. Fla. 2005)........................................... 15

## Statutes, Rules and Constitutional Provisions

18 U.S.C. § 3005................................................................. 1, 6, 7, 9, 10, 20

18 U.S.C. § 3006A .......................................................................................... 1

18 U.S.C. § 3006A(g)....................................................................................... 6

18 U.S.C. § 3593(a) .................................................................................. 17, 18

18 U.S.C. § 3599.................................................................................. 1, 9, 10, 20

18 U.S.C. § 3599(a)(1)................................................................................... 6, 8

**Exhibit F**

18 U.S.C. § 3599(f) ...................................................................... 6

18 U.S.C. § 3599(g)(1) ................................................................. 8

## Other Authorities

American Bar Ass'n, Guidelines for the Appointment and
    Performance of Defense Counsel in Death Penalty Cases
    (Feb. 2003) .................................................................... 7

Guide to Judiciary Policy ...................................... 2, 6, 8, 11, 12

v

**Exhibit F**

## INTEREST OF THE AMICUS CURIAE

The National Association of Federal Defenders (NAFD), formed in 1995, is a nationwide, volunteer organization of attorneys who serve in federal public defender offices and community defender organizations authorized under the Criminal Justice Act, 18 U.S.C. § 3006A. Each year federal defenders collectively represent tens of thousands of indigent criminal defendants in federal court, including hundreds of defendants charged with potential death-penalty offenses.[1] Federal defenders also regularly assist federal courts and their budgeting staff and CJA attorneys to ensure that all capital defendants receive constitutionally effective representation while containing unnecessary costs.[2]

---

[1] Federal defenders are often assigned to capital cases together with private CJA-funded co-counsel—often the attorney appointed as "learned counsel" under 18 U.S.C. §§ 3005 and 3599. *See, e.g.*, *United States v. Bowers*, No. 2:18-cr-292 (W.D. Pa. 2023); *United States v. Saipov*, No. 1:17-cr-722 (S.D.N.Y. 2023); *United States v. Council*, No. 4:17-cr-866 (D.S.C. 2019); *United States v. Christensen*, No. 2:17-cr-20037 (C.D. Ill. 2019); *United States v. Cramer*, No. 1:16-cr-26 (E.D. Tex. 2018); *United States v. Tsarnaev*, No. 13-10200 (D. Mass. 2015).

[2] Federal defenders are required by statute and local CJA Plans to identify and recommend counsel to district courts in capital cases. *See* 18 U.S.C. § 3005; *see, e.g.*, Criminal Justice Act Plan of the United

- 1 -

**Exhibit F**

NAFD files amicus briefs when we believe our experience would help the courts resolve issues of broad importance. *See, e.g., Erlinger v. United States*, 602 U.S. 821, 841 (2024) (relying on NAFD amicus brief). This appeal presents such an issue.

The parties have consented to the filing of this brief.[3]

---

States District Court for the Western District of Pennsylvania, § XIV (revised Mar. 16, 2021), *available at* https://www.pawd.uscourts.gov/sites/pawd/files/PAWD_Approved_CJA_Plan%20_March_2021.pdf. They also help manage the CJA panels in their districts and oversee the CJA administrator in many districts. *See Guide to Judiciary Policy*, Vol. 7, Pt. A, Ch. 2, App. 2A, at 5. And they work with the defender program's Federal Death Penalty Resource Counsel Project to consult with and train CJA attorneys handling capital cases. *See id.* at 13, 25-27.

[3] This brief was not authored in whole or in part by a party or a party's counsel. No party or party's counsel contributed money with the intention of funding the preparation or submission of this brief. No person other than amicus or their counsel contributed money for the preparation and submission of this brief.

- 2 -

**Exhibit F**

## INTRODUCTION

This case concerns the federal judiciary's long-established system for managing the enhanced funding of the defense function required in federal capital prosecutions. The government, in its merits briefing, contends that even after filing a formal notice of intent *not* to seek the death penalty (a "no seek"), it may later withdraw that notice at virtually any time, for any reason, or for no reason at all.[4]

The government's position, if adopted, would upend decades of settled law and practice that have made federal capital litigation fair and workable, while satisfying Congressional statutes governing the defense function. If "no-seek" notices could be revoked at will, every death-eligible prosecution would necessarily remain a capital case until trial. That outcome would not only undermine the federal judiciary's ability to manage its dockets but also—because nearly all death-eligible

---

[4] This amicus brief does not address the even more important ways in which a belated "no-seek" reversal directly subverts counsel's ability to timely and effectively prepare a defense in a death-penalty case. That subject is addressed in the district court's order and Defendant-Appellee's brief.

- 3 -

**Exhibit F**

defendants qualify for CJA representation—impose enormous and unnecessary burdens on the federal defender program, drain judiciary resources, and exhaust the limited pool of capitally-qualified counsel.

Recent actions by the current Attorney General have brought these concerns into sharp relief. In February, the Attorney General directed the Department of Justice (DOJ) to reevaluate every "no seek" decision made since January 2021[5]—more than 800 in total—and has thus far ordered the filing of death-penalty notices against ten defendants who previously received "no-seeks" (including in this case).[6] Every district court to consider a defense challenge to this tactic has ruled against the government. This appeal is the first in which the government seeks to overturn that uniform line of decisions.

This Court should affirm the district court's order and preserve the stability, fairness, and efficiency of the system that the federal

---

[5] *See* Attorney General, Memorandum, *Reviving the Federal Death Penalty*, at 3 (Feb. 5, 2025), a*vailable at* https://www.justice.gov/ag/media/1388561/dl.

[6] Amicus also understands that in dozens more such "no seek" cases, DOJ has summoned defense counsel to meetings with its capital case committee, one of the last steps before the Attorney General approves a death-penalty notice.

- 4 -

**Exhibit F**

judiciary, defenders, and CJA counsel, and DOJ designed together and have maintained for three decades.

## ARGUMENT

**I. The government's filing of "no-seek" notices—a critical, longstanding practice that the federal courts and defender offices rely on to manage costs—is embedded in case law, the Judiciary Guide, and DOJ's own manual.**

Since the Federal Death Penalty Act (FDPA) was enacted in 1994, the federal courts have developed a system that aims to provide the enhanced defense resources the law requires in capital cases (*i.e.*, where the crime charged is punishable by death), while containing unnecessary costs. This legal machinery was developed and has long functioned with the cooperation of defenders and CJA lawyers, as well as DOJ. Its fulcrum is the well-established practice of the government's filing and serving formal notice—generally by an agreed-upon deadline—as soon as the Attorney General decides whether to seek a death sentence, usually relatively early in the pretrial period of any death-eligible case.[7] And when the government formally declares it will

---

[7] *See* Justice Manual, § 9-10.050 ("the Attorney General will make the final decision whether to seek the death penalty"), *available at*

- 5 -

**Exhibit F**

*not* pursue the death penalty—as it does in the vast majority of such cases—district courts and defender offices rely on the government's "no seek" notices to reclassify the cases as non-capital and adjust staffing and budgeting accordingly.[8] This also allows scarce capitally-learned CJA and defender counsel[9] to take on other cases, which conserves limited resources while containing costs.[10]

---

https://www.justice.gov/jm/jm-9-10000-capital-crimes.

[8] CJA counsel assigned to capital cases and any defense expert or investigative services are generally funded through and with the approval of the district court, *see* 18 U.S.C. § 3599(a)(1), (f). That process requires counsel to develop a budget with the circuit budgeting attorney, which must be separately approved by the court and the circuit chief judge in advance of work being done or funds expended. *See Guide to Judiciary Policy*, Vol. 7, Pt. A, Ch. 6, § 640, *available at* https://www.uscourts.gov/sites/default/files/2025-01/guide-vol07a-ch06.pdf. Defender offices have their own budgets, approved by the federal judiciary, *see* 18 U.S.C. § 3006A(g), from which they must fund their own staff and any experts or other defense services.

[9] Federal statutes mandate that "in every criminal action in which a defendant is charged with a crime which may be punishable by death," a defendant "shall be entitled" to the appointment of one or more attorneys who are "learned in the law applicable to capital cases." *See* 18 U.S.C. §§ 3005 and 3559. Attorneys satisfying this requirement are referred to as "capitally-learned" counsel.

[10] *See Guide to Judiciary Policy*, Vol. 7, Pt. A, Ch. 6, Appx. 6A, *Recommendations and Commentary Concerning the Cost and Quality of Defense Representation*, at 106 (unnecessarily delaying "no seek" decisions "limits the availability of lawyers qualified to serve as 'learned

- 6 -

**Exhibit F**

This practice is deeply rooted in judicial decisions going back decades, including by this Court, applying statutes that govern the defense function in capital cases. The relevant statutes, which were enacted or revised when the FDPA was passed, entitle a defendant to enhanced representation and resources as soon as he is capitally charged.[11] *See* 18 U.S.C. § 3005 ("Whoever is indicted for treason or

---

counsel' for other capital appointments"), *available at* https://www.uscourts.gov/file/vol07a-ch06-appx6apdf; *id.*, Vol. 7A, Appx. 2A, XIV(C)(1)(h) (given the dearth of capitally-learned attorneys, district court may need to look to "[o]ut-of-district counsel" to find one with "requisite expertise"), *available at* https://www.uscourts.gov/file/vol07a-ch02-appx2apdf.

[11] This reflected Congress's recognition that early intervention by capitally-qualified and well-resourced counsel is essential for an effective defense in cases of life or death. *See United States v. Cordova*, 806 F.3d 1085, 1100 (D.C. Cir. 2015); *In re Sterling-Suarez*, 306 F.3d 1170, 1173 (1st Cir. 2002); *see also* American Bar Ass'n, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 1.1, History; Guideline 10.2, Commentary, at 2, 58-59 (Feb. 2003) (early investigation including of mitigating evidence from the client, his family, and other sources is a necessity because otherwise such evidence may become unavailable, and because it is needed to advocate to the prosecution not to seek the death penalty), *available at* https://fdprc.capdefnet.org/sites/cdn_fdprc/files/Assets/media-root/public/overview/ABA%20Guidelines/aba_guidelines.pdf; *id.*, Guideline 10.8 & Commentary, at 86-88 (counsel must litigate capital issues from the outset of a case to obtain timely relief and guard against claims of waiver and forfeiture).

**Exhibit F**

other capital crime" must be assigned "2 … counsel, of whom at least 1 shall be learned in the law applicable to capital cases");[12] § 3599(a)(1) ("in every criminal action in which a defendant is charged with a crime which may be punishable by death," specially qualified counsel and enhanced investigative, expert and other services must be provided).[13] Where the government has charged a capital offense, the district court must promptly provide the defendant with such enhanced representation and resources; the court may not wait until the government announces its intention to seek a death sentence to do so.

---

[12] Capitally-learned counsel are paid at an hourly rate that is substantially higher than the ordinary CJA rate. *See* 18 U.S.C. § 3599(g)(1); *Guide to Judiciary Policy*, Vol. 7, Pt. A., Ch. 6, § 630.10.10.

[13] Those additional resources often include mitigation specialists, mental-health professionals, forensic experts, future-dangerousness and prison-conditions experts, victim liaisons, and other kinds of experts and investigators necessary in defending a death-penalty case. *See* Report to the Committee on Defender Services, Judicial Conference of the United States: *Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases*, at 71-77 (September 2010), *available at* https://www.uscourts.gov/update-cost-and-quality-defense-representation-federal-death-penalty-cases; *see also id.* at 71 ("In death penalty cases, both the prosecution and the defense make more extensive use of investigators, expert witnesses, and other case-related services than they do in non-capital cases."); *A.B.A., Guidelines, supra*, Guideline 4.1, Commentary, at 30-33; Guideline 10.11, at 108; Guideline 10.10.2, at 101-02 n.259.

- 8 -

**Exhibit F**

*In re Sterling-Suarez*, 306 F.3d 1170, 1171-75 (1st Cir. 2002) (granting a mandamus petition against district judge who delayed appointment of capitally-learned counsel under § 3005).

In the early days of the FDPA, the question quickly arose: Was a defendant charged with a capital offense statutorily entitled to enhanced counsel and other defense services even if the government filed notice that it would *not* seek a death sentence? This and every other circuit court (with one possible exception) answered this question: "no." For even though the statutes extend these rights to any person "indicted for" a "capital crime," § 3005, or "charged with a crime which may be punishable by death," § 3599, their "purpose" is to "provide additional support and expertise to defendants facing *the possibility* of the death penalty." *United States v. Cordova*, 806 F.3d 1085, 1099-1100 (D.C. Cir. 2015) (emphasis added); *United States v. Douglas*, 525 F.3d 225, 236 (2d Cir. 2008) (§ 3005 applies until the "'threat that the death penalty will be imposed has been eliminated'") (quoting *United States v. Waggoner*, 339 F.3d 915, 919 (9th Cir. 2003)); *Sterling-Suarez*, 306 F.3d at 1175 (§ 3005 applies "until it becomes clear that the death penalty is

- 9 -

**Exhibit F**

no longer an option"); *see also United States v. Casseus*, 282 F.3d 253, 256 (3d Cir. 2002) (assuming § 3005 applies when "the possibility of the death penalty was hanging over appellants' heads").[14]

Thus, a capital defendant's rights to enhanced resources in death-eligible cases under § 3005—and by implication, the similarly-worded § 3599—end once the government files a "no-seek" notice and thus "formally and *irrevocably* renounces any intention" to pursue a death sentence. *Waggoner*, 339 F.3d at 919 (emphasis added); *see Cordova*, 806 F.3d at 1099-1100 (once "the government has conclusively determined that it will not seek the death penalty" the possibility of a

---

[14] The one possible exception is the Fourth Circuit, which has held that a "defendant has an absolute statutory right to two attorneys" in a death-penalty-eligible case, regardless of whether the government decides to seek the death penalty. *United States v. Watson*, 496 F.2d 1125 (4th Cir. 1973); *see also United States v. Boone*, 245 F.3d 352, 358-61 (4th Cir. 2001) (reaffirming *Watson*). This is identified only as a *possible* exception because the Fourth Circuit has elsewhere suggested that district courts may have discretion to withdraw the enhanced resources afforded capital defendants once the government notices its intent not to seek the death penalty. *See, e.g., United States v. Robinson*, 275 F.3d 371, 384 (4th Cir. 2001); *United States v. Hall*, 506 F. App'x 245, 249 (4th Cir. 2013) (unpub.); *cf., United States v. Cerritos*, 180 F. Supp. 3d 432, 438 (E.D. Va. 2016) (holding that notwithstanding *Boone*, the trial court retains discretion to keep or dismiss the second attorney once the government files a "no seek").

- 10 -

**Exhibit F**

death sentence is no longer "on the table"); *Douglas*, 525 F.3d at 236-37 (government's announcement it would not seek the death penalty meant "a sentence of death was precluded"); *United States v. Grimes*, 142 F.3d 1342, 1347 (11th Cir. 1998) (same where "the government announce[d] that it will not seek the death penalty or the death penalty is otherwise unavailable by force of law"); *see also Casseus*, 282 F.3d at 256 ("after the government declared that it would not seek the death penalty, the appellants were no longer capital defendants").

Since this law was established, the importance of the government's timely filing of a "no-seek" notice, on which courts and defense lawyers rely, has been recognized by the *Guide to Judiciary Policy* as a key measure for managing capital cases and "control[ling] costs." Thus, the Guide advises district courts to promptly "establish a schedule"—subject to extension "for good cause shown"—for the government's notice of whether it will or will not seek the death penalty. *Id.*, Vol. 7A, Pt. A, Ch. 6, § 670(a), (b)(3), (c); *see also id.*, § 640.30(c)(3) ("As soon as practicable after a decision not to seek the death penalty, the number of appointed counsel and hourly rate of

- 11 -

**Exhibit F**

compensation should be reviewed.").[15] The Administrative Office of the

United States Courts (AO) has explained to Congress why timely notice

is critical to managing the judiciary's costs and resource obligations:

until DOJ affirmatively declines to seek the death penalty, the

judiciary, and defense counsel must treat the case as capital and bear

the resulting costs and resource burdens.

> Until DOJ formally notifies counsel and the court that it
> does not intend to seek the death penalty for a death-eligible
> defendant, defense counsel must assume that the death
> penalty will be pursued. Pending DOJ's decision, the
> judiciary is obligated to bear the substantial cost of two
> statutorily-required, capital-qualified defense counsel that
> are compensated at the higher capital panel attorney hourly
> rate of $223, as of January 1, 2025. These attorneys must
> undertake the intensive, time-consuming work to advocate
> on behalf of the CJA client and present evidence that the
> death penalty should not be sought, as well as prepare for a

---

[15] *Available at*
https://www.uscourts.gov/sites/default/files/document/guide-vol07a-ch02.pdf. The Judicial Conference had been urging such a "fast track process" to "preserve funding and minimize the unnecessary expenditure of resources" since as far back as 1998. *See Guide to Judiciary Policy*, Vol. 7, Pt. A, Ch. 6, Appx. 6A, *Recommendations and Commentary Concerning the Cost and Quality of Defense Representation*, at 1, 106. District courts have discretion to keep two defense counsel on a case even after the government files a "no-seek," but it is Judicial Conference policy to do so only under "extenuating" circumstances and, even then, to "reduce the compensation rate." *Guide to Judiciary Policy*, Vol. 7, Pt. A, Ch. 6, § 630.30.

**Exhibit F**

capital trial and sentencing proceeding. An early decision by the Attorney General *not* to seek the death penalty could achieve significant cost savings for the Defender Services program, DOJ, and the courts.[16]

Even DOJ's own manual directs prosecutors to "promptly inform the district court and counsel for the defendant once the Attorney General has made the final decision" whether to pursue a death sentence. It explains that "[e]xpeditious communication is necessary so the court is aware, in cases in which the Attorney General directs the [government] not to seek the death penalty," that enhanced defense resources are "no longer required" by statute. U.S. Dep't of Justice, *Justice Manual*, § 9-10.150.[17]

This DOJ protocol for "Capital Crimes" also repeatedly

---

[16] United States Courts, *FY 2026 Congressional Budget Request, Defender Services*, at 5.20-5.21, *available at* https://www.uscourts.gov/sites/default/files/document/section-05-defender-services-fy2026.pdf.

[17] *Available at* https://www.justice.gov/jm/jm-9-10000-capital-crimes. For nearly a quarter century, DOJ's manual has directed the government to "promptly" advise district courts of a "no-seek" decision so that courts are aware that enhanced defense resources are no longer required. *See United States Attorneys' Manual*, § 9-10.020, at 1-2 (2001 revision), *available at* https://www.justice.gov/archive/usao/usam/1997/1997USAM_Title%209%20Criminal_Part2.pdf.

- 13 -

**Exhibit F**

acknowledges that deadlines for such notice are generally set by district courts and that prosecutors should take steps involved in the DOJ's internal process early enough to allow them to meet courts' notice deadlines. *See id.*, §§ 9-10.040, 10.060, 10.070, 10.080.[18] In this case, this is just what happened initially: early last year, the government filed and served a "no-seek" notice by an agreed-upon deadline.[19]

This notice practice is longstanding. For decades, district courts across the country have set—and the government has met—agreed-

---

[18] DOJ's published "capital crimes" protocol has long provided for timely internal review to enable notices to be filed "prior to the date on which the Government is required, by an order of the court or otherwise," to do so. *United States Attorneys' Manual*, § 9-10.040 (1997 ed., as revised June 7, 2001), *available at* https://www.justice.gov/archive/usao/usam/1997/1997USAM_Title%209%20Criminal_Part2.pdf.

[19] The government never questioned the district court's authority to set a deadline for the death penalty notice. On the contrary, it acknowledged the court's authority by requesting—and obtaining—an extension of the deadline. The government then filed its "no-seek" notice within the extended period. *See* Appx 6-7. "[I]n reliance on the no-seek notice," counsel for Mr. Dangleben "did not request the appointment of learned counsel, a mitigation specialist, or penalty-phase experts, and did not conduct any mitigation investigation, which he otherwise would have done '"immediately."'" Response Brief of Defendant-Appellee, *United States v. Dangleben*, Nos. 25-2807, 25-2916, at 5 (3d Cir. Oct. 31, 2025).

- 14 -

**Exhibit F**

upon deadlines for notices of whether the government intends to pursue a death sentence. *See, e.g.*, *United States v. Frye*, 372 F.3d 729, 731 (5th Cir. 2004); *United States v. Wilk*, 366 F. Supp. 2d 1178, 1181 (S.D. Fla. 2005); *United States v. Furrow*, 100 F. Supp. 2d 1170, 1172-73 (C.D. Cal. 2000); *United States v. Valle-Lassalle*, 36 F. Supp. 2d 445, 446 (D. P.R. 1999); *United States v. Storey*, 1997 WL 51394, at *1 (D. Kan. Jan. 29, 1997) (unpub). And where any question arose, courts *in every instance* confirmed their inherent authority to establish and thus enforce such deadlines. *See, e.g.*, *United States v. Rivas-Moreiera*, 2023 WL 11960650, at **1-2 (E.D. Tex. Oct. 7, 2023) (unpub); *United States v. Tsarnaev*, 2013 WL 5701582, at *2 (D. Mass. Oct. 18, 2013) (unpub); *United States v. Slone*, 969 F. Supp. 2d 830, 838 (E.D. Ky. 2013); *United States v. Ball*, 2006 WL 8570266, at **1-2 (D.D.C. Oct. 19, 2006) (unpub).

Over the last decade and a half (the period for which robust data is available), the government has filed thousands of "no-seeks."[20]

---

[20] *See* Federal Death Penalty Resource Counsel Project, *Declaration of Matthew Rubenstein Regarding the Length of Time Between Capital Indictment and the Government's Decision Not to Seek the Death Penalty Between 2010 and January 20, 2025*, at 3 (Oct. 12,

**Exhibit F**

Amicus is not aware of any case before this year (under any administration) in which the government has ever questioned whether "no seeks" filed under these court-ordered deadlines were conclusive. That consensus likely reflects recognition that the orderly process, refined over decades, protects the interests of all stakeholders while safeguarding the legal rights of capital defendants.

For the defense, it ensures the expanded staffing and funding for attorneys, experts, and investigators to which capital defendants are entitled throughout the period the possibility of a death sentence remains "on the table." For the government, it preserves time to evaluate each potential capital prosecution according to its internal protocol (*see Justice Manual,* Capital Crimes, §§ 9-10.030 to 9-10.140), so the Attorney General can decide which fraction of eligible cases warrant a resource-intensive death-penalty authorization. And for district courts and their budgeting staff (and federal defenders, for

2025), *available at* https://fdprc.capdefnet.org/sites/cdn_fdprc/files/Assets/media-root/public/project-declarations/Authorization/Dec%20re%20Indict%20to%20Decision%20Not%20Auth%202010-2025%20%28Rubenstein_Oct%202025%29.pdf.

- 16 -

**Exhibit F**

cases in which they are assigned) early notice that a defendant no longer faces a potential death sentence enables immediate adjustments to defense staffing and budgets, conserving scarce resources.

## II. Accepting the government's legal position in this appeal would severely disrupt the federal judiciary's management of capital cases and generate potentially exorbitant costs.

Breaking with this well-established, orderly process, the government now insists in this case (and in a growing number of similar cases around the country) that it is not obliged to furnish any notice once it reaches a "no-seek" decision, and that a district court has little authority to make it do so—by any deadline, let alone well before trial.[21] The government also argues that, if it does file and serve a "no-

---

[21] At one point, the government seems to allow that a district court might have limited power to set a deadline solely to effectuate the requirement that notice be given a "'reasonable time before trial.'" Gov. Br. 36 (quoting § 3593(a)). But apparently, in the government's view, such a deadline could not be set early or even in the middle of the pretrial period, since it maintains that notice as little as four months before trial—even a trial where execution is on the line—is "reasonable." Gov. Br. 21. More importantly, the government insists that any notice deadline must be tied to a scheduled trial date, and if that date is cancelled or changed, as often occurs throughout the pretrial period, the deadline automatically becomes "defunct." Gov. Br. 37.

- 17 -

**Exhibit F**

seek" notice, even by agreement, it remains free thereafter—perhaps until the very eve of trial[22]—to renege on it, for any reason, or no reason, and file a death-penalty notice.[23] In other words, the government insists that, no matter how much time has lapsed, a district court lacks authority to either (1) enforce a missed deadline for the government to give notice regarding whether it will seek the death penalty or (2) hold the government to its position if it filed a "no seek."[24]

---

[22] Although the government acknowledges the statutory requirement that it give notice of intent to seek the death penalty by a "reasonable time before the trial," 18 U.S.C. § 3593(a), it maintains that reversing a prior "no seek" just a few months before a scheduled trial date (as it sought to do here) is "reasonable." Indeed, the government goes so far as to suggest that, even if a reversal comes on the very eve of trial, the district court still could not disturb the new "seek" notice; rather, its only recourse would be to postpone the trial. Gov. Br. 32, 37-40, 46.

[23] The government's position is unequivocal: it sees no need for extraordinary, unusual, or changed circumstances to justify reversing a "no seek." Rather, such a reversal may rest on nothing more than a new or different assessment of the case or a re-assessment by a new or different official (anyone from the line prosecutor to the President), based on any of the countless "prosecutorial considerations" that inform charging decisions. Gov. Br. 28-29.

[24] Notably, the government has abandoned its alternative argument below that, even if a court may impose limits on such tactics, DOJ's "swing in attitude toward capital punishment" under a new president and new attorney general constituted an "exigent circumstance" that justified the government's reversal of its prior "no-

- 18 -

**Exhibit F**

Gov. Br. 38-40, 47-54.

The government's attempt to diminish the district court's authority is not only novel and extreme, it is also inconsistent with the federal judiciary's long-established protocols for staffing and resourcing the defense in federal capital cases. As described above, these protocols are deeply embedded in case law applying capital statutes, federal judicial policy as set forth in the Judiciary Guide, and even the DOJ's own manual. If the government need never file a "no-seek" notice and, even when it does, may renege on it at will, then for any charge that is punishable by death, the death penalty could never be deemed "unavailable by force of law," *Grimes*, 142 F.3d at 1347, "no longer an option," *Sterling-Suarez*, 306 F.3d at 1175, a "threat" that "has been eliminated," *Douglas*, 525 F.3d at 236, not "on the table," *Cordova*, 806 F.3d at 1100, or no longer a "possibility," *Casseus*, 282 F.3d at 256. A case charged under a capital statute would necessarily remain "capital,"

---

seek." *See* Appx13-15, 97-98, 115-117. Similarly, although the district court allowed that a "no-seek" might be reversible based on "good cause," Appx17, the government has eschewed any claim that it satisfied that standard or that the court abused its discretion in holding that it did not satisfy that standard. *See* Gov. Br. 22-23, 41-43.

- 19 -

**Exhibit F**

since the government could always change its mind. Thus, under binding precedent in this and other circuits, courts (in overseeing assigned CJA counsel) and federal defenders (in overseeing their own attorneys) could never withdraw the enhanced staffing, funding, and resources to which capital defendants are entitled under §§ 3005 and 3599—at least not until trial begins and jeopardy attaches.

In denying "no-seek" reversals, several district courts have recognized this problem and rejected the government's new position as contrary to established precedent. "[D]efense counsel and the Court would have to continue to treat every single capital-eligible case as a death case. That system . . . would clash, for example, with the premise" of circuit decisions "that a defendant may be stripped of learned counsel once an 'irrevocable' no-seek notice is filed." *United States v. Spurlock*, 782 F. Supp. 3d 987, 1008 (D. Nev. 2025); *United States v. Cole*, ___ F. Supp. 3d ___, 2025 WL 2592515, at *14 (D.V.I. Sept. 7, 2025); *see also United States v. Suarez*, ___ F. Supp. 3d ___, 2025 WL 2710094, at **3-4 (N.D. Cal. Sept. 23, 2025) (court terminates appointment of capitally-learned counsel under § 3005 only after deeming government's "no seek"

- 20 -

**Exhibit F**

notice "irrevocable").

Several of these courts have also accurately observed that the government's regime would be "unworkable." *Spurlock*, 782 F. Supp. 3d at 1008; *accord Cole*, 2025 WL 2592515, at *14. The precise scale of the disruption and cost is incalculable, but it would undoubtedly be immense. The Department of Justice files and serves, on average, about 150 "no-seeks" each year in capital cases.[25] It generally does so relatively early in the pretrial period—on average, only five months after a capital indictment.[26] By contrast, the government seeks a death

---

[25] *See Declaration Regarding Time, supra*, at 3.

[26] *Declaration Regarding Time, supra*, at 3. About a decade ago, DOJ created an "expedited" process for reaching and announcing "no-seek" decisions early, sometimes even before indictment, in the many cases where that decision is simple and clear-cut. *See Justice Manual*, §§ 9-10.060, 9-10.070. In promulgating that protocol to federal prosecutors, the Attorney General explained that, "[s]tatistically, the Department decides not to pursue the death penalty in the vast majority of cases that contain death eligible charges," that "[i]n many of those cases, the decision not to seek the death penalty can reasonably be made at the pre-indictment stage," and that doing so brings "substantial savings of time and money by courts, prosecutors and defense attorneys." Attorney General, Memorandum, *Revisions to Death Penalty Protocol* (Apr. 7, 2014), a*vailable at* https://www.justice.gov/oip/foia-library/ag_memo_revisions_death_penalty_protocol/dl.

- 21 -

**Exhibit F**

sentence in a much smaller proportion of eligible prosecutions (just over

10 percent of all the cases reviewed by DOJ in the modern era of the

federal death penalty).[27] This translates to only about 15 to 20 "seek"

notices a year, on average.[28] Even fewer prosecutions require funding a

death-penalty defense through trial, because, historically, about half

the cases that initially received "seek" notices ended in a negotiated

guilty plea to a non-death sentence or otherwise saw the "seek" notice

---

[27] As noted, the FDPA became law in 1994. In 1988, Congress enacted a much narrower capital statute, the Anti-Drug Abuse Act, 21 U.S.C. § 848 (repealed 2006). Data on authorizations and trials under both statutes is available starting in 1989. Federal Death Penalty Resource Counsel Project, *Declaration of Matthew Rubenstein Regarding the Geographic Location of Federal Cases, the Frequency of Authorizations, Death Sentences and Executions and the Race and Gender of Defendants and Victims (Revised August 13, 2025),* at 3-5 (Aug. 13, 2025), *available at* https://fdprc.capdefnet.org/sites/cdn_fdprc/files/Assets/media-root/public/project-declarations/Race%20%26amp%3B%20Gender/Dec%20re%20Race%20Geography%20Frequency%20%28Rubenstein_Aug%202025_rev%20Oct%202025%29.pdf.

[28] The figures thus far for the current Attorney General (as of August 2025, the latest date for which data is available) are similar: She has authorized death-penalty notices in 17 cases out of 222 that DOJ has reviewed. *Declaration Regarding Authorizations, supra,* at 3-5.

- 22 -

**Exhibit F**

withdrawn before trial.[29] Thus, since 1989, only 241 federal defendants have been actually tried capitally, *i.e.*, under "seek" notices—an average of only about seven a year.[30]

Thus, this Court can discern what is likely to be a major consequence of stripping district courts of their long-recognized authority to order that the government furnish notices of its "no seek" decisions, and to enforce such notices: the judiciary's finances. Whereas the federal courts and defender offices have historically provided enhanced staffing and resources to capital defendants in only about *seven cases a year*, they would now have to do so in roughly *150 additional cases* annually. And amicus would expect that change to prove extraordinarily expensive. Federal capital cases are overwhelmingly handled by federal defenders and other CJA-appointed attorneys. One AO study of defense costs in federal death-eligible cases between 1998 and 2004 found that "cases in which a capital prosecution was authorized cost almost eight times as much as those death-eligible

---

[29] *Id.*

[30] *Id.*

- 23 -

**Exhibit F**

cases that were not authorized."[31] Particularly under current budgetary

circumstances,[32] the cumulative cost to courts and defenders (not to

---

[31] *Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases*, *supra note* 10, at 10, 24-25, 128. When this study isolated "seek" prosecutions that pled before trial, the average defense costs of those cases were still nearly five times greater than in the "no seek" cases. *Id.* More recent data reveals that during the last two years of the Biden administration, CJA attorneys across the country submitted, on average, about 600 capital vouchers for a total of around $35 million in payments—and this is a period during which only one "seek" notice was filed, so this dollar figure generally represents the cost of the capital pretrial period before the "no seek" was filed. *FY 2026 Congressional Budget Request, Defender Services*, *supra*, at 5.13-5.15, 5.20- 5.21, https://www.uscourts.gov/administration-policies/governance-judicial-conference/congressional-budget-request. (This dollar figure rivalled or exceeded the CJA payments for several categories with many more cases, such as weapons prosecutions, which generated, on average, about 4,500 vouchers for about $40 million in annual payments. *Id.*, 5.13-5.15). It is fair to assume that the vast majority of this billing was for capital cases in which "no seek" notices were filed relatively early in the pretrial process and enhanced funding thereafter halted. The $35 million annual average, moreover, does not include the many cases or portions of cases handled by defender organizations.

[32] *See, e.g., Funding Crisis Leaves Defense Lawyers Working Without Pay*, (July 15, 2025) (AO reporting on the Judicial Conference Budget Committee's announcement that the program that pays court-appointed counsel ran out of funding on July 3, 2025), *available at* https://www.uscourts.gov/data-news/judiciary-news/2025/07/15/funding-crisis-leaves-defense-lawyers-working-without-pay; CJA Panel Attorney Funds Information FY 2025 (Oct. 6, 2026) (AO reporting that payments to CJA attorneys continue to be deferred during the current lapse in appropriations), *available at https://www.uscourts.gov/about-federal-*

- 24 -

**Exhibit F**

mention DOJ) would be enormously burdensome, if not disastrous, for

the criminal justice system.[33]

## CONCLUSION

This Court should affirm the order below.

Respectfully submitted,

Shelley M. Fite
  Co-Chair, Amicus Committee

Daniel Habib
Judith Mizner
  Members, Amicus Committee
National Association of
Federal Defenders

Elisa A. Long
Federal Public Defender
Western District of Pennsylvania

*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender
*Counsel of Record*

Federal Public Defender for the
Western District of Pennsylvania
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA 15222
(412) 644-6565

---

*courts/defender-services/cja-panel-attorney-funds-information-fy-2025*.

[33] The AO recently warned Congress that it expected the burden of capital cases on defender organizations to swell under the new administration, apparently based only on the increase in cases where a "seek" notice is filed from the start. *FY 2026 Congressional Budget Request, Defender Services, supra*, at 5.14-5.15, 5.20-5.21, *available at* https://www.uscourts.gov/administration-policies/governance-judicial-conference/congressional-budget-request.

**Exhibit F**

# CERTIFICATE OF BAR MEMBERSHIP

It is hereby certified that Renee Pietropaolo is a member of the

bar of the Court of Appeals for the Third Circuit.

*/s/ Renee Pietropaolo*
RENEE PIETROPAOLO

DATED:   November 7, 2025

**Exhibit F**

# CERTIFICATE OF COMPLIANCE

I, Renee Pietropaolo, Assistant Federal Defender, hereby certify the following:

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,434 words excluding the parts of the brief exempted by Fed. Rule App. P. 32(f) (2011).

2.     This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Word 365 in font size 14, type style Century Schoolbook.

3.     This brief complies with 3d Circuit L.A.R. 31.1 (2011) because the text of the electronic brief is identical to the text in the paper copies. Further, the electronic version of the attached brief was automatically scanned by Trend Micro antivirus, version 14.0 and found to contain no known viruses.

> */s/ Renee Pietropaolo*
> Renee Pietropaolo
> Assistant Federal Public Defender

- 27 -

**Exhibit F**

# CERTIFICATE OF SERVICE

I, Renee Pietropaolo, Assistant Federal Defender, hereby certify that I have electronically filed the Brief for the National Association of Federal Defenders as Amicus Curiae in Support of Appellee and that a copy has been served upon counsel of record, through the Third Circuit Court of Appeals' Electronic Case Filing (CM/ECF) system.

/s/ *Renee Pietropaolo*
RENEE PIETROPAOLO

DATED: November 7, 2025

- 28 -

**Exhibit F**