NJM:SKW/DKA
F. #2015R02002

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

      - against -
                                     20-CR-502 (BMC)

FAWAZ OULD AHMED OULD AHEMEID,
   also known as "Ibrahim Idress" and
   "Ibrahim Dix,"

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -X

## THE GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO STRIKE THE NOTICE OF INTENT TO SEEK THE DEATH PENALTY

                                        JOSEPH NOCELLA, JR.
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271-A Cadman Plaza East
                                        Brooklyn, NY 11201

Sara K. Winik
Daniel K. Amzallag
Assistant U.S. Attorneys
    (Of Counsel)

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the defendant Fawaz Ould Ahmed Ould Ahemeid's motion to strike the government's notice of intent to seek the death penalty (hereinafter, the "Motion"). ECF No. 165. For the reasons set forth below, the Motion should be denied.

Ahemeid was a terrorist who participated in two acts of mass murder and orchestrated a third, culminating in the deaths of dozens of people. He objects, in the present Motion, to the government's notice of intent ("NOI") to seek the death penalty against him, on grounds that the government had, initially, filed a letter stating that it would not seek the death penalty (a "no-seek letter") in his case. Ahemeid's Motion relies principally on a series of recent and distinguishable district court cases in which courts struck the government's NOIs when the government had first filed no-seek letters. The facts of Ahemeid's case and the gravity of his crimes make this case stand far apart from each of these district court cases. And, unlike each of these district court cases, in Ahemeid's case, the Court took careful steps to ensure that Ahemeid's rights would be protected, and, as a result, at the time the government filed its NOI, (1) no trial date had been firmly set; (2) no NOI deadline had been set, let alone one that the government violated; (3) no motions that depended on the case's posture with respect to capital authorization had been filed; (4) the Court had previously recognized that the filing of an NOI could change its trial and motion schedules; and, importantly as well, (5) Ahemeid now can make no convincing showing that the government's NOI caused him any prejudice whatsoever.

As to prejudice, Ahemeid stands in a fundamentally different position than defendants in other cases in which district courts have struck the government's NOIs. Ahemeid, unlike these other defendants, has had capital-ready defense teams representing him throughout

the entirety of this case, including at all times *after* the government filed its initial no-seek letter. This defense team consists of a lead attorney with deep experience in capital cases, two learned counsel who also have significant experience in capital cases, a mitigation specialist, an investigator, plus the assistance of the Federal Death Penalty Resource Counsel Project.  In the interest of ensuring that Ahemeid had every opportunity to mount a defense, the Court ensured that these resources all remained available to Ahemeid through the present even while the case was in a no-seek posture.

Ahemeid also argues, as to prejudice, that the government's NOI deprived him of the opportunity to obtain mitigation evidence from Mali, where the charged conduct took place. But defense counsel represents that their visas were denied in 2024.  Thus, any prejudice the defendant faces from defense counsel being unable to travel to Mali after the no-seek letter was filed on November 25, 2024, does not stem from the timing of the NOI.  Based on Ahemeid's representations, had the government initially sought the death penalty on November 15, 2024, defense counsel *still* would have been unable to travel to Mali in the two years since.  Therefore, the timing of the NOI cannot possibly have caused the defendant prejudice.

In any event, Ahemeid's attorneys have stated that his mitigation case involves multiple witnesses and forms of evidence located in many countries *beyond* just Mali.  *See* Tr. of July 30, 2024 Status Conf. at 11 (Ahemeid's former defense counsel's statement that Ahemeid's "mitigation investigation includes potential witnesses in at least six countries in Africa").  The government's NOI, in short, caused Ahemeid no prejudice with respect to his ability to travel to Mali.

Ahemeid also points to the alleged psychological harm that the government's NOI caused him, together with the alleged opportunity that he lost to resolve the case with a guilty plea

2

prior to the filing of the NOI.  It is not clear that the allegation relating to a plea is a cognizable form of prejudice, given that a defendant has no right to be "offered a plea, nor a federal right that the judge accept it." *Missouri v. Frye,* 566 U.S. 134, 148 (2012) (citation omitted).  Ahemeid also never once engaged the government in plea negotiations prior to the time that his no-seek letter was being reconsidered.  As to his psychological state, Ahemeid's alleged distress is an unfortunate result of any capital-eligible case in which a NOI is filed, and the record also suggests that Ahemeid was already in a distressed psychological state even when his case was in a no-seek posture.  *See* ECF Nos. 85, 101.

On the merits of Ahemeid's legal arguments, Ahemeid's Motion misconstrues the Federal Death Penalty Act, asking the Court to impose limitations where none exist in the statutory text or established case law.  Ahemeid also cannot show that the government waived its right to file a NOI, nor can he persuasively argue that any of the doctrines of estoppel apply to this case. Ahemeid's challenges to the NOI under the Fifth, Sixth, and Eighth Amendments of the U.S. Constitution similarly fail.

Ahemeid's crimes are paradigmatic examples of offenses for which courts and juries have found the death penalty to be appropriate.  Where, as here, the government has reconsidered its prior position not to seek capital punishment—a reconsideration during which Ahemeid received a meaningful opportunity to be heard, and which he cannot presently show causes him any prejudice beyond the prejudice inherent to the decision to seek in the first place— the Court should permit the government's NOI to stand.  Ahemeid's Motion should be denied.

### FACTUAL AND PROCEDURAL BACKGROUND

### I.    The Offense Conduct

Ahemeid's charges arise out of his terrorist activities on behalf of the foreign terrorist organizations al-Qaeda in the Islamic Maghreb ("AQIM") and al-Murabitoun, which

operate under the umbrella of al-Qaeda. Ahemeid planned and was involved in significant terrorist attacks in Africa against Western targets, including: (1) an attack on the La Terrasse restaurant in Bamako, Mali, on March 7, 2015, in which five individuals were killed; (2) an attack on the Hotel Byblos in Sevare, Mali, on August 7, 2015, in which 13 individuals—including five United Nations workers—were killed; and (3) an attack on the Radisson Blu Hotel in Bamako, Mali, on November 20, 2015, in which 20 individuals were killed, including U.S. citizen Anita Ashok Datar. *See* ECF Nos. 1, 14, 53.

Ahemeid joined AQIM in or around 2007, following which he planned and committed significant terrorist attacks against Western targets on behalf of AQIM and al-Murabitoun. *See* ECF No. 53 at 3. Ahemeid personally carried out the March 7, 2015 attack on the La Terrasse restaurant, which was frequented by Westerners. *See id.* He was armed with two AK-47 assault rifles, a pistol, and grenades, and killed five people in the attack. *See id.* That same day, al-Murabitoun issued a public statement claiming responsibility for the attack. *See id.*

Following the La Terrasse attack, Ahemeid met with the Mali-based head of operations for al-Murabitoun to discuss carrying out additional terrorist attacks on Western targets in the region. *See* ECF No. 53 at 3. The defendant subsequently helped to plan and execute the August 7, 2015 attack on the Hotel Byblos in Sevare, Mali. *See id.* During that attack, a lone gunman armed with an AK-47 assault rifle and equipped with a suicide vest entered the Hotel Byblos and opened fire. *See id.* The attack resulted in the deaths of 13 people, including five United Nations workers. *See id.* On or about August 10, 2015, al-Murabitoun issued a public statement claiming responsibility for the attack. *See id.*

Ahemeid also planned and helped oversee the execution of the November 20, 2015 attack on the Radisson Blu Hotel, which Ahemeid again targeted because of its popularity with

4

Westerners. *See* ECF No. 53 at 3. Approximately ten days before the attack on the Radisson Blu Hotel, Ahemeid and a co-conspirator met with the two chosen attackers, one from AQIM and one from al-Murabitoun, to discuss the attack; according to a statement by Ahemeid, the two terrorist groups had decided to conduct the attack jointly against a "common enemy." *See id.* at 3-4. Ahemeid and his co-conspirator instructed the attackers to kill as many Westerners as possible, and particularly to prioritize the killing of French citizens. *See id.* at 4. Beginning in the morning of November 20, 2015, the two attackers—armed with AK-47 assault rifles and hand grenades, and carrying the flag of al-Murabitoun—attacked the Radisson Blu Hotel. *See id.* The attack resulted in the deaths of 20 people, including U.S. citizen Anita Ashok Datar. *See id.* Datar, a 41-year-old public health expert from Takoma Park, Maryland, was in Mali working for an international development firm assisting the United States Agency for International Development. *See id.* Datar, who was a guest at the Radisson Blu Hotel, was shot multiple times and died at the scene as a result of the gunshot wounds. *See id.* In addition to the 20 people killed, at least seven more were wounded and multiple faced significant psychological harm. *See id.*

On December 7, 2015, AQIM issued the following public statement via Twitter, claiming responsibility for the attacks on behalf of AQIM and al-Murabitoun: "Two heroes infiltrating the Radisson Hotel in Mali, may God accept them. #Al-Qa'ida_in_West_Africa #Ansar_al_din #Al_Murabitun." *See* ECF No. 53 at 4. The tweet included photographs of the two attackers holding AK-47s and included each attacker's nom de guerre. *See id.* The attackers were depicted standing in front of a beige pickup truck parked under a tree. *See id.* Each photograph was emblazoned with the logo of Al-Ribat Media Foundation, the official media arm of al-Murabitoun. *See id.*

Following his April 2016 arrest by Malian forces and while in custody in Mali, Ahemeid made voluntary, Mirandized statements to agents of the Federal Bureau of Investigation's Joint Terrorism Task Force ("JTTF") on two separate occasions. *See* ECF No. 53 at 4. During these interviews, the defendant provided a detailed account of his role in planning and directing the November 2015 attack on the Radisson Blu Hotel, as well as his role in the other violent terrorist attacks. *See id.* at 4–5.

## II. Procedural History

On November 5, 2020, a grand jury sitting in the Eastern District of New York returned an indictment against Ahemeid. *See* ECF No. 3. On or about December 9, 2022, Ahemeid arrived in the United States in the custody of federal agents, and he was arrested pursuant to the charges in the indictment. *See* ECF No. 8. The Court appointed the Federal Defenders of New York ("FDNY") to represent Ahemeid. *See id.* Learned counsel, Anthony Cecutti, Esq., and Kestine Thiele, Esq., were also shortly appointed. *See* ECF Nos. 35, 37. Ahemeid also obtained the assistance of the Federal Death Penalty Resource Counsel Project. The government began producing discovery to defense counsel. On December 31, 2023—more than a year after Ahemeid's arrest and following multiple extensions—Ahemeid made a mitigation submission to the U.S. Attorney's Office ("USAO"), as part of the government's capital review process. *See* ECF No. 68 at 1; ECF No. 70 at 1–2. At no point in time did counsel engage in plea discussions with the government.

On July 30, 2024, the parties appeared before the Court for a status conference, where the parties discussed the timing of the government's capital review process. *See* Tr. of July 30, 2024 Status Conf. The Court ordered the USAO to complete its capital case review by December 15, 2024 and stated its expectation that the Department of Justice ("DOJ") would then

6

complete its further review within 60 days of the USAO's submission or, alternatively, before any "change in administration." *Id.* at 13–14. The government stated, at this conference, that it did not expect that any potential change in administration would have any "substantive effect" on the then-ongoing review process. *Id.* at 13. The defense, for its part, also provided details at this conference regarding its expected mitigation investigation, stating that the investigation would include "potential witnesses in at least six countries in Africa," likely requiring the issuance of "letters interrogatory, international subpoenas, [and] requests from foreign government agencies." *Id.* at 11.

The parties appeared for another status conference with the Court on October 30, 2024. Following this conference, the Court stated in a minute entry that Ahemeid's "pretrial motions, *except for* motion to suppress and motions dependent on the Government's decision to seek the death penalty" would be due January 28, 2025, and that Ahemeid's expected motion to suppress would be due March 28, 2025. Minute Entry, Oct. 30, 2024 (emphasis added). The Court scheduled trial for October 14, 2025, "with additional backup dates reserved." *Id.* Approximately one month later, on November 25, 2024, the government filed a no-seek letter, informing the Court that the then-Attorney General had authorized and directed the government not to seek the death penalty against Ahemeid. ECF No. 84.

On December 16, 2024, after the government's no-seek letter had been filed, FDNY moved to withdraw as counsel, citing a breakdown in communication with Ahemeid "over recent months." ECF No. 85. The Court held a status conference on December 19, 2024, where it relieved FDNY from the case. *See* Tr. of Dec. 16, 2024 Status Conf. at 6. Ahemeid's learned counsel since the beginning of his case, Anthony Cecutti and Kestine Thiele, remained appointed as counsel of record. *See id.* at 4. Mr. Cecutti then asked the Court to appoint additional counsel,

despite the fact that a no-seek letter had been filed (and that federal law no longer required the appointment of an additional attorney learned in the law of capital cases, *see* 18 U.S.C. § 3005). *Id.* The Court granted Mr. Cecutti's application and appointed additional counsel, who then joined Mr. Cecutti and Ms. Thiele in their representation of Ahemeid. *See* Tr. of Dec. 16, 2024 Status Conf. at 4; ECF No. 87. This additional counsel was Michael Bachrach, Esq., who states in the present Motion that he has participated as counsel in 32 death-eligible cases, including one to a penalty-phase verdict; that he has drafted motions and participated in jury selection in a second death penalty trial; and that he has been a member of the Federal Death Penalty Resource Counsel Project for two years, serving as Resource Counsel "to death-eligible capital defendants nationwide." *See* Bachrach Decl. ¶¶ 8–9, 12.

At the December 19, 2024 status conference, the Court also vacated its trial date and motion schedule, in light of the change in counsel. *See* Tr. of Dec. 16, 2024 Status Conf. at 5–6. Following this conference, Ahemeid sought and obtained multiple extensions of time to propose a new motion schedule for the case. *See* Order, Dec. 30, 2024; Order, Jan. 27, 2025; Order, Mar. 31, 2025.

On February 12, 2025, the parties appeared for another status conference. *See* Tr. of Feb. 12, 2025 Status Conf. Ahemeid had not, by this date, proposed a motion schedule, and so the Court admonished the defense to "pick up the pace a little," *id.* at 4, and to "get things moving," *id.* at 8. Counsel for Ahemeid pointed to a memorandum that had recently been issued by the then-Attorney General, which provided for a review of no-seek decisions in certain capital-eligible cases. *Id.* at 5. The Court expressed doubts as to whether Ahemeid's case would be included within the scope of this review. *Id.* at 5. Counsel for Ahemeid then responded that the defense had "every reason to believe," and "[had] to assume," that the review would include Ahemeid's

8

case. *Id.* at 5–7. The Court stated that it would "proceed on the assumption" that the government's initial no-seek letter would not be reconsidered, such that the case did not need to "be frozen or slowed" while any potential clarification of the Attorney General's memo was ongoing. *Id.* at 8. The Court recognized that if an NOI were filed, the Court's "schedule [was] going to change, obviously." *Id.* at 7. The Court then stated:

> Let's try to get things moving. If we run into a death penalty component that slows things down, well, at least we'll have everything else done, or a lot else done, before we get there and then we can slow it down for that if we need to.

*Id.* at 8. On this understanding, the Court ordered Ahemeid to submit a proposed motion schedule by March 28, 2025. *Id.* at 8; *see id.* at 4–5.

On March 20, 2025, the government notified Ahemeid's counsel that the USAO had received notice from DOJ that the case's no-seek determination was under review. Mot. Ex. B. Ahemeid, in response, requested vacatur of the deadline to file a proposed motion and trial schedule. ECF Nos. 111, 113. The Court ordered him to "file a proposed motion schedule for all non-capital related motions" by April 7, 2025. Order, Mar. 31, 2025.

Ahemeid filed a proposed motion schedule on April 7, 2025. ECF No. 115. This proposed schedule stated that a "[f]irst set of Rule 12 motions"—relating to venue, selective or vindictive prosecution, an error in the grand-jury proceeding or preliminary hearing, duplicity, multiplicity, lack of specificity of indictment, improper joinder, and failure to state an offense— would be due July 21, 2025. *Id.* The proposed schedule stated that a "[s]econd set of Rule 12 motions," relating to preindictment delay, right to a speedy trial, and the suppression of evidence, would then be due "45 days after decision to maintain prior no-seek (but no sooner than August 1,

9

2025) – *date subject to change if prior no-seek is reversed.*" *Id.* (emphasis added).[1] Put differently, Ahemeid's proposed motion schedule expressly carved out a series of complex, fact-dependent motions as motions for which the deadlines could be moved if a NOI were filed. *See id.* The Court so-ordered the motion schedule the same day. ECF No. 116. Ahemed did not ask to set a trial date at this point. *See id.*

On July 21, 2025, Ahemeid moved to dismiss two of the counts in the indictment (one of which was a capital-eligible offense) for failure to state an offense. ECF No. 135. Ahemeid won this motion, with the Court granting it and dismissing two of the indictment's counts, brandishing and discharging a firearm during a crime of violence, under 18 U.S.C. §§ 2, 924(c)(1)(A)(i)–(iii), 924(c)(1)(B)(ii) (Count Two), and causing death by a firearm during a crime of violence, under 18 U.S.C. §§ 2, 924(j)(1) (Count Three). ECF No. 150. Following the Court's order, only one capital-eligible offense remained in the indictment, first-degree murder (Count One), under 18 U.S.C. §§ 2, 1111(a), 2332(a)(1).

The parties appeared for a further status conference on October 20, 2025, to discuss the timing of the government's ongoing capital case re-review. *See* Tr. of Oct. 20, 2025 Status Conf. At this conference, the government asked the Court to set a deadline for the DOJ to complete

---

[1] Ahemeid's letter proposed July 21, 2025 as a deadline for motions filed under Federal Rule of Criminal Procedure 12(b)(3)(A)(i), (iv), and (v), as well as 12(b)(3)(B)(i), (ii), (iii), (iv), and (v). ECF No. 115. These rule citations correspond to motions to dismiss based on venue, selective or vindictive prosecution, an error in the grand-jury proceeding or preliminary hearing, duplicity, multiplicity, lack of specificity of indictment, improper joinder, and failure to state an offense. *See* Fed. R. Crim. P. 12(b)(3)(A)(i), (iv), (v); 12(b)(3)(B)(i), (ii), (iii), (iv), (v).

The letter proposed that motions filed under Rule 12(b)(3)(A)(ii), (iii), and 12(b)(3)(C), would be due "45 days after decision to maintain prior no-seek (but no sooner than August 1, 2025) – date subject to change if prior no-seek is reversed." ECF No. 115. These rule citations correspond to preindictment delay, speedy trial right, and the suppression of evidence. *See* Fed. R. Crim. P. 12(b)(3)(A)(ii), (iii); 12(b)(3)(C).

its capital case review, and Ahemeid expressly objected to the Court setting a deadline on the grounds that the government had stated it expected the review to be completed shortly and that, in the defense's view, setting a deadline might increase the chances that a NOI might later be filed. *Id.* at 4–6. The Court, accordingly, on Ahemeid's recommendation, did not set any deadline for a NOI to be filed. *Id.* Ahemeid then agreed with the Court that regardless of when the capital case process completed, the case was "still not ready for trial." *Id.* at 6.

On November 7, 2025, the Court granted, on Ahemeid's motion, a partial stay of the case, in light of a then-ongoing government shutdown and lapse in CJA funding. *See* ECF No. 145. The Court's partial stay included a stay of the deadline for motions that Ahemeid intended to file based on preindictment delay, lack of a speedy trial, and the suppression of evidence. *Id.* To date, Ahemeid still has not filed these motions.

On March 11, 2026, the Court held another status conference, at which the government informed the Court that it had been authorized and directed to seek the death penalty in this case. The Court directed the government to file its NOI by March 25, 2026, a deadline with which the government complied. *See* ECF No. 159. Ahemeid filed the instant Motion on April 27, 2026.

**ARGUMENT**

In the Motion, Ahemeid makes six principal arguments in support of his position that the government's NOI should be stricken. Specifically, he argues that: (1) a provision of the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3593(a), does not authorize the government to file an NOI after a no-seek letter has first been filed; (2) the FDPA requires a showing of "good cause" for the government to file an NOI when a no-seek letter has first been filed, and that no good cause has been established here; (3) the government's NOI was not filed a "reasonable time" before trial under the FDPA; (4) the government affirmatively waived its right to file a NOI by

first filing a no-seek letter; (5) the government should be estopped from seeking the death penalty in this case; and (6) the NOI violates the Fifth, Sixth, and Eighth Amendments of the U.S. Constitution.  Each of these arguments lacks merit.

I.        **The FDPA Does Not Bar the Government's NOI**

A.        **Section 3593(a) Does Not Prohibit the Filing of an NOI After a No-Seek Letter Has Been Filed**

In any case with capital-eligible charges, a district court must follow certain specified procedures, set forth in the Federal Death Penalty Act ("FDPA"), 18 U.S.C. §§ 3591 *et seq.*  Section 3593(a) sets forth a notice procedure for instances in which the government intends to pursue the death penalty.  The statute provides that in any capital-eligible case, if an "attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified," that attorney must, "a reasonable time before the trial or before acceptance by the court of a plea of guilty," file a notice "stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under [the FDPA] and that the government will seek the sentence of death." *Id.*  This notice (referred to as a notice of intent to seek the death penalty, or NOI) must also "set[] forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death." *Id.*  A court "may permit the attorney for the government to amend the notice upon a showing of good cause." *Id.*

By its plain language, § 3593(a) is a notice statute.  It operates to ensure that a defendant has adequate warning as to whether the government intends to seek the death penalty against him, as well as an understanding of the specific bases (*i.e.*, the aggravating factors) on which the government intends to make its argument in the penalty phase.  *See* 18 U.S.C. § 3593(a); *United States v. Robinson*, 473 F.3d 487, 491–92 (2d Cir. 2007) ("[T]he protection that § 3593(a)

12

affords a defendant . . . resemble[] the protection afforded by any number of pretrial rights that involve notification or disclosure for the purpose of allowing the defendant to prepare his case."). The statute, accordingly, imposes three requirements:  (1) that the government file a NOI "a reasonable time before . . . trial" or acceptance of a guilty plea; (2) that the NOI "set[] forth the aggravating factor or factors" on which the government will rely in a penalty proceeding; and (3) that the government establish "good cause" if it wishes to amend the NOI after it has been filed. 18 U.S.C. § 3593(a).

Nothing in § 3593(a) obligates the government to file a no-seek letter, nor does the statute address—in any way—an instance in which the government files a NOI after first filing a no-seek letter. *See* 18 U.S.C. § 3593(a).  The statute imposes rights and obligations only *after* the government decides to pursue the death penalty and files an NOI—not before.  As one district court has recently held, the "provisions of the FDPA are implicated only if the government has made an authoritative decision to seek the death penalty." *United States v. Restrepo*, No. 24-CR-20463, 2026 WL 1425059, at *6 (S.D. Fla. May 21, 2026) (citing *United States v. Fernandez*, 231 F.3d 1240, 1243 (9th Cir. 2000)); *see Robinson*, 473 F.3d at 487 ("If the government *ultimately decides* it will seek the death penalty, it must comply with 18 U.S.C. § 3593(a)." (emphasis added)).  In the stages of capital-eligible litigation prior to the time that the government files the NOI, § 3593(a) is simply not applicable.

Based on the plain and unambiguous language of § 3593(a), the Court should reject Ahemeid's argument that the filing of a no-seek letter is "irrevocable," or that the filing of an NOI after the initial filing of a no-seek letter in some way operates as an "amendment" of the initial no-seek letter. Mot. at 13–16.  To the contrary, § 3593(a) says nothing about no-seek letters.  The no-seek letters—while common practice in district courts across the country and while addressed in

13

the Justice Manual, discussed below—carry no legal effect under the statute.  Where, as here, a statute is unambiguous in the obligations that it imposes, the Court should not read additional requirements into it.  *See Patel v. Garland*, 596 U.S. 328, 346 (2022); *Degen v. United States*, 517 U.S. 820, 823 (1996).  This principle applies with added force to the question of the filing of a NOI, as this implicates the "broad discretion" afforded the government "to enforce the Nation's criminal laws."  *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

That Section 3593(a) does not recognize or accord legal weight to no-seek letters is unsurprising because at the time of the statute's enactment, in 1994, no-seek letters were not nearly as common a practice as they are today.  The FDPA was enacted in part as a reaction to *Furman v. Georgia*, a U.S. Supreme Court case that held unconstitutional the imposition of the death penalty based on open-ended, unbounded discretion.  408 U.S. 238, 239 (1972) (per curiam); *see* Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Fordham Urb. L.J. 347, 349 (1999).  Following *Furman* and other decisions, DOJ took the position that most "federal death penalty provisions were void" because they did not set forth adequate guidelines to control factfinder discretion, as *Furman* mandated.  U.S. Dep't of Justice, *U.S. Attorney's Manual* § 9-10.010 (1988), *available at* https://www.justice.gov/archive/usao/usam/1988/title9criminaldivisionchapters7-20.pdf (at 66). The FDPA was enacted to fix this problem.  *See Walker v. Reno*, 925 F. Supp. 124, 128 (N.D.N.Y. 1995).  As *Furman* mandated, the statute provided juries with a coherent framework to exercise their discretion in deciding whether to impose the death penalty.  It, specifically, created a requirement that the jury consider certain specified aggravating and mitigating factors, *see* 18 U.S.C. § 3592; it required that the jury return special findings at the conclusion of a penalty

hearing, *see id.* § 3593(d); and it limited the death penalty to a narrow list of qualifying offenses, *see id.* § 3591.

Only *after* the enactment of the FDPA, in January 1995, did DOJ implement procedures for the departmental review of capital-eligible cases—the foundation of the capital case review process today. *See* U.S. Dep't of Justice, *Federal Prosecutions in Which the Death Penalty May Be Sought* (Jan. 27, 1995), *available at* https://www.justice.gov/archive/usao/usam/1988/title9criminaldivisionchapters7-20.pdf (at 42). These internal policies later evolved to include a recommendation that a prosecuting attorney "promptly inform the district court if [DOJ] decides not to seek the death penalty"—the basis for the practice of filing no-seek letters today. *See* U.S. Dep't of Justice, *U.S. Attorney's Manual* § 9-10.020 (1997) (June 20, 2001 amendment), *available at* https://www.justice.gov/archive/usao/usam/1997/1997USAM_Title%209%20Criminal_Part2.pdf (at 38).[2]

Despite this evolution in internal DOJ policy, § 3593(a) of the FDPA was never amended to reflect this changing practice. The statute, therefore, remains silent as to the weight to accord no-seek letters. It unambiguously delineates obligations for the government when the government chooses to *seek* capital punishment—but it imposes no requirements whatsoever for the government to act (or not act) after it has filed a *no-seek* letter. Where, as here, a statute is unambiguous, a court must interpret the law according to its plain text. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). The plain text of the statute does not attach legal significance

---

[2]    The government notes that the Justice Manual does not create or confer any rights enforceable by a criminal defendant. *See* Justice Manual § 1-1.200 (the Manual "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter").

to the filing of a no-seek letter, and Ahemeid's unfounded interpretation of § 3593(a) must therefore be rejected.

**B.      Section 3005 of Title 18 Compels No Different Conclusion**

Unable to base his reading of § 3593(a) in the statute itself, Ahemeid looks for support in another provision of law applicable to capital cases, 18 U.S.C. § 3005. Section 3005 provides different protections for capital-eligible defendants, including the right to be appointed two attorneys, one of whom must be "learned counsel" (that is, an attorney "learned in the law applicable to capital cases"). The statute also ensures that the defendant be granted legal process to compel the attendance of witnesses; that the defendant's attorneys be granted free access to him during all reasonable hours; and that the defendant be allowed "in his defense to make any proof that he can produce by lawful witnesses." *Id.*

Nothing in this statute so much as mentions the filing of no-seek letters, nor does it plausibly inform any reading of § 3593(a). To begin with, § 3005 contains broader language than § 3593(a). Section 3005 requires the appointment of learned counsel for any defendant who "is *indicted* for treason or other capital crime" and requires that this appointment be conducted "promptly, upon the defendant's request." 18 U.S.C. § 3005 (emphasis added). Section 3593(a) speaks more narrowly, only to the notice that must be filed, post-indictment, when the government wishes to seek the death penalty. *See id.* § 3593(a). The triggering event, put differently, for the right to the appointment of learned counsel under § 3005 (indictment) is one that takes place earlier in a case than the triggering event for the obligations set forth in § 3593(a) (a notice of intent to seek the death penalty). The two statutes relate to different procedural protections, and nothing in their plain text indicates that Congress intended the reading of one to inform the other (nor is it plain that the reading of either would somehow manifest the idea of no-seek letters into the other).

16

Ahemeid argues that Congress must have intended §§ 3005 and 3593(a) to be interpreted in light of each other, because, he says, "Congress enacted both § 3593(a) and the current version of § 3005 in the same 1994 legislation." Mot. at 21. Ahemeid is wrong: a version of § 3005 has been on the books of the U.S. Code since the time of the founding. *See* An Act for the Punishment of Certain Crimes Against the United States, ch. 9, § 29, 1 Stat. 112, 118 (1790) (allowing a person accused of treason or "other capital offenses" to "make his full defence by counsel learned in the law" and requiring "the court before whom such person shall be tried, or some judge thereof" to "immediately upon his request to assign to such person such counsel, not exceeding two, as such person shall desire"). Indeed, a version of § 3005 that was later enacted in 1948 contains nearly identical language to the version that is effective today. *See* 62 Stat. 683, 814 (1948) (providing that "[w]hoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel learned in the law; and the court before which he is tried, or some judge thereof, shall immediately, upon his request, assign to him such counsel"). Nothing in the history of the enactment of these two statutes indicates that Congress intended them to be read as Ahemeid suggests.[3]

Ahemeid next turns for his argument to a series of decisions that have interpreted § 3005. *See* Mot. at 13–14 (citing *United States v. Douglas*, 525 F.3d 225, 237 (2d Cir. 2008); *United States v. Waggoner*, 339 F.3d 915, 918 (9th Cir. 2003); *United States v. Suarez,* 801 F. Supp. 3d 872, 878 (N.D. Cal. 2025); *United States v. Cerritos*, 180 F. Supp. 3d 432, 438–39 (E.D. Va. 2016)). These cases addressed whether a defendant was entitled to learned counsel after a no-

---

[3]    As Ahemeid points out, there exists another statute, 18 U.S.C. § 3599, which sets forth provisions for the modern administration of court-appointed counsel for indigent defendants in capital-eligible cases. *See* Mot. at 21. As Ahemeid concedes, however, this statute was enacted in 2006, well after the FDPA became law. *Id.* at 21 n.12.

seek letter was filed.  *See Douglas*, 525 F.3d at 237; *Waggoner*, 339 F.3d at 918; *Suarez,* 801 F. Supp. 3d at 878; *Cerritos*, 180 F. Supp. 3d at 438–39.  These courts held that it is not error for a court to relieve learned counsel after a no-seek letter is filed, as the no-seek letter represents an "irrevocable" commitment not to seek the death penalty.  *See id*.  These decisions assumed that a no-seek letter was irrevocable only for the purposes of their analysis.  They did not address whether the government may file a NOI after a no-seek letter has been filed—in which case, the most natural extension of their holdings would be to require a court to reappoint learned counsel if learned counsel had previously been relieved.

Ahemeid argues that the government's position would create "an entirely new regime for the administration of the . . . death penalty," as, he states, the possibility that the government could reconsider a no-seek letter would require district courts to keep learned counsel in place in every capital-eligible case.  Mot. at 1–2, 21–25.  Ahemeid's concerns are unfounded. First, under controlling Second Circuit law, a district court retains discretion to keep learned counsel appointed even after a no-seek letter is filed.  *See Douglas*, 525 F.3d at 238 ("Deciding when, if ever, the retention of both counsel is necessary in the interest of justice after the government has announced it will not seek the death penalty is an exercise best left to the broad discretion of the district court.").  In the rare case in which the government appears likely to revisit its decision to file a no-seek letter, a court could keep learned counsel appointed for a period of time.  In addition, § 3593(a) allows a NOI to be filed only a "reasonable time" before trial.  18 U.S.C. § 3593(a).  As discussed below, courts have developed multiple factors to assess whether the filing of a NOI was timely and reasonable under this requirement, *see United States v. Wilk*, 452 F.3d 1208, 1225 (11th Cir. 2006); *United States v. McBean*, No. 24 CR. 541 (PAE), 2026 WL 1383153, at *17, providing guidance to courts as to when learned counsel need no longer be

appointed.  Furthermore, as also discussed below, courts have held that a district court has the authority to set a firm deadline for the government to file a NOI, after which, these courts have struck NOIs for failing to comply with these court-ordered deadlines.  *See, e.g.*, *United States v. Dangleben*, ___ F.4th ___, No. 25-2807, 2026 WL 1530107, at *5 (3d Cir. June 1, 2026). Following the passing of a NOI deadline, accordingly a court could determine in its direction that learned counsel no longer need remain appointed.  For these and other reasons, Ahemeid's arguments, about the harm to judicial economy that the government's NOI would cause, are overstated.

### C.    Ahemeid's Remaining Arguments Relating to § 3593(a) Lack Merit

Ahemeid argues that "absurd results" will occur if the Court fails to interpret § 3593(a) in the way that he suggests—that is, if the Court fails to engraft an extratextual bar against reconsiderations of no-seek letters into the language of the statute.  *See* Mot. at 24.  The government could, in Ahemeid's view, file a NOI "5 years or even 10 years after filing a no-seek notice," such as in a situation in which a defendant were convicted following the filing of a no-seek letter, his conviction were vacated on appeal, and, on remand in the district court, the government then filed a NOI and sought the death penalty.  *Id.*  Such a situation is exceedingly unrealistic, given that a presumption of prosecutorial vindictiveness attaches under the Due Process Clause when more serious charges are filed after a defendant's successful appeal. *See Thigpen v. Roberts*, 468 U.S. 27, 28 (1984); *Blackledge v. Perry*, 417 U.S. 21, 22 (1974).  It is also far from clear that the filing of a NOI in this circumstance would comply with § 3593(a)'s requirement that a NOI be filed a "reasonable time" before trial.  18 U.S.C.  § 3593(a). Additionally, to the extent that an NOI were filed an unduly long period following the

commencement of a case, the Sixth Amendment right to a speedy trial would serve as an additional safeguard against any extreme prejudice.[4]

Finally, unable to rest his argument on statutory language, Ahemeid turns to the Justice Manual. *See* Mot. at 16–18. As an initial matter, as noted above, the Justice Manual does not create or confer any rights enforceable by a criminal defendant. *See* Justice Manual § 1-1.200 (the Manual "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter"); *see United States v. Lee*, 274 F.3d 485, 493 (8th Cir. 2001); *Nichols v. Reno*, 124 F.3d 1376, 1377 (10th Cir. 1997). In addition, Ahemeid misconstrues the language of the Manual. The applicable provisions of the Manual discuss DOJ's capital review process, which is a lengthy process that requires U.S. Attorney's Office consultation with DOJ's Capital Case Section; a decision by DOJ's Capital Review Committee; a recommendation from the Deputy Attorney General; and multiple conferences, submissions, and opportunities for defense and victim input. *See* Justice Manual §§ 9-10.030–9-10.050, 9-10.100, 9.10.130, 9-10.150. At the end of this lengthy process, the Manual states, the Attorney General makes the "final decision" as to whether the government will seek the death penalty. *Id.* § 9-10.050; *see* § 9-10.150. Put differently, according to the language of the Manual, the capital case review process "culminates" in a decision by the Attorney General "to seek, or not to seek," the death penalty in a given case. *Id.* § 9-10.030. From this language, Ahemeid argues that the Justice Manual views a seek or no-seek decision as a "final" decision that

---

[4]     In the present Motion, Ahemeid has not directly raised an argument regarding his speedy trial rights under the Sixth Amendment. Nor could he, given the full year that Ahemeid took to prepare a mitigation presentation in the initial instance; the multiple extensions of time that Ahemeid sought and obtained to propose a motion schedule after the government's no-seek letter was filed; the fact that Ahemeid requested a change in his counsel, causing additional delay; and the fact that Ahemeid opposed the setting of a deadline for the government to file its NOI, among other reasons.

can never be revisited or reversed.  But the Manual speaks of "finality" in the sense of the end of a lengthy decision-making process—making clear only that the last, ultimate decisionmaker in this process is the Attorney General.  Nothing in the Manual states that the Attorney General's decision may never be revisited, whether by the same Attorney General or a different one.  The Manual actually says the opposite:  it recognizes that in certain circumstances, the decision of the Attorney General to seek the death penalty may be reconsidered, ending with a notice to withdraw a prior NOI and proceed with the case in a no-seek posture.  *See id.* § 9-10.160.

**II.        The FDPA Does Not Require Good Cause for the Filing of an NOI, and Ahemeid Fails to Show that Good Cause Is Lacking Here**

Ahemeid also argues that the filing of a NOI after the filing of a no-seek letter requires "good cause" within the meaning of § 3593(a).  *See* Mot. at 18–21.  As should already be clear from the analysis of § 3593(a)'s plain language, above, there is no merit to this contention.

Under the text of § 3593(a), the "good cause" requirement applies only to an amendment of an already-filed NOI.  *See* 18 U.S.C. § 3593(a) (a court "may permit the attorney for the government to *amend the notice* upon a showing of good cause" (emphasis added)).  No part of § 3593(a) treats an initial NOI as an "amendment" when a no-seek letter has previously been filed—nor could it, given that, as discussed above, no-seek letters carry no legal effect under the statute.  The obligations in § 3593(a) attach only upon the filing of an initial NOI, and no good cause is ever required for one.

Ahemeid also misconstrues the standard for "good cause" under § 3593(a).  Multiple district courts in this circuit have held that "the government is permitted to amend a notice of intent under [§] 3593(a) where there is no deliberate delay by the government and no prejudice to the defendant."  *United States v. Barnes*, 532 F. Supp. 2d 625, 629 (S.D.N.Y. 2008); *see United States v. Fell*, No. 01-CR-12, 2017 WL 10809983, at *3 (D. Vt. Jan. 20, 2017) ("A showing of

good cause depends upon a demonstration that (1) the new aggravating factors have a plausible connection to the facts of the case; (2) the Government has not deliberately delayed; and (3) the defendant suffers no prejudice." (citing *United States v. Battle*, 173 F.3d 1343, 1347–58 (11th Cir. 1999))); *United States v. Taveras*, 488 F. Supp. 2d 246, 250 (E.D.N.Y. 2007) ("Good cause is demonstrated where the government's application was made in good faith and the defendant was not prejudiced." (internal quotation marks omitted)); *United States v. Bin Laden*, 126 F. Supp. 2d 290, 305 (S.D.N.Y. 2001).

Here, Ahemeid fails to show that the government lacked good cause for the NOI (were such cause even required). First, he has not shown any deliberate delay on the part of the government—nor could he, given that it was the *government* that suggested setting a deadline for the filing of an NOI, which Ahemeid opposed, *see* Tr. of Oct. 20, 2025 Status Conf. at 4, and it was the government that repeatedly opposed motions for extensions of time that Ahemeid filed throughout this case, *see, e.g.*, ECF Nos. 112, 143. Second, for the reasons set forth in the sections, Ahemeid also has not shown that the government's NOI caused him any unfair prejudice.

**III.**     **The Government Did Not Violate Section 3593(a)'s Requirement that an NOI Be Filed A "Reasonable Time" Before Trial**

Ahemeid argues that the government's NOI was not filed a "reasonable time" before trial, as § 3593(a) requires. *See* Mot. at 28–48. It is by no means clear how the government could have violated this requirement, given that no trial date was in effect at the time that the NOI was filed and Ahemeid himself repeatedly objected to the Court setting a trial date. *See* Mot. at 29 (conceding that no trial date had been set at the time the NOI was filed); Tr. of Oct. 20, 2025 Status Conf. at 6 (defense agreeing with the Court that the case was "not ready for trial"). Throughout this proceeding, the Court took multiple steps to protect Ahemeid's rights—carefully ensuring that he would suffer no prejudice in his ability to mount a defense—including by granting

22

him the extensions of time that he requested; allowing him to defer the filing of fact-intensive motions until after any NOI would be filed; and stating that the Court would adjust any future trial date or motion deadlines if a NOI were filed.  Ahemeid now seeks to turn the "reasonable time before . . . trial" requirement in § 3593(a) into a generalized, free-floating inquiry into defendant prejudice.  But no such inquiry is warranted under the statute, and, in any event, Ahemeid can show no real prejudice here.

### A.    The Government Complied with § 3593(a)'s "Reasonable Time" Requirement

As discussed above, the FDPA's notice provision, 18 U.S.C. § 3593(a), requires that the government file any notice of intent to seek the death penalty a "a reasonable time before the trial or before acceptance by the court of a plea of guilty."  18 U.S.C. § 3593(a).  The purpose of this requirement is to allow the defendant adequate time "to prepare his case," *Robinson*, 473 F.3d at 492, and to "protect the accused from having to endure a capital trial for which he was provided inadequate notice," *United States v. Ferebe*, 332 F.3d 722, 727 (4th Cir. 2003).

By the plain language of the statute, the government's NOI did not violate this requirement, as no trial date was in place at the time the NOI was filed.  The initial trial date in this case, October 14, 2025, was set following a status conference held on October 30, 2024.  *See* Minute Entry, Oct. 30, 2024.  The Court scheduled this trial "with additional backup dates reserved."  *Id.*  This trial date (and accompanying motion schedule) had to be vacated, however, in December 2024, when the FDNY moved to be relieved, and new counsel had to be appointed at Ahemeid's request.  *See* Tr. of Dec. 16, 2024 Status Conf. at 5–6.  Ahemeid then requested and obtained multiple extensions of time to propose a new motion schedule for the case—a schedule that Ahemeid proposed only in April 2025, nearly four months after his change of counsel.  *See* ECF No. 115.  The Court, during this time, expressed a willingness to adjust the trial and motion

schedule in this case in the event a NOI were filed. *See* Tr. of Feb. 12, 2025 Status Conf at 7 (stating that the "schedule is going to change" if a NOI is filed); *id.* at 8 ("If we run into a death penalty component that slows things down, well, at least we'll have everything else done, or a lot else done, before we get there and then we can slow it down for that if we need to."). Indeed, the motion schedule that the Court later set allowed the deadline for certain important motions to be fully adjusted if a NOI were to be filed. *See* ECF No. 116 (motion deadline "subject to change if prior no-seek is reversed"). As of October 20, 2025—six days past the Court's original trial date in this matter—the only motion that Ahemeid had filed was one to dismiss certain counts for failure to state an offense. *See* ECF No. 135. At a status conference on that date, Ahemeid agreed with the Court that regardless of when the government's review of the case's no-seek status were completed, the case was "not ready for trial." *See* Tr. of Oct. 20, 2025 Status Conf. at 6.[5]

Logically, a NOI that was filed at a time when no trial date was in effect, and when any such date was numerous litigative steps away, must be one that was filed a "reasonable time before the trial." 18 U.S.C. § 3593. This conclusion flows from the statutory text, which frames the "trial" as the benchmark by which the reasonableness of the timing of the NOI filing must be measured. *See id.* (requiring NOI filing a "reasonable time before the *trial*," not a "reasonable time" *generally* (emphasis added)). It also aligns with the statute's purpose, which is to enshrine a right "*not to stand trial* for [a] capital offense except upon adequate notice." *Robinson*, 473 F.3d at 491 (emphasis added) (quoting *Ferebe*, 332 F.3d at 728); *see id.* (the "reasonable time"

---

[5]       Ahemeid concedes in his Motion that there was no trial date in effect at the time that the government filed its NOI. *See* Mot. at 29–30. Ahemeid argues, however, that this is because the government "had blown through" the previous trial date of October 14, 2025. *Id.* at 29. This argument is not credible, given the profound delays on this case that Ahemeid caused by asking for a change in his lead counsel and by Ahemeid's new counsel moving for multiple extensions of time to propose the case's motion schedule.

requirement in § 3593(a) is akin to "any number of pretrial rights that involve notification or disclosure for the purpose of allowing the defendant to prepare his case"); *United States v. Wilk*, 452 F.3d 1208, 1225 (11th Cir. 2006) ("[T]he goal of § 3593(a) to assure that defendants have adequate time to prepare a defense to the death penalty and do not *stand trial* for their life without reasonable notice." (emphasis added)); *Ferebe*, 332 F.3d at 737 (the touchstone of the "reasonable time requirement" is "whether sufficient time exists following notice and *before trial* for a defendant to prepare his death defense" (emphasis added)).

Ahemeid would transform the "reasonable time" requirement in § 3593(a) into a free-floating prejudice inquiry, addressed generally at the purported hardship that a NOI has caused a defendant. *See* Mot. at 31–32. Indeed, in Ahemeid's view, factors as broad as his "anxiety" and his "trauma" should be cognizable forms of prejudice under this analysis. *Id.* at 36–40. Nothing whatsoever in the text or purpose of § 3593(a) supports this view. The statute is plainly and narrowly focused on the sufficiency of a disclosure to allow preparation for trial. Nor, similarly, is there any room in the analysis for Ahemeid's alleged "lost opportunity to resolve this case in a manner that would preclude the death penalty" given that the "reasonable time" requirement is a *trial*-based right, not a right that pertains to the plea-bargaining process. Ahemeid's attempt to shoehorn a full-blown prejudice analysis into the clear, narrow, trial-based language of § 3593(a) should be rejected.

### B.    The *Wilk* and *Ferebe* Factors Favor the Government

To interpret the "reasonable time" requirement in § 3593(a), courts have applied a series of factors that, these courts have held, help determine the "objective reasonableness" of a NOI's pretrial timeliness. *Wilk*, 452 F.3d at 1221; *see Ferebe*, 332 F.3d at 731, 738. These factors, aimed toward a consideration of the "totality of the circumstances," include "(1) what transpired in the case before the [NOI] was filed; (2) the period of time remaining for trial after the [NOI]

25

was filed; (3) the status of discovery and motions in the proceedings; (4) the nature of the charges in the indictment; (5) the nature of the aggravating factors claimed to support the death penalty; and (6) the anticipated nature of the defense, if known." *Wilk*, 452 F.3d at 1221–22; *see Ferebe* 332 F.3d at 737 (setting forth a similar four-factor test).[6]  Ahemeid makes no attempt to apply these factors to his case, despite conceding that they are the factors that courts have traditionally used to analyze § 3593(a)'s timeliness requirement.  *See* Mot. at 28.  The government agrees that the Court need not apply these factors, since the lack of a trial date necessarily means that the NOI here was entered a "reasonable time" before trial.  18 U.S.C. § 3593(a).  Nevertheless, for the reasons set forth below, these factors weigh toward finding the timing of the NOI reasonable.

Begin with the first factor, focused on the events that "transpired in the case before the [NOI] was filed," *Wilk*, 452 F.3d at 1221.  At the time the NOI was filed, no deadline for filing a NOI had been in effect, and Ahemeid had, indeed, expressly objected to the setting of any such deadline.  *See id.* at 4–6.  Ahemeid, meanwhile, had requested in December 2024 that the Court relieve his lead counsel of record—but the Court nevertheless kept appointed Ahemeid's two learned counsel, ensuring that a capital-ready defense team was constantly in place, even after the case was in a no-seek posture.  *See* Tr. of Dec. 16, 2024 Status Conf. at 4; ECF No. 87.  The Court

---

[6]  Some courts are split as to whether, in analyzing whether a NOI was entered a "reasonable time before the trial," a court may consider whether the filing of the NOI would have caused the district court to enter a continuance of the trial date.  In *Wilk*, the Eleventh Circuit held that these sorts of reasonable continuances can be considered, 452 F.3d at 1222–25; *see also id.* at 1223 n.28, whereas following *Ferebe*, some courts in the Fourth Circuit held that they cannot be, *see Ferebe*, 332 F.3d at 737 (measuring the reasonableness of the NOI filing "irrespective of the filing's effects" on the trial date).  In the present case, the Court need not decide this issue, because no trial date was in place at the time the government filed its NOI.  Nevertheless, as a case in the U.S. District Court for the Southern District of New York has recently and persuasively explained, *Ferebe* has not been followed in the Second Circuit and is likely inconsistent with Second Circuit law.  *See United States v. McBean*, No. 24 CR. 541 (PAE), 2026 WL 1383153, at *17 ("*Ferebe* is an outlier decision"); *id.* at *21 (S.D.N.Y. May 18, 2026); *see also Robinson*, 473 F.3d at 492 (rejecting the application of *Ferebe* in the context of the collateral order doctrine).

then appointed an attorney with extremely significant experience in capital cases.  ECF No. 87; Bachrach Decl. ¶¶ 8–9, 12.  Less than three months after the government filed its no-seek notice, by February 12, 2025, counsel for Ahemeid was on notice that the government's no-seek letter might be reconsidered—allowing the defense team to resume and complete any mitigation investigation that had purportedly been paused in light of the initial no-seek letter.  *See* Tr. of Feb. 12, 2025 Status Conf. at 5–7 (counsel for Ahemeid stating that he had "every reason to believe" and "[had] to assume" that the Attorney General's re-review of capital-eligible cases included Ahemeid's case).  Ahemeid, in short, had ample notice and resources to defend against a capital-authorized trial at all times in this case, including at all times before the government's NOI was filed, especially because there is still no trial date set.

The second factor, the "period of time remaining for trial after the [NOI] was filed," also favors the government.  *Wilk*, 452 F.3d at 1221.  At the time that the government filed the NOI against Ahemeid, both Ahemeid and the Court agreed that the case was "not ready for trial," owing to the fact that Ahemeid had still not filed his most fact-intensive motions: a motion to suppress and a motion to dismiss for preindictment delay.  Tr. of Oct. 20, 2025 Status Conf. at 6.  The Court, furthermore, had stated that it would allow Ahemeid additional time to file motions, investigate a mitigation case, and otherwise prepare for a penalty-phase trial if the government's no-seek letter were ever reconsidered and an NOI were filed.  *See* Tr. of Feb. 12, 2025 Status Conf at 7.  The motion schedule that Ahemeid later requested, and that the Court so-ordered, allowed for motion deadlines to be adjusted if a NOI were filed.  *See* ECF No. 116.  To date, a trial date has still not been set in this case—nor has one been requested by Ahemeid.  Nor has a motion to suppress briefing schedule been set, let alone a suppression hearing date.  Put simply, a significant amount of time for trial remained when the government filed its NOI and remains to this day.

27

Turning to the third factor, the "status of discovery and motions in the proceedings," this also favors a finding that the timing of the NOI was reasonable. *Wilk*, 452 F.3d at 1221. As stated above, at the time the NOI was filed, no motions had been filed that depended on the case's posture as capital-authorized. No evidentiary hearing had been held on any issue—meaning that Ahemeid had not been forced to elicit testimony or disclose witnesses in ways that could be prejudicial to his penalty-phase case. *Cf. United States v. Spurlock*, 782 F. Supp. 3d 987, 999 (D. Nev. 2025) (evidentiary hearing on motion to suppress had already been held at the time the government filed its NOI). The single motion that *had* been filed, the motion to dismiss for failure to state an offense, was one that was decided in Ahemeid's favor, in which the Court dismissed two counts. *See* ECF No. 150. And while Ahemeid continues to complain that the government has not provided him with the penalty-phase discovery that he seeks, *see* Mot. at 47 n.24, the government has complied with its obligations, *see* ECF No. 127, and the Court denied his motion to compel on the issue, *see* ECF No. 134. To the extent that Ahemeid seeks additional discovery or intends to conduct additional investigation, he will have ample time to do so, given the length of the proceedings that likely still need to occur prior to trial.

The final three factors, the "nature of the charges in the indictment," the "nature of the aggravating factors claimed to support the death penalty," and the "anticipated nature of the defense" also weigh toward finding the NOI reasonable. *Wilk*, 452 F.3d at 1222. Prior to the filing of the NOI, Ahemeid had prevailed in a motion to dismiss two counts of his initial indictment for failure to state an offense. *See* ECF No. 150. One of these counts had been a capital-eligible one, leaving only one other capital-eligible count in the superseding indictment. No convincing showing of prejudice can be made where Ahemeid succeeded in *narrowing* the government's basis for obtaining the death penalty prior to the filing of any NOI. In addition, the defenses that

28

Ahemeid has proffered are principally defenses to the admissibility of his confessions, based on allegations that he was "tortured and repeatedly interrogated by multiple law enforcement agencies" in Mali.  Mot. at 4.  The government strongly disputes these allegations, but the defense is one more likely to be raised in a future suppression hearing, rather than trial, making the defense unaffected by the filing of the NOI (let alone, by the NOI's timeliness).

In short, each of the factors that courts have used to analyze the reasonableness of the timing of a NOI favor the government in this case, and the NOI properly satisfied the "reasonable time" requirement of § 3593(a).

### C.    Ahemeid Has Not Otherwise Shown Prejudice from the Timing of the NOI's Filing

Ignoring these tests, Ahemeid urges the Court to engage in an unbounded, open-ended inquiry into his alleged prejudice from the NOI, with considerations as broad as his psychological state, his opportunity to plea-bargain, and his opportunity to conduct a mitigation investigation.  *See* Mot. at 32–43.  The Court should reject this argument as untethered to any legal standard.  For the reasons set forth below, Ahemeid also cannot show that the timing of the NOI caused him any significant prejudice.

Beginning with Ahemeid's assertion that the NOI's timing has deprived him of the opportunity to investigate and develop mitigation evidence in Mali—this claim misstates the record.  *See* Mot. at 40–43.  In his Motion, Ahemeid claims that he experienced undue prejudice because, since the no-seek letter was filed, Mali denied defense counsel's visa to travel.  *See* Mot. At 40.[7]  But any prejudice the defendant faces from defense counsel's inability to travel to Mali

---

[7]    Defense counsel's inability to travel to Mali is unsurprising, given that Mali has been engaged in one of the world's worst security crises since at least 2022.  *See generally* Council on Foreign Relations, Violent Extremism in the Sahel (May 5, 2026), https://www.cfr.org/global-conflict-tracker/conflict/violent-extremism-sahel.

does not stem from the timing of the NOI.  Based on Ahemeid's representations, had the

government initially sought the death penalty on November 15, 2024, defense counsel *still* would

---

In 2020 and 2021, Mali was the subject of two coups d'état, according to publicly available news sources, acts that followed the deaths of thousands at the hands of Islamist insurgencies.  *See Washington Post*, Mali's acting vice president ousts leaders in second coup d'etat (May 25, 2021), https://www.washingtonpost.com/world/2021/05/25/mali-military-president-prime-minister/ (reporting 6,200 deaths in the Sahel region in 2020, with 2,800 in Mali and describing the manner in which "militants carried out massacres in the country's rural center and northward, protesters filled the streets of Bamako," Mali's capital).

The following year, in 2022, French forces, which had been providing security in Mali, withdrew from the country, creating a security vacuum.  *See Le Monde*, After ten years, France to end military operation Barkhane in Sahel (Nov. 9, 2022), https://www.lemonde.fr/en/international/article/2022/11/09/after-ten-years-france-to-end-military-operation-barkhane-in-sahel_6003575_4.html.  As a result, "[t]he first six months of 2022 saw a dramatic increase in attacks" in the Sahel region, causing the deaths of more than 2,000 civilians, "an over 50 percent increase from 2021."  Council on Foreign Relations, Violent Extremism in the Sahel (May 5, 2026), https://www.cfr.org/global-conflict-tracker/conflict/violent-extremism-sahel.

Later, in 2023, a United Nations peacekeeping force, the United Nations Multidimensional Integrated Stabilization Mission in Mali (or "MINUSMA") withdrew from the country, after incurring the second-greatest number of fatalities for a peacekeeping force in United Nations history.  *See* BBC, Mali: UN peacekeeping mission ends after decade (Dec. 30, 2023), https://www.bbc.com/news/world-africa-67851525;  United Nations, Fatalities (last updated May 15, 2026), https://peacekeeping.un.org/en/fatalities.  One organization described a "catastrophe" of Islamic militant attacks occurring throughout Mali in mid-2023.  Africa Center for Strategic Studies, Mali Catastrophe Accelerating under Junta Rule (Jul. 10, 2023), https://africacenter.org/spotlight/mali-catastrophe-accelerating-under-junta-rule/.

In the following two years, 2024 and 2025, militant-perpetrated violence continued throughout Mali, with attacks accelerating and causing thousands of deaths.  *See* Africa Center for Strategic Studies, Militant Islamist Groups Advancing in Mali (Sept. 24, 2024), https://africacenter.org/spotlight/militant-islamist-groups-advancing-mali/; Council on Foreign Relations, Mali Is the Linchpin of West Africa—Now It's Under Jihadist Siege (May 5, 2026), https://www.cfr.org/articles/whats-at-stake-in-mali-and-what-comes-next.  The violence and instability in Mali continue to this day.  *See New York Times*, Al Qaeda-Linked Militants Launch Major Attacks on Cities Across Mali (Apr. 25, 2026), https://www.nytimes.com/2026/04/25/world/africa/mali-attacks-jnim-al-qeda-bamako.html .

have been unable to travel to Mali.  Therefore, the timing of the NOI cannot possibly have caused the defendant prejudice.[8]

In addition, no more than three months elapsed between the date that the government filed its initial no-seek letter (Nov. 25, 2024), *see* ECF No. 84, and the date when Ahemeid's counsel stated that he "[had] to assume" that Ahemeid's no-seek determination was under review by DOJ (February 12, 2025), *see* Tr. of Feb. 12, 2025 Status Conf. at 5–7.  During these three months, Ahemeid underwent a change in his counsel, and Ahemeid's new counsel was occupied receiving re-productions of the government's discovery, *see* ECF No. 99; working to "rebuild Mr. Ahemeid's legal team," ECF No. 91 at 2; "coordinat[ing] with the Second Circuit's budgeting attorney "to prepare a revised CJA budget," *id.*; and otherwise "get[ting] up to speed on the case," *id.*  It is entirely implausible, therefore, that the loss of these three months during the winter holidays were material to Ahemeid's mitigation case.  Even if they were, it is also not credible that Ahemeid's mitigation case rests *entirely* in Mali, as opposed to multiple other countries where Ahemeid's legal team could feasibly visit.  *See* Tr. of July 30, 2024 Status Conf. at 11 (Ahemeid's former defense counsel's statement that Ahemeid's "mitigation investigation includes potential witnesses in at least six countries in Africa").  For all these reasons, the Court should reject any argument that the NOI caused Ahemeid prejudice in terms of his ability to develop mitigation evidence in Mali.

Ahemeid also argues that the timing of the NOI deprived him of an opportunity to have "resolved his case with a non-capital plea bargain or a plea to the Indictment."  Mot. at 33; *see id.* at 32–36.  Ahemeid fails to articulate how the ability to plea bargain is a cognizable form

---

[8]     The Motion is silent as to whether any of Ahemeid's defense counsel traveled to Mail to conduct investigation in 2022 or 2023 before their visas were rejected in 2024.

31

of prejudice under § 3593(a), given that a defendant has no right to be "offered a plea, nor a federal right that the judge accept it." *Frye,* 566 U.S. at 148 (citation omitted). Putting that aside, § 3593(a) requires that any NOI be filed "before acceptance by the court of a plea of guilty." 18 U.S.C. § 3593(a). Had Ahemeid entered a plea of guilty (such as an open plea to the indictment) at any point prior to the government's entry of a NOI, and had the Court promptly accepted that plea, the government would have been unable to file a NOI. *See id.* In any event, at no time prior to the capital case re-review in 2025 did Ahemeid attempt to enter a plea to his charges or even discuss a plea bargain with the government. In fact, at no point at all during this case has Ahemeid sought to discuss a plea bargain with the government.

Ahemeid, finally, points to the alleged psychological harm that the timing of the government's NOI has caused him. *See* Mot. at 36–40. But regrettably and unfortunately, emotional distress is the result of nearly any capital-eligible case in which a NOI is filed—and, indeed, in many capital-eligible cases in which the defendant is facing life imprisonment. The heinousness of the defendant's crimes, and the increasing likelihood that he will pay a steep price for them, are more likely causes of Ahemeid's alleged distress than the fact that the NOI was filed in 2026, rather than 2024. Ahemeid offers no reason to believe that psychological well-being is a cognizable form of prejudice in assessing whether a NOI was filed a "reasonable time" before trial. 18 U.S.C. § 3593(a). And as shown in a lengthy letter that Ahemeid submitted to the Court in December 2024 and a statement from Ahemeid's former attorneys at that time, Ahemeid's distress level was likely high even before the NOI was filed and the capital case review process was reopened. *See* ECF No. 101 (letter); ECF No. 85 (statement of former counsel, pointing to a "breakdown in communication" with Ahemeid "over recent months," together with an "impairment of [counsel's] ability to communicate with him").

For all these reasons, the government's NOI was filed a "reasonable time" before trial, 18 U.S.C. § 3593(a), and the Court should reject Ahemeid's arguments to the contrary.

**D.      The District Court Cases that Ahemeid Cites Are Distinguishable**

Ahemeid relies heavily for his Motion on a series of recent district court cases that struck NOIs that had been filed after the government had previously filed no-seek letters, principally, *United States v. Cole*, 799 F. Supp. 3d 438 (D.V.I. 2025); *United States v. Constanza-Galdomez*, 787 F. Supp. 3d 131 (D. Md. 2025); and *United States v. Spurlock*, 782 F. Supp. 3d 987 (D. Nev. 2025).  In each of these cases, however, the government's NOI was filed close to the date for which trial had been set.  In *Spurlock*, the government's NOI was filed twelve days before a non-capital trial was set to commence.  *Spurlock*, 782 F. Supp. 3d at 1017.  The court relied heavily on this fact in issuing its decision, noting that the court had previously emphasized that the trial date it set would be "firm," *id.* at 996, 1005, 1010; that jury summonses for a non-capital trial had already been issued, *id.* at 1000, 1008, 1020; and that the court had cleared its calendar to account for an already-lengthy non-capital trial, *id.* at 1008, 1011.  At the time the government filed its NOI in *Spurlock*, furthermore, fact-intensive, case-dispositive motions had already been briefed, and an evidentiary hearing had already been held.  *Id.* at 999.  The facts of *Cole* were similar: the government's NOI was filed 52 days, or less than two months, before trial was set to commence.  799 F. Supp. 3d at 460.  Likewise, in *Constanza-Galdomez*, the government filed its NOI 109 days, or just over three months, before the case's trial date, a date which the court had previously warned was "fixed."  787 F. Supp. 3d at 140, 143.  The NOI was also filed, the court in *Constanza-Galdomez* noted, only five days before the defendants' substantive motions were scheduled to be filed.  *Id.* at 139.  In all three cases, *Spurlock*, *Cole*, and *Constanza-Galdomez*, learned counsel had been relieved after the government had filed its initial no-seek letters, leaving

33

the defendants, in these courts' view, without the knowledge or resources to conduct a meaningful mitigation investigation. *See Spurlock*, 782 F. Supp. 3d at 996, 1008, 1011; *Cole*, 799 F. Supp. 3d at 442, 450–51, 457; *Constanza-Galdomez*, 787 F. Supp. 3d at 139. Indeed, in *Constanza-Galdomez*, the court was unable entirely to find learned counsel for the defendant, and, at the time the defendant's motion to strike the NOI had been filed, learned counsel had still not been appointed. 787 F. Supp. 3d at 139–40.

Ahemeid's case could not be more different from *Spurlock*, *Cole*, and *Constanza-Galdomez*. Unlike the defendants in those cases, at the time the government's NOI was filed against Ahemeid, no trial date had been set, and the Court had repeatedly taken careful steps to protect Ahemeid's rights—providing his legal team with extensions of time to file a proposed motion schedule, keeping his learned counsel appointed even after the government's initial no-seek letter was filed, and indicating that it would adjust future schedules if a NOI were ever filed. At the time the government filed its NOI, further, no fact-intensive motions—nor any motions that depended in any way on the case's no-seek posture—had been filed, nor had any sort of evidentiary hearing been held. Ahemeid's comparison of his position to the positions of the defendants in *Spurlock*, *Cole*, and *Constanza-Galdomez* is unfounded.

Ahemeid's case is also different from others that he cites for another reason: in Ahemeid's case, no firm deadline for the filing of a NOI had ever been set, nor was one ever violated. Ahemeid, indeed, objected to the scheduling of a deadline for a NOI earlier in this case. *See* Tr. of Oct. 20, 2025 Status Conf. at 4; Mot. at 41; *see also id.* at 29 (acknowledging that no deadline for a NOI was in effect at the time that the government's NOI was filed). The fact that the government did not transgress a court-ordered deadline significantly distinguishes Ahemeid's case from *Spurlock* and *Cole*, together with multiple other cases that Ahemeid cites, *United States*

*v. Suarez*, 801 F. Supp. 3d 872, 875 (N.D. Cal. 2025); *United States v. Dangleben*, No. 3:23-CR-0072, 2025 WL 2647195, at *1 (D.V.I. Sept. 15, 2025), *aff'd*, No. 25-2807, ___ F.4th ___, 2026 WL 1530107 (3d Cir. June 1, 2026); and *United States v. Hue*, No. 24-CR-38 (AWA) (LRL) (E.D. Va. Apr. 14, 2026), ECF No. 243.  In each of these cases, courts found that the government had violated a court order that any NOI be filed by a date certain.  In striking the NOIs, these courts relied heavily on the "inherent authority" that they stated they have to "manage their dockets" and enforce their own deadlines.[9]  *Cole*, 799 F. Supp. 3d at 444; *see Spurlock*, 782 F. Supp. 3d at 1002; *Dangleben*, 2025 WL 2647195, at *2; *Suarez*, 801 F. Supp. 3d at 880; *Hue*, No. 24-CR-38 (E.D. Va.), ECF No. 243 at 19.  Ahemeid makes no such argument in his brief—nor could he, given that the government's NOI did not violate any deadline that the Court had firmly set.[10]

---

[9]    *Dangleben*, indeed, was affirmed by the Third Circuit on this ground.  *See* ___ F.4th ___, No. 25-2807, 2026 WL 1530107, at *5 (3d Cir. June 1, 2026).  The Third Circuit rested its decision entirely on the district court's inherent authority to enforce its NOI deadline.  *Id.* at *5.  The court expressly declined to rule on the defendant's other claims, such as that the FDPA barred the NOI or that the NOI violated the defendant's constitutional rights.  *Id.* at *7 n.4.

[10]    One case that Ahemeid cites, *Suarez*, is also distinguishable for another reason.  801 F. Supp. 3d at 879.  In that case, a district court held that a government's no-seek letter was "irrevocable" and that the government's ability to file a NOI in the future would be "waived."  *Id.*  No NOI had ever actually been filed in that case, however.  *See id.* at 876.  The court reached the issues of irrevocability and waiver only in the context of deciding that the defendants' learned counsel could be relieved, as, in the court's view, the case was "no longer a capital case."  *Id.*  The government did not oppose the motion to relieve learned counsel, *id.* at 875—meaning that the issues presented were not subject to significant briefing or adversarial consideration.  The case's holdings, as a result, consist of a small number of cursory paragraphs with little analysis.  *See id.* at 879.  In light of these circumstances, *Suarez* is not persuasive.

## IV.   The Government Did Not Waive Its Ability to File a NOI

Finding no support in statutory language or established case law, Ahemeid turns to the argument that the government "affirmatively waived" its right to file a NOI after first filing a no-seek letter.  Mot. at 48–51.  Ahemeid's argument is unfounded.[11]

Focusing on the waiver argument, "waiver is the 'intentional relinquishment or abandonment of a known right.'"  *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  "Whether a particular right is waivable; whether [a party] must participate personally in the waiver; whether certain procedures are required for waiver; and whether the [party's] choice must be particularly informed or voluntary, all depend on the right at stake." *Id.*  Here, the right at issue, to file a NOI, is grounded in the Executive Branch's exclusive constitutional authority and "broad discretion to enforce the Nation's criminal laws." *Armstrong*, 517 U.S. at 464; *see* U.S. Const. art. II, § 1, cl. 1; § 3; *United States v. Nixon*, 418 U.S. 683, 693 (1974).  "There is a presumption against the waiver of constitutional rights . . . and for a waiver to be effective it must be clearly established that there was an intentional relinquishment or abandonment of a known right or privilege."  *Brookhart v. Janis*, 384 U.S. 1, 4 (1966) (internal quotation marks omitted); *see United States v. Parse*, 789 F.3d 83, 112 (2d Cir. 2015).  Ahemeid has made no such showing.  Nothing on the face of the government's no-seek letter indicated that the letter was irrevocable, and, as stated above, the FDPA in no way prohibits the filing of a NOI

---

[11]   Ahemeid's arguments contradict each other.  Ahemeid argues, on the one hand, that a NOI is an "amendment" of a no-seek letter, such that "good cause" must be established before the government files the NOI.  *See* Mot. at 18–27.  A NOI can, in this view, be filed following a no-seek letter if the government makes the requisite good-cause showing.  On the other hand, Ahemeid argues that the filing of a no-seek letter affirmatively *waives* the government's ability thereafter to file a NOI—meaning that a NOI can *never* be filed once a no-seek letter is on the record.  *See* Mot. at 48–51.  Both of these arguments cannot simultaneously be true; in fact, neither is.

following a no-seek letter.   These circumstances in no way show a "clearly established . . . intentional relinquishment or abandonment of a known right or privilege." *Brookhart*, 384 U.S. at 4.

Ahemeid cites no cases in support of his waiver argument other than a handful of recent out-of-circuit district court decisions.  Even some of those cases do not support his conclusions, such as *Constanza-Galdomez*, a case that Ahemeid cites no fewer than thirty times in his brief.  There, the court found *no* waiver when the government filed a NOI after first filing a no-seek letter.  787 F. Supp. at 147.  The court in *Constanza-Galdomez* held:

> As to waiver, this Court would not go as far as Defendants ask it to.
> Although this Court believes that, for a whole host of reasons, the
> government's change in position in this case was improper, **it does
> not believe that the government could *never* reverse a prior no-
> seek.**

*Id.* (emphasis added); *see also id.* ("It is not hard to imagine some circumstance where reversing a prior no-seek decision could be proper."); *id.* at 149–50 ("[T]his Court draws no brightline rules about when the government can and cannot change its mind about seeking the death penalty."). The *Constanza-Galdomez* court nevertheless struck the government's NOI, but on different grounds and based on facts vastly different from those of Ahemeid's case, as described above.

Ahemeid also relies for his waiver argument on *Hue*, an unreported, out-of-circuit case discussed further above.  *See* No. 2:24-CR-38-01-AWA-LRL (E.D. Va. Apr. 14, 2026), ECF No. 243.  The court in *Hue* found that the government's initial no-seek letter had waived its right to file a subsequent NOI—but, as discussed above, in that case, the government's NOI was filed after a court-scheduled deadline for filing a NOI had passed.  *See id.* at 18–19.  The court rested its waiver holding on the fact that the government had filed the NOI "well beyond the . . . deadline without requesting an extension." *Id.* at 23 (stating that "[w]aiver and preclusion is an ordinary and unremarkable consequence of failure to meet clear, court-ordered deadlines"). Here,

Ahemeid concedes that no deadline for a NOI was in effect at the time that the government's NOI was filed, *see* Mot. at 29, weakening considerably the argument for waiver and rendering cases like *Hue* inapplicable.

For all these reasons, the government did not waive its ability to file a NOI.

## V.    **Estoppel Has No Application to This Case**

Ahemeid also argues that three theories of estoppel, judicial estoppel, equitable estoppel, and promissory estoppel, all bar the filing of the government's NOI.  *See* Mot. at 51–65. None of these doctrines have any application here.

### A.    **Judicial Estoppel Does Not Bar the NOI**

"The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting 18 *Moore's Federal Practice* § 134.30 (3d ed. 2000)).  Courts in the Second Circuit usually apply a two- or three-part test for judicial estoppel:  (1) "a party's later position must be clearly inconsistent with its earlier position"; (2) a party must have "succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and, as often applied, (3) "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110, 116 (2d Cir. 2014) (quoting *New Hampshire*, 532 U.S. at 749).

As is clear from these considerations, judicial estoppel is ordinarily applicable only to contradictory positions taken across different judicial proceedings.  *See id.* (requiring that "judicial acceptance of an inconsistent position in a *later proceeding* would create the perception that either the first or the *second court* was misled" (emphasis added)); *AXA Marine & Aviation*

*Ins. (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 628 (2d Cir. 1996) ("Judicial estoppel is a doctrine that forbids a party from advancing contradictory factual positions in *separate proceedings*." (emphasis added)); *Bates v. Long Island R. Co.*, 997 F.2d 1028, 1038 (2d Cir. 1993) ("First, the party against whom the estoppel is asserted must have argued an inconsistent position in a *prior proceeding . . . .*" (emphasis added)). Indeed, each of the precedential Second Circuit opinions that Ahemeid cites in his brief involved a party taking inconsistent positions across two or more different proceedings—not, as here, the same phase within the same proceeding.[12] *See* Mot. at 51–54. Where, as here, a difference in position has been alleged within a single phase of a single proceeding, controlling authority does not require the application of judicial estoppel.

Applying the test for estoppel, Ahemeid's argument also fails. First, the positions that the government took in the present litigation were not "clearly inconsistent" with each other. *Adelphia*, 748 F.3d at 116. Estoppel is ordinarily applied to bar a party from taking different *factual* positions across judicial proceedings—not, as in the case of a NOI, a policy-based or legal position on the type of punishment that the government, acting in its prosecutorial capacity, would seek. *See Ashmore v. CGI Grp., Inc.*, 923 F.3d 260, 272 (2d Cir. 2019) (judicial estoppel "prevents a party from asserting a *factual position* in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding." (emphasis added)); *Caldero v. MTGLQ Invs., L.P.*, No. 25-CV-1831 (MKB), 2026 WL 850824, at *10 (E.D.N.Y. Mar. 27, 2026) ("Judicial estoppel typically only applies to inconsistent factual positions, not to issues of law."); *accord*

---

[12]    Ahemeid cites one non-precedential case of the Second Circuit in which the Court held that judicial estoppel could apply in the "same court in an earlier phase of the same proceeding." *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 620 (2d Cir. 2012) (summary order). This case, however, cited only one precedential Second Circuit opinion for its decision, and in that case, estoppel was not actually applied. Ahemeid cites no controlling precedent for the proposition that estoppel can be applied within, as here, a single criminal proceeding.

*Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007) ("The position at issue must be one of fact as opposed to one of law or legal theory.").  Nothing in the government's no-seek letter expressed any view as to the facts of this case, nor did it make any allegation about proof, evidence, or culpability, that the government later attempted to contradict.  *See* ECF No. 84.  The letter stated simply that "the Attorney General has authorized and directed the government not to seek the death penalty against [Ahemeid] in the above-captioned matter."  *Id.*  No position that the government took with respect to any disputed area of fact was later contradicted by any other position that the government later took in this litigation.

The second factor of the judicial estoppel analysis requires that "the prior inconsistent position . . . have been adopted by the court in some manner," a point that Ahemeid concedes.  *Bates*, 997 F.2d at 1038; *see Ashmore*, 923 F.3d at 277; Mot. at 54–55.  The party must, indeed, have "succeeded in persuading a court to accept that party's earlier position."  *Adelphia*, 748 F.3d at 116.  It is far from clear how, if at all, the Court adopted, relied upon, or was materially misled by the government's initial no-seek letter.  The Court, when relieving Ahemeid's lead counsel in December 2024, kept in place his two learned counsel, even though a no-seek letter was then on file.  *See* Tr. of Dec. 16, 2024 Status Conf. at 4.  The Court appointed, as a replacement, an additional attorney with extensive experience in capital cases.  *See* ECF No. 87; Bachrach Decl. ¶¶ 8–9, 12.  The Court allowed Ahemeid's legal team multiple continuances of deadlines that it requested; the motion schedule that the Court entered was ordered "subject to change if prior no-seek is reversed," ECF No. 116; and the Court stated that any future trial or motion schedule could be changed or "slow[ed] down" if needed in light of a future NOI, Tr. of Feb. 12, 2025 Status Conf. at 7.  The no-seek letter, as stated above, was on file with the Court for less than three months before Ahemeid's counsel told the Court that he believed the case's no-seek status was likely under

review. *See* Tr. of Feb. 12, 2025 Status Conf. at 5–7. At no time did the Court prejudice Ahemeid's ability to prepare a capital-authorized case, nor did the Court ever set a schedule, hold a hearing, order disclosures, or take any other action that depended on the case's initial no-seek posture. *Cf. United States v. Meehan*, No. 2:22-CR-00002-JPH-CMM, 2026 WL 447431, at *3 (S.D. Ind. Feb. 17, 2026) (applying judicial estoppel to the government's NOI when the defendant had undergone significant litigation, including "extensive competency proceedings," prior to the time that the NOI was filed).[13]

As to the third and final factor, Ahemeid cannot show that the government's NOI would work an "unfair advantage or impose an unfair detriment" on him. *Adelphia*, 748 F.3d at 116. Of course, any defendant who faces the death penalty faces a potential extreme detriment; the question for this analysis, however, is whether this detriment is "unfair." Here, death is within the range of punishments that the government is authorized to seek, and, given the heinousness of Ahemeid's crimes, it is one that is appropriate for the government to seek in this case. Ahemeid was afforded the opportunity to submit extensive briefing and to conduct presentations to the government in mitigation, before the Attorney General made a decision to file the NOI. As detailed above, Ahemeid cannot show that the NOI's timing caused him material prejudice—indeed, he is,

---

[13]     Ahemeid argues that the Court "adopted and relied" on the no-seek letter when the Court "permitted the Federal Defenders to withdraw from this case without any discussion of whether the No-Seek Notice could thereafter be reversed." Mot. at 55. When the Court granted this motion, however, Ahemeid had written the Court a lengthy letter detailing a breakdown in trust and communication with his former attorneys. *See* ECF No. 101. Ahemeid's former counsel then filed a motion to withdraw from the representation, citing an "impairment of [FDNY's] ability to communicate with" Ahemeid over the recent months. ECF No. 85. When a court is confronted with clear evidence of a "total lack of communication preventing an adequate defense," a court has no choice but to grant a motion for the substitution of counsel. *United States v. John Doe No. 1*, 272 F.3d 116, 122 (2d Cir. 2001). The Court likely had little choice but to relieve FDNY, whether the case was capital-authorized or not. Nevertheless, the Court promptly cured any potential prejudice, by appointing a new lead attorney with extensive experience in capital cases.

41

for all intents and purposes, identically situated to where he would be if the government had simply elected to file a NOI at the outset of the case, as it was permitted to do.  Ahemeid, accordingly, cannot establish the third factor of the judicial estoppel analysis.

### B.      Equitable Estoppel Does Not Bar the NOI

Ahemeid also relies on another species of estoppel, equitable estoppel, to argue that the government's NOI should be struck.  *See* Mot. at 59–62.  Ahemeid acknowledges, correctly, that "equitable estoppel carries a higher bar than judicial estoppel," Mot. at 59, as "equitable estoppel is not available against the government 'except in the most serious of circumstances.'" *Drozd v. I.N.S.*, 155 F.3d 81, 90 (2d Cir. 1998) (quoting *United States v. RePass*, 688 F.2d 154, 158 (2d Cir. 1982)); *see Est. of Carberry v. Comm'r*, 933 F.2d 1124, 1127 (2d Cir. 1991) ("The doctrine of estoppel is applied against the Government with the utmost caution and restraint." (internal quotation marks omitted)).  "The different standard for estoppel of the Government springs from the tenet that estoppel would frustrate the Government's ability to enforce the law and, in turn, undermine the public interest in full enforcement of the law."  *United States v. Boccanfuso*, 882 F.2d 666, 669 (2d Cir. 1989).

As applied against an ordinary (non-governmental) party, the doctrine of equitable estoppel requires proof that "(1) the [party] made a definite misrepresentation of fact, and had reason to believe that [the party's adversary] would rely on it; and (2) the [adversary] reasonably relied on that misrepresentation to his detriment."  *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995) (citing *Heckler v. Community Health Svs.*, 467 U.S. 51, 59 (1984)).  The second element, reasonable reliance, is not established "[i]f at the time when [the person] acted, such [person] had knowledge of the truth, or had the means by which with reasonable diligence he could

42

acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means." *Boccanfuso*, 882 F.2d at 670.

As applied against the government, the party invoking equitable estoppel must prove the elements described above, and must also prove "both that the Government made a misrepresentation upon which the party reasonably and detrimentally relied and that the Government engaged in affirmative misconduct." *City of New York v. Shalala*, 34 F.3d 1161, 1168 (2d Cir. 1994); *see Drozd*, 155 F.3d at 90; *United States v. Paredes-Batista*, 140 F.3d 367, 375 (2d Cir. 1998). Multiple courts of appeals have held that "affirmative misconduct" requires an extremely high showing, specifically, proof of conduct that "intentionally or recklessly misleads" a party. *Mich. Exp., Inc. v. United States*, 374 F.3d 424, 427 (6th Cir. 2004) (collecting cases); *see Wilkins v. United States*, 163 F.4th 636, 652 (9th Cir. 2025) (affirmative misconduct requires "an affirmative misrepresentation or affirmative concealment of a material fact by the government," such as a "deliberate lie" or "pattern of false promises"); *Bruning v. City of Omaha, Neb.*, 6 F.4th 821, 827 (8th Cir. 2021) ("Even 'negligence and possible bad faith' is insufficient to establish affirmative misconduct in the absence of evidence that the government intended to mislead the plaintiff." (quoting *Morgan v. Comm'r*, 345 F.3d 563, 567 (8th Cir. 2003))); *LaBonte v. United States*, 233 F.3d 1049, 1053 (7th Cir. 2000) ("Affirmative misconduct is 'more than mere negligence. . . . It requires an affirmative act to misrepresent or mislead.'" (quoting *Gibson v. West*, 201 F.3d 990, 994 (7th Cir. 2000))); *United States v. Marine Shale Processors*, 81 F.3d 1329, 1350 (5th Cir. 1996) (to satisfy the element of affirmative misconduct, "at minimum the official must intentionally or recklessly mislead the estoppel claimant"); *cf. Keener v. E. Associated Coal Corp.*, 954 F.2d 209, 214 n.6 (4th Cir. 1992) (finding no affirmative misconduct when a party conceded

that the government had not been "lying" and that its conduct, while "misleading," was not "malicious").

Here, Ahemeid can establish no element of equitable estoppel. First, Ahemeid fails to show that the government made a "definite misrepresentation of fact." *Buttry*, 68 F.3d at 1493. A "misrepresentation of fact" is ordinarily understood to be "[a] false statement about the occurrence, existence, or quality of an act, circumstance, event, or thing," that is, a factual statement that is false at the time it is made. *Black's Law Dictionary*, "misrepresentation of fact" (12th ed. 2024); *see also Ballentine's Law Dictionary*, "misrepresentation" (2010). The representation that the government made when it filed its no-seek letter was that "the Attorney General [had] authorized and directed the government not to seek the death penalty" against Ahemeid in this case. ECF No. 84. This factual representation was true at the time it was made. What Ahemeid attempts to argue is that the no-seek letter contained some form of implied promise or assurance that the government would not seek the death penalty at any point in the *future*. *See* Mot. at 60 ("[T]he government made a misrepresentation of fact by . . . notifying the Court and the defense that the Attorney General would not—meaning *never*—seek the death penalty in this case."). An alleged implied promise about future conduct, rather than a factual statement about a current state of affairs, is an assertion more suited to the doctrine of promissory estoppel, discussed below. As to equitable estoppel, however, Ahemeid cannot show any false statement of fact that any government attorney made in, or in relation to, the government's initial no-seek letter.

Second, Ahemeid cannot show that he "reasonably relied on [any alleged] misrepresentation to his detriment." *Buttry*, 68 F.3d at 1493. As discussed above, the time between the date that the government filed its initial no-seek letter (November 25, 2024) and the date when counsel for Ahemeid stated that he was on notice that this letter might be reconsidered

(February 12, 2025) was less than three months. *See* ECF No. 84; Tr. of Feb. 12, 2025 Status Conf. at 5–7; *Boccanfuso*, 882 F.2d at 670 (reliance must be "reasonable" and does not include any time during which a party "had the means by which with reasonable diligence he could acquire the knowledge" that a representation was false). As further detailed above, Ahemeid's legal team could not plausibly have been engaged in mitigation preparation during this time, as the amount of time was short, and included the December holidays, and the legal team needed to reconfigure itself to account for the change in counsel. *See* ECF No. 91. Under these circumstances, it is facially implausible that Ahemeid's reliance on the government's letter was to his significant detriment. Ahemeid cannot establish the second element of an equitable estoppel claim.

Third, Ahemeid cannot show that the government engaged in "affirmative misconduct," *Shalala*, 34 F.3d at 1168, in the sense of an act, as the legal standard requires, that misled him "intentionally or recklessly." *Mich. Exp.*, 374 F.3d at 427; *see Wilkins*, 163 F.4th at 652; *Bruning*, 6 F.4th at 827; *LaBonte*, 233 F.3d at 1053; *Marine Shale Processors*, 81 F.3d at 1350; *Keener*, 954 F.2d at 214 n.6. Ahemeid offers no basis in his Motion to believe that the government, at the time that it filed the initial no-seek letter, intentionally sought to mislead him, *see Mich. Exp.*, 374 F.3d at 427; *Bruning*, 6 F.4th at 827, or engaged in a "deliberate lie," *Wilkins*, 163 F.4th at 652, as the established case law requires. Nor could he, as throughout the entire capital review process, the government (consistent with its obligation of confidentiality, *see* Justice Manual § 9-10.050) endeavored to ensure that the Court and counsel for Ahemeid were properly and truthfully informed as to the information that government counsel had about each stage of the process. In no way can Ahemeid meet the high bar that equitable estoppel requires.

45

### C.     Promissory Estoppel Does Not Bar the NOI

Ahemeid turns also to the doctrine of promissory estoppel to support his claim. *See* Mot. at 62–65. This argument also fails. Promissory estoppel, a creature of contract law, provides that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Restatement (Second) of Contracts* § 90 (1981). "In New York, promissory estoppel has three elements: [1] 'a clear and unambiguous promise; [2] a reasonable and foreseeable reliance by the party to whom the promise is made, and [3] an injury sustained by the party asserting the estoppel by reason of the reliance.'" *Cyberchron Corp. v. Calldata Sys. Dev., Inc.,* 47 F.3d 39, 44 (2d Cir. 1995) (collecting cases) (quoting *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989)); *see* 28 N.Y. Prac., Contract Law § 4:31; Mot. at 63 (setting forth this same test).

Ahemeid cannot satisfy these elements. The "promise" that he alleges the government made in its initial no-seek letter was that the government would not seek the death penalty against him and would never revisit or reconsider this determination. Mot. at 63–64. This is an allegation of an implied promise, given that the no-seek letter did not explicitly state this. ECF No. 84. But New York law requires that promises be "clear and unambiguous" in order for promissory estoppel to apply.[14] *Cyberchron Corp.*, 47 F.3d at 44; *see, e.g.*, *Bd. of Managers v. Palazzolo*, 346 F. Supp. 3d 432, 469 (S.D.N.Y. 2018); *United States v. Rosario*, 237 F. Supp. 2d 242, 248 (E.D.N.Y. 2002). Additionally, for the reasons set forth above, Ahemeid cannot show

---

[14]     Contrast, for example, the government's no-seek letter with a letter of immunity or proffer letter, to which courts have at times applied promissory estoppel if the terms of those documents were sufficiently clear. *See United States v. Doumanis*, No. 17-CR-87 (ALC), 2018 WL 623551, at *1 (S.D.N.Y. Jan. 29, 2018); *Rosario*, 237 F. Supp. 2d at 238.

that he reasonably relied on this alleged promise (the second element of the claim), nor can he show that any such alleged reliance injured him (the third element of the claim), given the careful steps that the Court took to protect his rights. Ahemeid's attempt to apply promissory estoppel in this context does not have merit.

**VI.    Ahemeid's Claims Under the Fifth, Sixth, and Eighth Amendments Fail**

Ahemeid, as a last resort, turns to the Fifth Amendment's Due Process Clause, the Sixth Amendment's guarantee of the right to counsel, and the Eighth Amendment's Cruel and Unusual Punishments Clause for his argument. *See* Mot. at 65–76. These arguments each lack merit.

First, the government's NOI did not violate the Fifth Amendment's Due Process Clause. It is unclear how the NOI could violate the right to procedural due process, when Ahemeid will have a full jury trial on both liability and penalty phases, and, in particular, where a trial date has not yet been set, no fact-intensive motions have been filed, and no significant prejudice has been shown. Indeed, "[s]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Armstrong,* 517 U.S. at 464; *see Wayte v. United States*, 470 U.S. 598, 607 (1985). Before the NOI was entered, Ahemeid also had a meaningful opportunity to be heard, in the form of detailed mitigation submissions and presentations, including during the reconsideration process. Ahemeid argues that the Due Process Clause prohibits "government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense," but this is a test for substantive due process, which has no clear application here. *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995). Substantive due process does not protect against government action that is simply "incorrect or ill-advised" *id.*, as it protects against "executive action only when it can properly be characterized as

47

arbitrary, or conscience shocking, in a constitutional sense." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (internal quotation marks omitted); *see id.* at 849 ("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."). Here, where the government has sought the death penalty against a violent terrorist responsible for the deaths of dozens of people in three different attacks, one of whom was a United States citizen and the mother of a young child, no reasonable person could find the government's NOI untethered to and unjustified by a significant government interest. Ahemeid, in short, has no viable claim under the Due Process Clause.

The same is true for Ahemeid's claim under the Sixth Amendment's right to counsel. The Court should be hard-pressed to understand how Ahemeid's right to counsel has been violated, when he is represented by multiple attorneys with immense capital-case experience, a mitigation specialist, an investigator, and other resources. Ahemeid bases his Sixth Amendment claim entirely on his legal team's inability to travel to Mali to conduct additional mitigation investigation. *See* Mot. at 68–70. But, had the government filed its NOI on the date it filed its initial no-seek letter, defense counsel would *still* have been unable to travel to Mali due to the country's extremely dangerous security environment over the past four years. The Sixth Amendment requires counsel only to act at a level of objective reasonableness: it does not require counsel to take steps that are impossible, infeasible, or outside the control of any party. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984). Ahemeid's counsel may have operated for a brief period under the belief that the government would not seek the death penalty—but so too did the prosecution team. Neither failed in their constitutional duties.

Finally, Ahemeid's Eighth Amendment claim also fails. Ahemeid bases his claim on "the period of time in which Mr. Ahemeid was forced to wait for the Government's decision

on whether it would seek the death penalty against him." Mot. at 73. Putting aside that some part of this delay was attributable to Ahemeid, given that Ahemeid's mitigation submission to the USAO was not made until more than a year after Ahemeid was arrested, Ahemeid's argument falls short of the applicable standard. Among other things, to state an Eighth Amendment claim, Ahemeid must show that the government acted with a "sufficiently culpable state of mind," *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (internal quotation marks omitted), and that the conduct at issue was objectively "harmful enough" or "sufficiently serious" to reach constitutional dimensions, *id.* at 8, 20, such as "the unnecessary and wanton infliction of pain," *Ingraham v. Wright*, 430 U.S. 651, 670 (1977), a showing greater than ordinary lack of due care, *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Ahemeid has made no such showing here.

\* \* \*

As the United States Supreme Court has stated, "the penalty of death is different in kind from any other punishment imposed under our system of criminal justice." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976). The decision of a prosecutor to pursue capital punishment, accordingly, is one of the most significant decisions that a prosecutor can ever make, and it is one that carries profound consequences for the rights of the defendant. Courts must ensure that "every safeguard is observed" in the penalty's application. *Id.* Here, Ahemeid stands charged with horrific offenses involving mass loss of life, acts that helped to destabilize an entire region. The Court has consistently taken steps to protect Ahemeid's rights, ensuring that he has every tool reasonably available to mitigate his case and mount an effective defense. The filing of a NOI against Ahemeid was lawful and appropriate, and the Court should deny Ahemeid's Motion.

49

**CONCLUSION**

For all the foregoing reasons, Ahemeid's Motion should be denied.


Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:  _____/s/_____
Sara K. Winik
Daniel K. Amzallag
Assistant U.S. Attorneys
(718) 254-7000